UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
2004 JAN 12 P 3: 02
U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| DENNIS ROSSITER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 04 CR 1 0 0 6 9 DPW |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

A.    <u>Preliminary Statement:</u>

This action for damages and other relief is brought pursuant to

Massachusetts General Law ch. 151 B as well as the Age Discrimination in

Employment Act 29 U.S.C. § 621 et seq.

The Court is asked to exercise its pendant jurisdiction over the State

Claims because the State Claims arise from a Common nucleus of operative

facts as the Federal Claims.

B.    <u>Parties to the Action:</u>

1.    PLAINTIFF

The Plaintiff Dennis Rossiter is a resident of Hancock, New

Hampshire.  At all relevant times the Plaintiff was employed by the

Defendant Corporation in Massachusetts.

2.    DEFENDANT

The Defendant International Business Machines Corporation is a

Corporation doing business in the Commonwealth of Massachusetts.  During

all relevant time the Defendant Corporation employed the Plaintiff in its

corporate offices located in the City of Waltham, County of Middlesex,

Commonwealth of Massachusetts.

## COUNT I--M.G.L. 151B Claim

3.    Dennis L. Rossiter (hereinafter the Plaintiff), was at all relevant times,

over 40 years of age, his date of birth is January 16, 1942.

4.    In 1995 the Plaintiff began working in the Marketing Group of the

Defendant International Business Machines Corporation's (hereinafter IBM)

Microelectronics Division.

5.    The Plaintiff was the oldest employee in the Marketing Group.

6.    During the time the Plaintiff worked for IBM, he received excellent

performance evaluations, and positive input from his supervisors and fellow

employees.

7.    On January 3, 2002 the Plaintiff was laid off.

8.    Preceding the Plaintiff's lay off, he was functionally demoted, treated

differently than younger employees in his Group, and not offered the

2

opportunity to compete for positions offered to younger employees, and for which he was well qualified.

9.   Although the Plaintiff was laid off, his job was, in fact, not eliminated.

10.   Two younger employees took over the job duties and responsibilities that the Plaintiff had previously performed.

11.   One of the younger employees who took over the Plaintiff's job had previously been removed from a job identical to the one the Plaintiff was losing. This employee was being re-assigned to the Plaintiff's job after having failed to perform adequately in her prior assignment.

12.   The other employee displacing the Plaintiff was a recent college graduate in his early twenties, who had been with IBM less than a year.

13.   Younger, less experienced employees filled jobs for which the Plaintiff was well qualified.

14.   Some of the jobs that were filled by employees who were younger than the Plaintiff were not posted to the IBM "Jobs Book".

15.   Filling positions without first posting them in the IBM's "Jobs Book" was a violation of company policy.

16.   Within IBM Microelectronics Division's Marketing Group, employees in the 50+-age category comprised 22% of the employee

population, but were subjected to 60% of the lay-offs within their age grouping.

17.    The decision to lay off the Plaintiff and retain other younger employees was made on account of the Plaintiff's age.

18.    The Plaintiff has suffered lost wages and emotional distress as a result of the Defendant's actions.

## COUNT II--ADEA CLAIM

19.    The Plaintiff realleges, reasserts and incorporates by reference the facts and allegations set forth in paragraphs 1 through 18 above.

20.    As a result of the Defendants' actions the Plaintiff has suffered lost wages and emotional pain and suffering.

Wherefore, the Plaintiff demands that this Court order:

a.    that the Defendants compensate Plaintiff for any loss of wages and/or benefits incurred as a result of his termination;

b.    that the Plaintiff be awarded an amount of money which will fairly compensate him for his emotional and physical pain and suffering;

c.    that the Defendant pay the Plaintiff costs and attorney's fees resulting from this action;

d.    that the Defendant pay the Plaintiff interest on any judgment entered from the time of the filing of this suit;

e.    that the Defendant be ordered to pay the Plaintiff punitive damages;

4

    f.      that the Defendant be ordered to pay the Plaintiff exemplary damages;

    g.     that the Defendant be ordered to reinstate the Plaintiff to his position in the Marketing Group of IBM; and

    h.    such relief as may be just and proper and/or which will make the Plaintiff whole.

The Plaintiff Requests a Jury Trial on All Issues and Causes of Action Contained in this Complaint.

Respectfully submitted,

The Plaintiff
By his attorneys,

Kevin G. Powers, BBO# 405020
Robert S. Mantell, BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA  02108
(617) 742-7010

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Dennis Rossiter,** )<br>           **Plaintiff** )<br>)<br>**v.** )<br>)<br>**International Business Machines** )<br>**Corporation,** )<br>           **Defendant** )<br>)| **C.A. No. 04-CR-10069DPW** |

## PLAINTIFF DENNIS ROSSITER'S ANSWERS TO DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATIONS FIRST SET OF INTERROGATORIES

Plaintiff Dennis Rossiter hereby answers, and objects to, through his

attorneys, Defendant International Business Machines Corporation's (hereinafter

referred to as "IBM") First Set of Interrogatories.

## GENERAL OBJECTIONS

1.    Plaintiff objects to each interrogatory to the extent that it seeks obligations beyond those imposed by the Federal Rules of Civil Procedure.

2.    Plaintiff objects to those interrogatories that seek information that is protected by either the attorney-client privilege or the attorney work-product doctrine.

3.    Plaintiff objects to those interrogatories that are not reasonably calculated to lead to the discovery of admissible evidence relevant to the claims and/or the defenses in this action.

## ANSWERS TO INTERROGATORIES

### Interrogatory No. 1

Identify yourself by stating your full name, date of birth, residence address, and Social Security number.

**Answer:**    Dennis Laurence Rossiter; DOB: January 16, 1942; Residence: 7 Boutwell Road, P.O. Box 8, Hancock, NH 03449; SS No.: 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.

### Interrogatory No. 2

Identify any person who has assisted you in gathering information and/or preparing your answers to these interrogatories, and any person who has assisted you in gathering information or searching for documents in order to respond to the accompanying Defendant's First Request for the Production of Documents.

**Answer:**    No one assisted Plaintiff in gathering information or searching for documents. Plaintiff prepared the answers to his interrogatories and provided them to his counsel.

### Interrogatory No. 3

Identify all persons who were witnesses to any of the occurrences, events, facts or circumstances described in your Complaint and/or who have knowledge of any facts pertaining thereto, and state the specific occurrences, events, facts or circumstances to which each person was a witness.

**Answer:**    IBM Microelectronics managers: Mark LeFebvre, Patricia McGloin, and James P. Monahan, and the IBM Microelectronics Human Resources Department.

2

**Interrogatory No. 4**

Identify all persons, including but not limited to friends, family members, and medical or mental health care providers, with whom you discussed any of the occurrences, events, facts or circumstances described in your Complaint and/or who have knowledge of any facts pertaining thereto.

**Answer:**    In January 2002, Plaintiff discussed the occurrences, events, facts or circumstances described in his Complaint with his two sisters, Carol F. Bonnar of Boston, Massachusetts, and Nancy R. Mobley of Westwood, Massachusetts.  He has also discussed his case with his spouse, Alison F. Rossiter.

**Interrogatory No. 5**

Identify every document which supports your contention that IBM terminated your employment, or otherwise acted concerning the terms and conditions of your employment on the basis of age.

**Answer:**    IBM Microelectronics Division Resource Action ("MERA") information package, as provided by IBM to Plaintiff, November 28, 2001.

**Interrogatory No. 6**

Identify every document, not identified in the preceding Interrogatory No. 5, which you contend evidences wrongful conduct of any kind directed at you by IBM or which otherwise supports the claims asserted in the Complaint.

**Answer:**    Plaintiff objects to this interrogatory on the grounds that it seeks information that is in the possession and/or under the control of IBM.  Without

3

waiving his objection, Plaintiff refers IBM to his Human Resources file for the

performance review conducted by Plaintiff's manager, James P. Monahan,

wherein Mr. Monahan reduced Plaintiff's employment job "band" and

eliminated Rossiter's manager title, stating that the action was part of an averred

organizational restructuring; that is, reducing the number of management

positions. Subsequently, additional management positions were created by IBM

and filled by younger, less qualified individuals. For his demotion, Plaintiff

refers IBM to its records pertaining to Plaintiff, for April 1, 1998. Plaintiff also

refers the Defendant to his response to Document Request No. 3 and produced

documents.

**Interrogatory No. 7**

To the extent that you are claiming that you were denied promotions or

otherwise deprived of the opportunity to be laterally transferred to another

position within IBM on the basis of age discrimination, identify with respect to

each such promotion or lateral transfer:

> (a)     the job title;
>
> (b)     when the position became available;
>
> (c)     the person who filled the position;
>
> (d)     what steps, if any, did you take to apply for the position; and
>          to the extent you applied, the results of your application.

**Answer:**     Plaintiff objects on the grounds that the interrogatory seeks

information, which is in the possession and/or under the control of IBM; Plaintiff

has requested that IBM provide the information; and IBM has failed to provide the requested information. Without waiving these objections, Plaintiff states that he has requested information from IBM concerning the following positions:

> Director, Integrated Marketing Communications – Technology Group;
> Corporate Events Operations Manager (James Hasl, Director);
> Technology Group Events Manager;
> Technology Group Collateral Manager;
> PowerPC Marketing Communications Manager and/or Programs Manager;
> Technology Group Brand Marketing & Corporate Programs Manager;
> Technology Group Interactive Marketing Manager; and
> IBM Microelectronics Server Group Marketing Services Manager.

## Interrogatory No. 8

Identify all health care providers, including mental health care providers, you have consulted from November 1, 1992 through the present and for each health care provider, state the reason you sought treatment, the nature of treatment you received, the dates you received treatment, and whether you are claiming that you received this treatment as a consequence of IBM's alleged unlawful conduct.

**Answer:**    Plaintiff suffers from a chronic dermatological condition commonly called eczema, which can be exacerbated by stress. Plaintiff had flare-ups of this condition subsequent to his demotion and subsequent to his termination. His treating physician is Dr. Richard Seymour at the Cheshire Medical Center/Dartmouth-Hitchcock, at 580 Court Street, Keene, New Hampshire 03431. Following Plaintiff's termination, he saw Dr. Seymour on

April 22, 2002; December 17, 2002; April 23, 2003; July 28, 2003; July 29, 2003, September 18, 2003; October 9, 2003; and March 24, 2004, respectively.

**Interrogatory No. 9**

Identify all prescription medications you have taken since November 1, 1992, including in your answer the duration and frequency of your use of the medication and the name of the physician who prescribed the medication.

**Answer:**    Plaintiff's primary care physician, Dr. Frederick Bruch of the Cheshire Medical Center, prescribed valium for Plaintiff on March 6, 2002.

**Interrogatory No. 10**

Identify each element of damages including, without limitation, lost wages, emotional distress, and attorneys' fees and costs, which you claim to have suffered as a direct result of IBM's alleged unlawful conduct, and for each type of damage, identify:

    (a)    the amount of damages you claim to have suffered;

    (b)    the facts and method of calculation on which you base the claim that you have suffered that amount of damage; and

    (c)    any documents that support your claim.

**Answer:**    Plaintiff objects to this interrogatory to the extent that it seeks information that is protected by the attorney-client privilege and the attorney work-product doctrine.  Without waiving his objection, Plaintiff states that the precise amount of certain damages has not yet been determined.  Plaintiff asserts that as a result of IBM's discriminatory conduct, he has suffered loss of salary,

loss of retirement benefits, and loss of benefits; lost career opportunities, from the time of his termination to the present; and loss of career opportunities into the future due to his age at the time of termination, diminishment of his professional reputation through his termination, and age discrimination in the labor market.

Plaintiff's demotion and termination caused economic damages and physical and emotional damage in the following specific ways:

Plaintiff's Demotion

In Plaintiff's IBM performance evaluation, dated January 13, 1998, his then immediate supervisor, James P. Monahan, made the following entry in Plaintiff's performance evaluation:

> *Following a department reorganization and a general flattening of management levels across marketing late in 1Q, Dennis was given project management responsibility for a number of important customer programs.*

Although not stated explicitly in the written performance evaluation, Mr. Monahan informed Plaintiff in his verbal presentation of the performance evaluation that Plaintiff would be stripped of his management title and bonus range and that Plaintiff's job band level would be reduced from a level 10 to a level 9 due to organizational requirements expressed by Mr. Monahan as "*a general flattening of management levels.*" This band reduction was later documented in Plaintiff's employee record in April 1998.

Additionally, Mr. Monahan told Plaintiff verbally that he, Mr. Monahan did not know what to do with Plaintiff – that Plaintiff was "over-qualified" for the work available.  "Project management" meant "special assignments," which is

IBM-speak for "your job is endangered because we're telling you that we don't know what to do with an 'over-qualified' employee."

This particular review was deeply frustrating and hurtful to Plaintiff because he had been through a year managing "*less experienced employees in remote locations, saddled with an over-taxed budget and few people resources.*" (Same performance evaluation).

Because reorganizations are a fact of life in large corporations and because there were no strong negatives in Plaintiff's performance evaluation indicating a basis for firing Plaintiff, Plaintiff felt there was nothing that he could do to reverse this decision to "flatten management levels." Thereafter, Plaintiff carried on to successfully complete his new work assignments, as reflected in future performance evaluations. However, Plaintiff's demotion resulted in additional disparate treatment of Plaintiff:

(1)    While Plaintiff's salary was not reduced, the latitude for future salary increases was severely restricted due to the way IBM structured its salary/compensation program. Essentially, Plaintiff's salary expansion was partially frozen and limited to modest, if any, increases in future years. His salary increase would never approach, on a percentage basis, those of other department members who received comparable performance ratings.

(2)    Plaintiff was assigned to a small, cramped cubicle with a large post jutting into the space, further restricting his work area. The cubicle was not in

Plaintiff's department's area, but rather, was amid the contract workers and the order-processing department – a noisy interior space away from the windows.

(3)    Plaintiff was assigned to work on "naming;" that is, designating names for new products as they were brought to market, in keeping with IBM's brand image. This work was formerly assigned to a low-level employee and was described by Alex Tognino, an IBM attorney, at an April 2001 corporate meeting in Armonk, New York, as "*the septic tank of IP law.*"

(4)    Plaintiff's IBM career was on a backslide at that point. All of the work that he had done to become a knowledgeable and skilled employee over the years, the travel away from home, the late hours, and the frustrations dealing with limited resources to do his job went unappreciated and unnoticed.

(5)    Plaintiff felt extremely frustrated and stressed, but he accepted the decision as necessary for the organization, and he needed a job.

(6)    However, subsequent to Plaintiff's demotion, IBM promoted younger, less experienced employees to manager positions. New jobs were created for which Plaintiff was well-qualified, but never considered, because the jobs were not posted. Rather, IBM gave the jobs to younger, less qualified employees. Plaintiff then realized that when he put the pieces together: the demotion, the cramped work space away from his department; the partially frozen salary; the low-level work assignments; and new jobs being awarded to younger employees, without posting, IBM was sending him a clear message: As one of the oldest employees in the marketing group, he was not valued, even though his

experience and skill set exceeded those of other employees who were now new managers.

(7)   As a result of this realization, Plaintiff felt depressed, angry, and deeply frustrated. He was embarrassed and demeaned by these intentional actions, and he felt that his IBM manager was doing everything short of involuntary termination to force Plaintiff out of the company.

(8)   Plaintiff suffered from sleeplessness, diminished ability to concentrate, stress-related flare-ups of a chronic dermatological condition, and tension in his relationship with his wife.

Plaintiff's Termination

Plaintiff's termination occurred at a time when he was particularly vulnerable. As one of the oldest employees in the marketing group, and just days away from his 60th birthday at the time of his termination, Plaintiff and his wife were making plans to build a small retirement home and map out their financial future in retirement. Plaintiff's termination changed everything:

(1)   All plans for building the retirement home came to a dead stop.

(2)   Plaintiff and his wife had to discard any projections for retirement financial planning because such projections had become untenable when Plaintiff's income went to zero over night.

(3)   At 60 years of age, Plaintiff's job opportunities were very limited, even though he applied for numerous jobs, which were well below his IBM compensation level.

(4)     As Plaintiff's job search extended fruitlessly over several months, Plaintiff and his wife started to spend down their financial reserves to meet their obligations.

(5)     Their sale of securities to raise cash increased their tax exposure for capital gains, and another expense piled on top of their already drastically-reduced budget.

(6)     Finally, after months of an unsuccessful job search, Plaintiff decided that he had to change his strategy for producing income because neither employment nor a steady job was forthcoming.

(7)     Plaintiff, therefore, attended classes to prepare for becoming a real estate agent and successfully passed the New Hampshire and the national real estate exams for licensure in the Summer of 2002.

(8)     Plaintiff signed on as a contract real estate agent in New Hampshire and has been listing and selling real estate since that time.

(9)     Plaintiff's first year's earnings as a real estate agent were 20% of what he was earning at IBM – barely enough to pay for the most basic of living expenses.

(10)    As a new agent, Plaintiff was competing with hundreds of established agents, and he realized that it will take him years to build an income stream anywhere near what he was earning at IBM.

In summary, Plaintiff's termination had an immediate and severe impact on his family's finances, his retirement plans, and the future financial security of

11

Plaintiff and his wife. They had to spend down their retirement savings, cut life insurance expenses, and delay paying property taxes – risking property seizure. Plaintiff's IBM pension has been diminished, and Plaintiff's family lost their health, dental, and life insurance benefits. As a result, the material quality of their lives today is restricted, fraught with financial stresses, and fundamentally and irrevocably altered for the worse.

In addition to economic duress, Plaintiff has suffered, continues to suffer, and will suffer in the future emotional distress as a result of IBM's constructive and actual termination of his career. Plaintiff's physical and emotional pain has taken various forms and has caused multiple symptoms. Plaintiff withdrew from his family and friends and suffered from stress-related flair ups of a chronic dermatological condition. Plaintiff took medication to treat the condition, but his deep sadness, frustration, and feeling that he had let his wife down did not abate. Plaintiff felt worthless after many years of successful advancement in high technology. He gained weight. Plaintiff's intimate relations with his wife ceased. Plaintiff would wake up in the middle of the night going over in his mind how IBM had promoted younger, less experienced employees, tried to force Plaintiff to leave, and when that did not work, terminated his employment. Plaintiff could not even enjoy simple pleasures, such as reading a book, because he could not concentrate for any period of time without lapsing into a rehashing of IBM's discriminatory conduct towards him.

Plaintiff has suffered and continues to suffer anxiety about his unpredictable/unstable income, and he faces a future without opportunity to retire. At the age of 60, Plaintiff was forced to abandon his career in the high technology industry, which had provided him with enormous satisfaction, and begin all over again as an entry-level sales person in real estate. Plaintiff was dedicated to IBM; his identity was closely tied to his work; and Plaintiff's termination dealt a savage blow to his self-esteem. As a result of his termination, Plaintiff lost the collegiality of his professional peers and the meaningfulness that he had derived from his career.

## Interrogatory No. 11

Identify all efforts on your part or on your behalf to obtain employment after October 1, 2001. With respect to each effort, identify:

    (a)    each prospective employer contacted;

    (b)    each communication, written or oral, relating to such efforts, and the results of your efforts.

**Answer:**    Plaintiff refers IBM to the Defendant's archived documents on Plaintiff's former IBM computer and to Plaintiff's response to Document Request No. 15 and produced documents.

## Interrogatory No. 12

Identify all employment you obtained after your termination from IBM. With respect to each, identify:

    (a)    the name, address, and telephone number of your employer;

    (b)    your job title;

    (c)    the total compensation you received and your weekly or annual salary;

    (d)    the name of your supervisor; and

    (e)    the dates of employment and the reason(s) for your termination, if applicable.

**Answer:**    Plaintiff is self-employed, as a licensed New Hampshire Real Estate Broker. Plaintiff was briefly affiliated with another Coldwell Banker agency in Amherst, New Hampshire, and then transferred in the Fall of 2002 to his current agency, Coldwell Banker Residential Brokerage, 104 Route 101A, Amherst, New Hampshire 03031. Plaintiff's supervisor is Carole Byatt.

**Interrogatory No. 13**

Describe fully and in complete detail all sources of income and/or support received by you since your termination from IBM, including but not limited to the following:

    (a)    the source of the income;

    (b)    the amounts received; and

    (c)    the dates upon which the income was received.

**Answer:**    Plaintiff's income stream from 2002 to the present has been:

2002    $5,194 IBM vacation pay & $19,968 unemployment compensation;

2003    $21,718 real estate commissions & $9,841 sale of personal property;

2004    $11,440 real estate commissions.

**Interrogatory No. 14**

If you have engaged the services of an employment agency, job counselor or search firm, please list the name and address of the firm or individual counselor, the contact person and the date of initial contact.

**Answer:**    Plaintiff refers IBM to his response to Document Request No. 15 and produced documents.

**Interrogatory No. 15**

Identify any and all expert witnesses you intend to call to testify at the trial in this case, and for each expert, state the substance of the facts and opinions to which said expert is expected to testify, and a summary of the grounds for each opinion.

**Answer:**    Plaintiff has not made a final determination concerning the expert witness(es) he will call to testify at the trial of this action and will provide the requested information upon determination.

**Interrogatory No. 16**

Identify all non-expert witnesses you plan to call at trial and the subject matter of their expected testimony.

**Answer:**    Plaintiff has not made a final determination concerning the non-expert witnesses he will call to testify at the trial of this action and will provide the requested information upon determination.

15

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, on this

_13th_ , day of October 2004.

_Dennis L. Rossiter_
Dennis Rossiter

Signed before me 10/13/04
Michael Elcan
comm exp. 12/06/05

Respectfully submitted,

Dennis Rossiter
By his Attorneys,

_Kevin Powers_
Kevin G. Powers, BBO #405020
Linda Evans, BBO #635078
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

IntAns

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on    10 | 14 | 04    .

_Linda Evans_

16

EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENNIS ROSSITER                                  )
        Plaintiff                          )
                                                 )
v.                                               )          C.A. No. 04 CR 10069DPW
                                                 )
INTERNATIONAL BUSINESS                           )
MACHINES CORPORATION                             )
        Defendant                          )
                                                 )

## AFFIDAVIT OF DANIEL S. TARLOW IN SUPPORT OF MOTION TO COMPEL

1.      My name is Daniel S. Tarlow and I am counsel to Defendant International

Business Machines Corporation ("IBM") in this case.

2.      Attached hereto as Exhibit A is a true and accurate copy of an e-mail I sent to

plaintiff's counsel, Kevin Powers, on January 27, 2005 concerning the subpoena

issued to the Dartmouth-Hitchcock Clinic.

3.      Attached hereto as Exhibit B is a true and accurate copy of an e-mail I sent to

plaintiff's counsel, Kevin Powers, on January 27, 2005 concerning the documents

relating to plaintiff's case against Digital Equipment Corporation ("DEC").

4.      Attached hereto as Exhibit C is a true and accurate copy of an e-mail I sent to

plaintiff's counsel, Kevin Powers, on February 1, 2005 concerning the lack of

response to my e-mails of January 27, 2005.

5.      Attached hereto as Exhibit D is a true and accurate copy of a letter I sent to

plaintiff's counsel, Kevin Powers, on February 8, 2005 concerning the lack of

response to my e-mails of January 27 and February 1, 2005.

6.    Attached hereto as Exhibit E is a true and accurate copy of an e-mail I sent to plaintiff's counsel, Kevin Powers, on February 9, 2005 notifying him that I was seeking a discovery dispute conference pursuant to Local Rule 37.1.

7.    Attached hereto as Exhibit F is a true and accurate copy of correspondence my firm received from the MCAD concerning plaintiff's age discrimination case against Digital Equipment Corporation. The MCAD stated that it destroyed the case file pursuant to its normal document retention policy. The MCAD produced a database report that showed the case was closed (conciliated) on 12/24/99.

8.    My law firm (then known as Peckham, Lobel, Casey, Prince & Tye) initially represented DEC in the case brought by plaintiff, but the lawyer (David Casey) handling the matter moved to then Bingham Dana in 1999 and took the case and the files with him. I did not work at the firm at that time.

9.    Attached hereto as Exhibit G is a true and accurate copy of the only medical record (a dermatological report) produced by plaintiff in this case.

10.    Attached hereto as Exhibit H is a true and accurate copy of excerpts (pages118-132) from Day II of the plaintiff's deposition concerning his emotional and physical injuries.

11.    Attached hereto as Exhibit I is a true and accurate copy of excerpts (pages109-111, and 123-125) from Day II from the plaintiff's deposition concerning his earlier case against DEC.

12.    Attached hereto as Exhibit J is a true and accurate copy of a subpoena I had issued to the Keeper of the Records of the Dartmouth-Hitchcock Clinic (the "Clinic")

because plaintiff had only produced the one medical record described above. Plaintiff did not seek a protective order with respect to the subpoena to the Clinic.

13.    I spoke with a representative of the Clinic shortly after the subpoena was served in late December 2004. The Clinic indicated that the records would be produced but that it needed more time (the return date was 1/4/05, the close of discovery in this matter). I told the Clinic that as long as it was going to produce the documents it could have additional time to do so.

14.    When I had not received records from the Clinic by January 27, 2005, I called the Clinic again and spoke to a Mandy Alley, from the medical records department, who was handling the subpoena. Ms. Alley stated that the subpoena misnamed the Clinic as the "Dartmouth-Hitchcock Hospital", and therefore, the Clinic decided not to produce any records without Mr. Rossiter's approval. She said that she spoke with Mr. Rossiter who instructed the Clinic not to release his medical records.

15.    Plaintiff's counsel, Kevin Powers, as of the date of the filing of the accompanying motion to compel, has not responded in any fashion to my correspondence of January 27, February 1, 8 or 9, 2005 concerning these discovery disputes.


        SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 18TH
DAY OF FEBRUARY, 2005.

                                    _____
                                    Daniel S. Tarlow

EXHIBIT A

## Tarlow, Daniel S.

| | |
|---|---|
| **From:** | Tarlow, Daniel S. |
| **Sent:** | Thursday, January 27, 2005 1:30 PM |
| **To:** | 'KGPowers@theemploymentlawyers.com' |
| **Cc:** | Rubin, Laurie F. |
| **Subject:** | IBM-Rossiter--Dartmouth-Hitchcock. |

Kevin--As you know, I issued a subpoena to Dartmouth-Hitchcock. I just spoke to someone from the medical records department about the delay in production. She indicated that they asked your client for permission to release his medical records and he declined as per his attorney's instructions. Please call me to discuss this development.

Daniel S. Tarlow, Esq.
Prince Lobel Glovsky & Tye, LLP
585 Commercial Street
Boston, MA 02109
Direct Dial: 617-456-8013
Fax: 617-456-8100
E-mail: dstarlow@plgt.com

*Right firm, right size, right choice.*

The information contained in this e-mail message is intended for the confidential use of the addressees only. The information subject to the attorney-client privilege and/or may be attorney work-product. Recipients should not file copies of this e-mail with publicly accessible records. If you are not an addressee or an authorized agent responsible for delivering this e-mail to a designated addressee, you have received this e-mail in error, and any further review, dissemination, distribution, copying or forwarding of this e-mail is strictly prohibited. If you received this e-mail in error, please notify us immediately at (617) 456-8000. Thank you.

## Tarlow, Daniel S.

**From:**    Tarlow, Daniel S.
**Sent:**    Thursday, January 27, 2005 11:14 AM
**To:**      'KGPowers@theemploymentlawyers.com'
**Cc:**      Rubin, Laurie F.; 'Terence J Corrigan'
**Subject:** RE: IBM-Rossiter

Kevin—As you know, Fed. R. Civ. P. 34 requires a party to produce documents in his possession, custody or control. Mr. Rossiter was represented by counsel in his age discrimination case against DEC. Clearly, Mr. Rossiter, the client, has the right to obtain the file or a copy of the file from the lawyer/firm that represented him in that matter. It appears he was represented by John McKelway at Gadsby & Hannah.  Please have your client obtain a copy of his file from Gadsby and please produce the file to us as soon as possible.

Thank you.

Dan Tarlow.

---

**From:** Kevin Powers [mailto:KGPowers@theemploymentlawyers.com]
**Sent:** Monday, January 24, 2005 10:08 AM
**To:** 'Tarlow, Daniel S.'
**Subject:** RE: IBM-Rossiter

Dan
I recall that Dennis testified that he was not sure he had the DEC documents but that he would look for them.  I spoke to Dennis last week he has looked for them and was unable to locate them.

Kevin

Kevin G. Powers
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA  02108
617-742-7010
fax: 617-742-7225

---

**From:** Tarlow, Daniel S. [mailto:DSTarlow@plgt.com]
**Sent:** Monday, January 24, 2005 8:37 AM
**To:** Kevin
**Subject:** FW: IBM-Rossiter

Kevin—Please respond to the below e-mail.

---

**From:** Tarlow, Daniel S.
**Sent:** Sunday, January 09, 2005 10:27 AM
**To:** 'KGPowers@theemploymentlawyers.com'
**Subject:** IBM-Rossiter

Kevin—When will I receive the documents Dennis is gathering concerning his MCAD case against DEC?

Daniel S. Tarlow, Esq.
Prince Lobel Glovsky & Tye, LLP

2/16/2005

585 Commercial Street
Boston, MA 02109
Direct Dial: 617-456-8013
Fax: 617-456-8100
E-mail: dstarlow@plgt.com

*Right firm, right size, right choice.*

The information contained in this e-mail message is intended for the confidential use of the addressees only. The information subject to the attorney-client privilege and/or may be attorney work-product. Recipients should not file copies of this e-mail with publicly accessible records. If you are not an addressee or an authorized agent responsible for delivering this e-mail to a designated addressee, you have received this e-mail in error, and any further review, dissemination, distribution, copying or forwarding of this e-mail is strictly prohibited. If you received this e-mail in error, please notify us immediately at (617) 456-8000. Thank you.

2/16/2005

## Tarlow, Daniel S.

| | |
|---|---|
| **From:** | Tarlow, Daniel S. |
| **Sent:** | Tuesday, February 01, 2005 9:56 AM |
| **To:** | 'KGPowers@theemploymentlawyers.com' |
| **Cc:** | Rubin, Laurie F.; 'Terence J Corrigan' |
| **Subject:** | IBM-Rossiter--outstanding discovery issues |

Kevin – I sent you three e-mail requests on Thursday (1/27) and want to know when I can expect to hear back from you. I'm hoping we can revolve these issues w/o court involvement, but if not, I'd like to know that sooner versus later. The requests were as follows:

- "As you know, Fed. R. Civ. P. 34 requires a party to produce documents in his possession, custody or control. Mr. Rossiter was represented by counsel in his age discrimination case against DEC. Clearly, Mr. Rossiter, the client, has the right to obtain the file or a copy of the file from the lawyer/firm that represented him in that matter. It appears he was represented by John McKelway at Gadsby & Hannah. Please have your client obtain a copy of his file from Gadsby and please produce the file to us as soon as possible."
- "In response to interrogatories 8 and 9, the plaintiff stated he has only seen two doctors since 1992: Dr. Seymour and Dr. Bruch. It does not seem this can be a complete and comprehensive answer. I am formally asking you to supplement plaintiff's answers to interrogatories 8 and 9 so that they are complete and comprehensive."
- "As you know, I issued a subpoena to Dartmouth-Hitchcock. I just spoke to someone from the medical records department about the delay in production. She indicated that they asked your client for permission to release his medical records and he declined as per his attorney's instructions. Please call me to discuss this development."

Daniel S. Tarlow, Esq.
Prince Lobel Glovsky & Tye, LLP
585 Commercial Street
Boston, MA 02109
Direct Dial: 617-456-8013
Fax: 617-456-8100
E-mail: dstarlow@plgt.com

*Right firm, right size, right choice.*

The information contained in this e-mail message is intended for the confidential use of the addressees only. The information subject to the attorney-client privilege and/or may be attorney work-product. Recipients should not file copies of this e-mail with publicly accessible records. If you are not an addressee or an authorized agent responsible for delivering this e-mail to a designated addressee, you have received this e-mail in error, and any further review, dissemination, distribution, copying or forwarding of this e-mail is strictly prohibited. If you received this e-mail in error, please notify us immediately at (617) 456-8000. Thank you.

DANIEL S. TARLOW
dstarlow@plgt.com
(617) 456.8013 Tel

Prince Lobel Glovsky & Tye LLP
Attorneys at Law

585 Commercial Street
Boston, MA 02109-1024
(617) 456.8000 Tel
(617) 456.8100 Fax
www.plgt.com

February 8, 2005

Kevin G. Powers, Esq.
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA  02108

Re:    <u>Dennis Rossiter v. International Business Machines Corporation</u>

Dear Kevin:

I am following-up on the e-mails I've sent you regarding discovery issues (copy of 2/1/05 e-mail attached).  If I do not hear back from you shortly, I will have to file a motion to compel.

Very truly yours,

Daniel S. Tarlow

DST/lk
Enclosure
cc:    Terrence Corrigan, Esq. (w/o enclosure)

PRINCE ▲ LOBEL ▲ GLOVSKY & TYE LLP

## Tarlow, Daniel S.

| | |
|---|---|
| **From:** | Tarlow, Daniel S. |
| **Sent:** | Wednesday, February 09, 2005 4:58 PM |
| **To:** | 'KGPowers@theemploymentlawyers.com' |
| **Cc:** | Rubin, Laurie F. |
| **Subject:** | FW: IBM-Rossiter--outstanding discovery issues |

Kevin—If it was not clear from my earlier correspondence, I am requesting a discovery dispute conference pursuant to Local Rule 37.1.

---

**From:** Tarlow, Daniel S.
**Sent:** Tuesday, February 01, 2005 9:56 AM
**To:** 'KGPowers@theemploymentlawyers.com'
**Cc:** Rubin, Laurie F.; 'Terence J Corrigan'
**Subject:** IBM-Rossiter--outstanding discovery issues

Kevin – I sent you three e-mail requests on Thursday (1/27) and want to know when I can expect to hear back from you. I'm hoping we can revolve these issues w/o court involvement, but if not, I'd like to know that sooner versus later. The requests were as follows:

- "As you know, Fed. R. Civ. P. 34 requires a party to produce documents in his possession, custody or control. Mr. Rossiter was represented by counsel in his age discrimination case against DEC. Clearly, Mr. Rossiter, the client, has the right to obtain the file or a copy of the file from the lawyer/firm that represented him in that matter. It appears he was represented by John McKelway at Gadsby & Hannah. Please have your client obtain a copy of his file from Gadsby and please produce the file to us as soon as possible."
- "In response to interrogatories 8 and 9, the plaintiff stated he has only seen two doctors since 1992: Dr. Seymour and Dr. Bruch. It does not seem this can be a complete and comprehensive answer. I am formally asking you to supplement plaintiff's answers to interrogatories 8 and 9 so that they are complete and comprehensive."
- "As you know, I issued a subpoena to Dartmouth-Hitchcock. I just spoke to someone from the medical records department about the delay in production. She indicated that they asked your client for permission to release his medical records and he declined as per his attorney's instructions. Please call me to discuss this development."

Daniel S. Tarlow, Esq.
Prince Lobel Glovsky & Tye, LLP
585 Commercial Street
Boston, MA 02109
Direct Dial: 617-456-8013
Fax: 617-456-8100
E-mail: dstarlow@plgt.com

*Right firm, right size, right choice.*

The information contained in this e-mail message is intended for the confidential use of the addressees only. The information subject to the attorney-client privilege and/or may be attorney work-product. Recipients should not file copies of this e-mail with publicly accessible records. If you are not an addressee or an authorized agent responsible for delivering this e-mail to a designated addressee, you have received this e-mail in error, and any further review, dissemination, distribution, copying or forwarding of this e-mail is strictly prohibited. If you received this e-mail in error, please notify us immediately at (617) 456-8000. Thank you.

2/16/2005

# COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
436 Dwight Street, Suite 220
Springfield, MA  01103

(413) 739-2145
fax (413) 784-1056

December 1, 2004
VIA FASCIMILE AND USPS
FIRST CLASS MAIL
(617) 456-8100

Joseph L. Edwards, Esquire
Prince, Lobel, Glovsky & Tye, LLP
585 Commercial Street
Boston, MA 02109-1024

RE:    **Information Request**
       **Freedom of Information Act**
       **Rossiter v. Digital Equipment Corporation**
       **MCAD Docket No.: 94230909**

Dear Mr. Edwards:

Per your request of November 30, 2004, requesting a copy of the complaint filed
in our office relative to the above referenced matter, research was done in the archives in
the Springfield office as well as a search of our data base which indicates that the file was
forwarded to our Boston office once the case was to be scheduled for public hearing.
Subsequently the file was destroyed, it is the procedure for all closed cases to be
destroyed three years after closure.

I have attached the findings from the database search and I hope these will contain
the information you seek.

Feel free to contact me should you need further information in this regard.

Sincerely,

Patty Woods
Public Records

Enclosures











Case Management System

Complaints  Tasks  User

Complaint (94230909)
├ Complaint
│  ├ General Info
│  ├ Incident Info
│  └ Federal Info
├ Complainants
│  └ Dennis Rossiter
├ Respondents
│  └ Digital Equipment Co
├ Interested Parties
├ Attorneys
├ Allegations
├ Events
├ Notes
├ Documents
└ Public Hearing

## Events

New Event     Export to Excel

| Event Code | Event Code Description | Date Occurred | Age | Recorded By | Staff Assigned |
|---|---|---|---|---|---|
| 1906 | Closed - Conciliated | 12/24/99 | 1804 | YP | |
| 1721 | Hearing Scheduled | 10/22/99 | 1867 | YP | |
| 1721 | Hearing Scheduled | 07/20/99 | 1961 | YP | |
| 1710 | Pre-Hearing Scheduled | 06/15/99 | 1996 | YP | |
| 1685 | Screening: Mediation - Yes | 03/15/99 | 2088 | YP | |
| 1707 | Order Issued | 11/12/98 | 2211 | YP | |
| 1707 | Order Issued | 11/12/98 | 2211 | YP | |
| 1707 | Order Issued | 04/29/98 | 2408 | JM | |
| 1707 | Order Issued | 03/11/98 | 2457 | YP | |
| 1703 | Hearing Commissioner/Officer Designated | 05/21/97 | 2751 | JM | |
| 1703 | Hearing Commissioner/Officer Designated | 08/22/96 | 3023 | | |
| 1701 | Certified for Public Hearing | 08/20/96 | 3025 | | |
| 1715 | Discovery Order Issued | 08/20/96 | 3025 | | |
| 1611 | Conciliation Conference Held | 07/09/96 | 3067 | | |
| 1610 | Conciliation Conference Scheduled | 05/09/96 | 3128 | | |
| 1241 | Information Received | 04/26/95 | 3507 | | |
| 1121 | Investigation File forwarded to | 03/13/95 | 3551 | | |
| 1061 | Compliance Officer/Investigator Reassigned | 03/13/95 | 3551 | | |
| 1081 | Investigative Conference Scheduled | 03/08/95 | 3556 | | |
| 1081 | Investigative Conference Scheduled | 01/24/95 | 3599 | | |
| 1061 | Compliance Officer/Investigator Reassigned | 01/24/95 | 3599 | | |
| 1001 | Filed with MCAD | 11/30/94 | 3654 | | |

Patty Woods    Administrative Assistants    Supervisor

| Event Code | Event Code Description | Date Occurred | Age | Recorded By Staff Assigned |
|---|---|---|---|---|
| 1906 | Closed - Conciliated | 12/24/1999 | 1804 | YP |
| 1721 | Hearing Scheduled | 10/22/1999 | 1867 | YP |
| 1721 | Hearing Scheduled | 7/20/1999 | 1961 | YP |
| 1710 | Pre-Hearing Scheduled | 6/15/1999 | 1996 | YP |
| 1685 | Screening: Mediation - Yes | 3/15/1999 | 2088 | YP |
| 1707 | Order Issued | 11/12/1998 | 2211 | YP |
| 1707 | Order Issued | 11/12/1998 | 2211 | YP |
| 1707 | Order Issued | 4/29/1998 | 2408 | JM |
| 1707 | Order Issued | 3/11/1998 | 2457 | YP |
| 1703 | Hearing Commissioner/Officer Designated | 5/21/1997 | 2751 | JM |
| 1703 | Hearing Commissioner/Officer Designated | 8/22/1996 | 3023 | |
| 1701 | Certified for Public Hearing | 8/20/1996 | 3025 | |
| 1715 | Discovery Order Issued | 8/20/1996 | 3025 | |
| 1611 | Conciliation Conference Held | 7/9/1996 | 3067 | |
| 1610 | Conciliation Conference Scheduled | 5/9/1996 | 3128 | |
| 1241 | Information Received | 4/26/1995 | 3507 | |
| 1121 | Investigation File forwarded to | 3/13/1995 | 3551 | |
| 1061 | Compliance Officer/Investigator Reassigned | 3/13/1995 | 3551 | |
| 1081 | Investigative Conference Scheduled | 3/8/1995 | 3556 | |
| 1081 | Investigative Conference Scheduled | 1/24/1995 | 3599 | |
| 1061 | Compliance Officer/Investigator Reassigned | 1/24/1995 | 3599 | |
| 1001 | Filed with MCAD | 11/30/1994 | 3654 | |

| EventId |
|---|
| 9283 |
| 257170 |
| 214286 |
| 133225 |
| 82291 |
| 76516 |
| 239861 |
| 113705 |
| 23835 |
| 83926 |
| 159342 |
| 345092 |
| 313873 |
| 153405 |
| 302307 |
| 299479 |
| 82937 |
| 152540 |
| 266488 |
| 344496 |
| 344497 |
| 19905 |

*Electronic Copy*                    EXHIBIT G

## Dartmouth Hitchcock - Keene, NH
### 590 Court St
### Keene, NH 03431
### (603)354-5400

*Patient :*  DENNIS L ROSSITER
      PO BOX 8
      HANCOCK, NH 03449-0008

*MRN:*  3011171
*Age/DOB:*  62  Jan 16 1942
*Home:*  525-3523
*Work:*  (603)525-3523
*Document:*  Office Note
OFFICE NOTE

*Encounter date:*  Apr 22 2002 9:45AM
DARTMOUTH-HITCHCOCK KEENE

Vis:     April 22, 2002

DENNIS ROSSITER
MRN:  3011171

Attending Provider
    Dr. Seymour (40859)

DERMATOLOGY

     S:   This is a follow up visit for Mr. Rossiter.  He has eczematous dermatitis on his hands and also on his torso, which has been acting up a little bit over the past few months.  He relates this to recently losing his job and the stress associated with that.  He has been using triamcinolone, which has really not been doing much to keep it under control.  He also has been fairly vigilante with his dry skin care measures as well.  He also has a history of actinic keratoses and a history of a BCC treated with ED&C on his right upper back.  The eczema on his hands has also been quite active and he has not been able to get any Diprolene, stating that it has been unavailable at the pharmacy.  On review of systems, negative for any other skin complaints.

     O:   On physical exam, on the right upper back there is a well-healed scar with no evidence of recurrent BCC.  There are considerable, moderately severe, erythematous patches of scale on the hands and fingers with some vesicles over the volar aspects of the fingers bilaterally and some patches of erythema and scale evident over the lower back, hips, buttocks, and the abdomen, to a lesser extent the arms.  No other worrisome lesions are seen on examination of face, neck, check, abdomen, back, arms, legs, and hands.

    A/P: 1.   HISTORY OF BCC WITH NO EVIDENCE OF RECURRENCE.

        2.   ECZEMATOUS DERMATITIS.  We will switch him to Cormax cream b.i.d. p.r.n. for his hands and fingers, and for his torso switch him to Lidex ointment 60 gm with no refills.  I have asked him to let me know if things are not considerably better within the next four weeks, in which case we will have him follow up.

        3.   ACTINIC KERATOSES.  The five lesions described above each treated with cryotherapy times three cycles.  Wound care instructions were given.  On the left dorsal hand there were four, rough, scaly, gritty, erythematous papules each about 6 mm in size; on the right ear there was a similar appearing lesion on the helix, which was 4 mm in size.  There was some slight scaling around the forehead, which seemed consistent with actinic damage, but there were no discrete, identifiable actinic keratoses there.  The changes were rather minimal and we will continue to observe this area.  I am concerned that with his eczema the way it is at this time, that it would be poor timing to use Efudex at this time.

*Printed By:*  Moore, Laurie A

000180

Page 117

[1] A: Yes.

[2] Q: What reserves are you talking about?

[3] A: Savings.

[4] Q: How much have you had to draw down on savings [5] since leaving IBM?

[6] A: Probably over $50,000.00.

[7] Q: And how does that relate to the total savings [8] that you have? What percentage is that?

[9] A: I don't know.

[10] Q: Is it a specific percentage?

[11] A: It's worrisome that we've had to draw that [12] down. I don't know what the percentage is.

[13] Q: Have you had to draw down any reserves other [14] than savings?

[15] A: Not that I can recall.

[16] Q: Well, does fifty thousand represent fifty [17] percent or more of your savings?

[18] A: I'd have to add up my 401(k)'s and so forth. [19] I don't have that information.

[20] Q: And during the time you were working for IBM, [21] what, if any, plans or thought had you given to [22] when you would retire?

[23] A: We had planned on retiring from IBM at age [24] sixty-five.

Page 118

[1] Q: I'm going to ask you questions about your [2] damages or the harm you've suffered.

[3] Is it true that while you were at IBM you were [4] suffering from — or you felt depressed and you [5] experienced sleeplessness?

[6] A: While I was at IBM?

[7] Q: Yes.

[8] A: From time to time, yeah.

[9] Q: And that was related to what?

[10] A: The way I was being treated.

[11] Q: By who?

[12] A: By the people that I've mentioned in my [13] testimony, Ms. McGloin and principally Monahan.

[14] Q: So when did you begin to feel depressed?

[15] A: When?

[16] Q: Yes, when?

[17] A: They were basically related to the events that [18] I've described. So if I was demoted, certainly the [19] layoff was a major event.

[20] Q: Okay. I had talked with you when you were at IBM. [21] So let's go pre-layoff. You said in your Answers [22] to Inter-rogatories that you were depressed as a

[23] result of the demotion.

[24] A: The demotion, the lack of op-portunity when

Page 119

[1] those came up, the working con-ditions, the nature [2] of the work that I was being assigned. I was [3] humiliated.

[4] Q: And were you depressed from April '97 when you [5] were demoted through the end of your employment?

[6] A: I think periodically.

[7] Q: And what were the manifestations of the [8] depression?

[9] A: Oh, just a feeling of — what you would [10] expect, a feeling of sadness, worthlessness, [11] relations at home, increased stressed levels. I [12] have a medical condition that's aggravated by [13] stress, and I think we provided the medical records [14] on that.

[15] Q: And that's a dermatological con-dition?

[16] A: Yes.

[17] Q: Is that psoriasis? What is it?

[18] A: No, it's recalcitrant excema.

[19] Q: And were you frequently de-pressed during the [20] period you re-ported to Pat McGloin?

[21] A: "Frequently" meaning what in your —

[22] Q: Weekly.

[23] A: I wouldn't say continually. I would say these [24] are related to events as they came along. And my

Page 120

[1] way of dealing with it was to work my way out of [2] it.

[3] Q: Would you say that you were more upbeat during [4] the time you reported to Pat McGloin than when you [5] work-ed for Monahan?

[6] A: No.

[7] Q: So you were equally depressed during both [8] periods?

[9] A: I can't quantify it. I mean it was [10] basically — you know, I had points when I knew [11] that I was being treated badly in my view, and I [12] would get upset and depressed about it. But it [13] wasn't every day of every week of every month.

[14] Q: Did you ever seek any treatment for it during [15] the time that you worked at IBM?

[16] A: For some stress I did.

[17] Q: With whom?

[18] A: I saw my principal physician.

[19] Q: When was this?

[20] A: It's in the medical records. I don't remember [21] the dates.

[22] Q: Well, I don't believe there's any-

thing you [23] produced to us, so don't expect that I know it.

[24] A: I don't know the dates.

Page 121

[1] Q: How often?

[2] A: How often what?

[3] Q: Did you seek out treatment for the depression [4] or stress you were feeling?

[5] A: I would say probably maybe one or two [6] occasions with my primary phys-ician.

[7] Q: With anybody else?

[8] A: I didn't see a specialist.

[9] Q: And what did your primary phys-ician do or [10] recommend?

[11] A: He prescribed some medication to get me over [12] the hard spots.

[13] Q: What medication?

[14] A: Some sort of a sedative.

[15] Q: Who was your primary care phys-ician?

[16] A: Frederick Bruch, B-R-U-C-H.

[17] Q: Where is he located?

[18] A: He's at the Dartmouth-Hitchcock Clinic.

[19] Q: Where is that located?

[20] A: Keene, New Hampshire.

[21] Q: You said you did not recall what he [22] prescribed?

[23] A: No. It was some sort of a sedative, but I [24] don't know what it was.

Page 122

[1] Q: How long did you take that sed-ative for?

[2] A: I didn't take it continually. I would take it [3] if — what would happen is if I was feeling [4] stressed, the recalcitrant excema would kick in, [5] and I would take one of these tablets, and that [6] would sort of break the cycle. And then I wouldn't [7] take — I didn't take them every day.

[8] Q: When you get the recalcitrant excema, where [9] does it show up on you?

[10] A: Basically it could be anywhere on my body.

[11] Q: And how often did you experi-ence sleeplessness [12] during the period you were working for IBM as a [13] result of the depression you suggest that you were [14] experiencing from time to time?

[15] A: It could have been, again, related to events. [16] If there was a particular event going on, "event"[17] meaning an opportunity lost or something like that, [18] sleeplessness might go on for two or three nights.

[19] Q: You were claiming at the same

Page 123

[1] **BY MR. TARLOW:**

[2] **Q:** This is a letter we got from the MCAD with the [3] information that they had about your case. They [4] don't have a file, but they have a printout. And [5] it indicates on this printout from the MCAD that [6] the case was closed — was conciliated in December [7] 1999. Does that ring a bell — refresh your [8] memory?

[9] **A:** No.

[10] **Q:** Well, the point I was going to raise is: were [11] you claiming emotional distress in that case [12] against Digital Equipment Corporation?

[13] **A:** I'd have to refer to the Complaint. I don't [14] recall at this point.

[15] **Q:** Were you experiencing any emotional distress [16] as a result of the events that you were complaining [17] about in the Digital case during the time you [18] worked for IBM?

[19] **A:** No, I don't believe so. I believe at that [20] point, once I started with IBM, I put the Digital [21] thing behind me.

[22] **Q:** Did you report that to the MCAD, you dropped [23] your emotional distress at that point?

[24] **MR. POWERS:** Well, wait a minute. I

Page 124

[1] don't think he's saying that he dropped the [2] emotional distress. I think he's saying that once [3] he joined IBM, he no longer experienced emotional [4] distress.

[5] **MR. TARLOW:** Well, I'd like to see if [6] that's consistent between the two cases, because he [7] joined IBM shortly after leaving DEC. And he [8] continued to be suing DEC for some number of years [9] while working at IBM. And I would be surprised if [10] he wasn't claiming ongoing emotional distress as a [11] result of the events at DEC that is overlapping [12] with what he's talking about here.

[13] **MR. POWERS:** Well, you're never going to [14] find that out.

[15] **MR. TARLOW:** Why is that?

[16] **MR. POWERS:** Well, you have all the [17] documents.

[18] **MR. TARLOW:** Have you produced everything [19] that you have regarding the case against DEC? [20] You've produced nothing.

[21] **MR. POWERS:** I don't have anything, so [22] you can ask him.

[23] **BY MR. TARLOW:**

[24] **Q:** Do you have any files at home regarding the

Page 125

[1] case against DEC?

[2] **A:** I'd have to check. I don't know. It's been a [3] number of years.

[4] **MR. TARLOW:** I think it's clearly [5] relevant. But more relevant, I think, having gone [6] through this exercise today than we even realized [7] before.

[8] **THE WITNESS:** It's a matter of public [9] record —

[10] **MR. POWERS:** You don't have to argue [11] about. I don't dispute relevancy. If we have —[12] if he has in his possession documents regarding the [13] case against DEC, we will produce them.

[14] **BY MR. TARLOW:**

[15] **Q:** Were there any other events in your life [16] during your tenure with IBM, any prior your layoff, [17] that were causing you stress or occasional feelings [18] of being depressed?

[19] **A:** When was the date that I joined IBM? I'm [20] sorry, was it 19 —

[21] **Q:** '95.

[22] **A:** '95. Not that I can recall at the moment.

[23] **Q:** And how did the events at IBM affect your —[24] that's before your layoff — affect your

Page 126

[1] relationships or your marriage?

[2] **A:** Well, I became withdrawn and uncommunicative [3] with my wife, caused her stress, wondering what was [4] going on. And generally it was just a hard time [5] because we had come so close to retiring and had a [6] plan on what we were going to do retirement-wise, [7] and basically all of that went away.

[8] **Q:** But I'm talking about the period before your [9] layoff. I'm talking about the period where you [10] said you were feeling at least occasional [11] depression and stress as a result of the events —

[12] **A:** Well, I tend to keep things to myself, and I [13] don't like to bring my wife into it and have her [14] worry, so I would just generally clam up. And she [15] knows when I get quiet that something's bothering [16] me. But I normally don't talk to her about all of [17] these things.

[18] After the layoff, it was a different story. [19] But you're not asking me about that.

[20] **Q:** Did you have a good marriage before you went [21] to work at IBM?

[22] **A:** Yes.

[23] **Q:** Did you continue to have a good marriage while [24] you were working at

IBM?

Page 127

[1] **A:** Yes.

[2] **Q:** And what are the damages or the harm you've [3] suffered as a result of the layoff?

[4] **MR. POWERS:** Do you mean emotional —

[5] **MR. TARLOW:** Well, he can tell me the [6] categories. And for the moment — so it can be [7] either economic — I expect it to be economic [8] and/or emotional.

[9] **THE WITNESS:** I don't have an answer on [10] the economic part of it. And the emotional, I've [11] sort of been describing that as we've been going [12] along here.

[13] **BY MR. TARLOW:**

[14] **Q:** The only thing we've talked about so far as [15] far as emotionally is what occurred while you were [16] working at IBM. So what harm have you incurred or [17] experienced emotionally as a result of the layoff?

[18] **A:** Well, I mean this was a very difficult thing [19] to deal with it at this particular time of my life. [20] Second only to a death in the family or some-thing, [21] this was a very, very serious — a blow both [22] psychologically and financially to me.

[23] All of our financial plans were put on hold. [24] We had to just adapt and spend down some of our

Page 128

[1] reserves. So, from a financial stand-point, it was [2] very stressful.

[3] I have these other medical conditions that got [4] triggered.

[5] And as I was just relaying, my communication [6] at home became difficult, and my wife was stressed [7] as a result of the financial difficulties that we [8] were anticipating.

[9] **Q:** You said you had medical conditions that were [10] triggered, is that more than one?

[11] **A:** No, just the — basically the recalcitrant [12] excema.

[13] **Q:** How many flare-ups did you experience of the [14] recalcitrant excema?

[15] **A:** Usually once it starts, it's hard to get back [16] under control, so it would ebb and flow, but it was [17] continuing there for several months.

[18] **Q:** Is that something that you experience absent [19] stress?

[20] **A:** Not as much, but occasionally with temperature [21] changes it might, but generally it's stress related [22] in my particular case.

[23] **Q:** And did you seek any treatment from any health [24] care professional as a

time that you [20] were employed at IBM — well, strike that. When [21] did your case against Digital get resolved?

[22] **A:** I don't recall.

[23] **MR. TARLOW:** I'll be right back.

[24] (Pause.)

result of the emotional harm

Page 129

[1] or the physical manifestations of emotional harm?

[2] A: Yes, I did.

[3] Q: With whom and when?

[4] A: I saw a dermatologist in Keene, New Hampshire, [5] Richard Seymour, S-E-Y-M-O-U-R, I believe. He's at [6] the same institution, the Dartmouth-Hitchcock [7] Clinic in Keene.

[8] There may have been another dermatologist, but [9] I can't recall the name right now.

[10] Q: Did you seek any other treatment or assistance [11] from any other health care professional other than [12] Richard Seymour regarding whatever you experienced [13] as a result of the layoff?

[14] A: Only the aforementioned primary care [15] physician, Dr. Bruch.

[16] Q: And what Dr. Bruch do or recommend?

[17] A: He basically gave me something to kind of help [18] me relax and as a sedative.

[19] Q: When was that?

[20] A: It was sometime after the layoff.

[21] Q: How soon after the layoff?

[22] A: I don't know. I don't remember.

[23] Q: How long did you take the sedative for?

[24] A: I take it infrequently.

Page 130

[1] Q: Do you still take it?

[2] A: Occasionally I do. Very infrequently, though.

[3] Q: And did you experience any depression-like [4] symptoms after the layoff?

[5] A: Yes, I had sleeplessness and withdrawal, lack [6] of appetite, relations with my wife.

[7] Q: Do they continue to today, all of those [8] elements?

[9] A: Not to the degree that they did.

[10] Q: When were they —

[11] A: I tend not to try to dwell on these things [12] because it's counterproductive, yes.

[13] Q: I take it during this whole period from 1995 [14] to the present, you've never sought out a mental [15] health professional?

[16] A: No.

[17] Q: Why is that?

[18] A: Well, I feel probably the best way to handle [19] it is to try to work my way out of it and get [20] another job and eliminate the things that are [21] causing the stress, which are the unemployment,

[22] basically.

[23] Q: And for what period of time did you experience [24] sleeplessness after the layoff?

Page 131

[1] A: I would say for a period of maybe two to three [2] months.

[3] Q: Okay.

[4] A: Not every night, but —

[5] Q: For what period of time did you experience or [6] were you withdrawn?

[7] A: I would say — I would say up until the time [8] that I really started to get into the real estate [9] thing and decided I had to really bootstrap and do [10] something on my own that I was more withdrawn than [11] normal.

[12] And when did that period come about that you [13] really sort of realized you needed to commit [14] yourself to the real estate field?

[15] A: Well, as I was going through the job [16] application process for whatever months it was, six [17] months or whatever after I got laid off, I think it [18] was just dawning on me that I wasn't going to get a [19] job.

[20] Q: Well, I'm trying to figure how long did you [21] feel you were more withdrawn than usual. Was it [22] for the first six months, was it for a year?

[23] A: I would say more intensively in the first [24] three months, and then it diminished.

Page 132

[1] Q: And for how long did you experience a lack of [2] appetite?

[3] A: I would say for about the same period.

[4] Q: Three months or so?

[5] A: Yeah, three to five months, maybe, afterward.

[6] Q: For how long were your relations — and do you [7] mean by that — I really don't want to pry, but do [8] you mean sexual relations with your wife?

[9] A: Yes.

[10] Q: How long were they adversely affected?

[11] A: I would say probably maybe six months or so.

[12] Q: If you look at Answer 10 in your Answers to [13] Interrogatories, you do describe elements of your [14] damages which I want to ask you about.

[15] A: Do you want me to look at something —

[16] Q: Yes, if you can find Exhibit 10.

[17] MR. POWERS: Are you talking about the [18] Interrogatory Answers?

[19] MR. TARLOW: Yes.

[20] MR. POWERS: I have those right here. [21] Page 14?

[22] MR. TARLOW: No. Page 10 and 11 and 12.

[23] THE WITNESS: What document?

[24] MR. TARLOW: Exhibit 10, your Answers to

Page 133

[1] Interrogatories in this case.

[2] BY MR. TARLOW:

[3] Q: So this is a description, Pages 10 through 13, [4] of basically your damages as a result of the [5] layoff. It's a fair description.

[6] If you look on the next page, Dennis, which is [7] Page 11, it describes some elements of the [8] financial harm, I believe it is.

[9] A: Can you point that out to me?

[10] Q: Well, look in Subparagraph 4, Subparagraph 5.

[11] A: Yeah.

[12] Q: Subparagraph 4 you describe having to spend [13] down your financial reserves. Is that the [14] $50,000.00 or so you've already told me about?

[15] A: Yes.

[16] Q: And then Subparagraph 5 relates to the sale of [17] securities?

[18] A: Yes.

[19] Q: Is that something different than 4? That's a [20] different element that you had to sell securities [21] in order to raise money for living expenses?

[22] A: No, it's — basically we were selling money [23] that we had saved in mutual funds. They're [24] basically the same.

Page 134

[1] Q: 4 and 5 are related.

[2] A: Yes.

[3] Q: I want to just go back. Similar to the [4] questions about loss of appetite and withdrawal, [5] when did you begin to pull out of the depression [6] you were experiencing after the layoff? Is it the [7] same period essentially?

[8] A: I think toward the end of that first six [9] months after the layoff, and I was getting more [10] involved in real estate. Starting to go to school [11] and studying for the exam and then taking the exam [12] occupied my mind.

[13] Q: How do you like the real estate field?

[14] A: Well, I'm starting at the bottom rung of the [15] — you know, I'm low man on the totem pole, [16] competing with a lot of experienced agents, so it's [17] like any other — like a law practice or anything [18] else, you've got to build up a client list and a [19] book of business. And

has your [8] Bates stamp on it.

[9] **Q:** Do you recall when or why you downloaded this?

[10] **A:** (No response.)

[11] **Q:** I see a date on the bottom right-hand corner [12] which may or may not be of some help to you.

[13] **A:** You're looking at the date that's below the [14] Bates stamp?

[15] **Q:** Yes, which I assume is the date it was [16] printed, although I'm not positive about that.

[17] **A:** I don't recall printing this.

[18] **MR. POWERS:** But the question is: does [19] that date refresh your recollection as to when you [20] did or why you did?

[21] **THE WITNESS:** No. No, I don't remember [22] this at all.

[23] **BY MR. TARLOW:**

[24] **Q:** And look at Exhibit 18. Do you recall when

---

Page 106

[1] and why you downloaded that —

[2] **A:** No.

[3] **Q:** — document? [4] And 18 is the company's policy on so-called [5] "Speak Up"?

[6] **A:** I don't know if it's a policy. It's a [7] description — it appears to be a description of [8] the "Speak Up" program.

[9] **Q:** And did you apply for some positions after [10] your notification of layoff and before your [11] departure?

[12] **A:** Yes.

[13] **Q:** Do you recall what positions you applied for?

[14] **A:** I applied for the position with Jim Hasl, [15] which was the Corporate Events Operations.

[16] **Q:** We discussed that one, too, correct?

[17] **A:** Yes.

[18] **Q:** What else?

[19] **A:** There was one other that I don't recall [20] exactly. There was one other.

[21] **Q:** Is that the Web Events job? Manager [22] of Web Events?

[23] **A:** No.

[24] **Q:** Did you apply —

---

Page 107

[1] **A:** Oh, I'm sorry, who was the hiring manager on [2] that one?

[3] **Q:** Laurie Currage.

[4] **A:** I believe I had some correspondence with [5] Laurie Currage at the very end.

[6] **Q:** Did you actually apply as far as —

[7] **A:** I don't recall whether I actually

---

applied or [8] not.

[9] **Q:** And was the other position that you might be [10] thinking of Integrated Marcom Lead, reporting to [11] Richard Stern?

[12] **A:** I have no recollection of that.

[13] **Q:** We've already dealt with the Hasl job, so [14] let's take that off the table. But the Web Events [15] job, are you including that in your complaint about [16] age discrimination, the fact that you didn't get [17] that job?

[18] **A:** No, I don't think so.

[19] **Q:** And you don't remember having applied for or [20] been interested in this Marcom Lead — Integrated [21] Marcom Lead job that I mentioned.

[22] **A:** I don't recall that at all.

[23] **Q:** And you don't recall any other jobs that you [24] specifically applied for after your notification of

---

Page 108

[1] layoff before your departure?

[2] **A:** Other than the aforementioned, no.

[3] **Q:** Did Mark LeFavre assist you in any way in [4] trying to find another job?

[5] **A:** Yes, he did.

[6] **Q:** And were you satisfied with the assistance he [7] provided, other than ultimately it wasn't [8] successful?

[9] **A:** At the time I was. It was nominal, but he did [10] what I asked him to do.

[11] **Q:** And what knowledge do you have of what became [12] of other employees in M.D. Marketing who were [13] selected for layoff at the same time you were?

[14] **A:** What became of them?

[15] **Q:** Whether they found jobs elsewhere at IBM or [16] did not and left the company.

[17] **A:** Your question is: what knowledge do I have of [18] the other people that got laid off after — what [19] happened to them after they left IBM — or after [20] they were laid off.

[21] **Q:** Well, after they were notified of their [22] selection for layoff, before the end of the period [23] where one was allowed to find another job.

[24] **A:** Yeah.

---

Page 109

[1] **MR. POWERS:** And the question is whether [2] they found another job within IBM.

[3] **THE WITNESS:** Within IBM.

[4] And you're talking specifically about the [5] people that were notified of layoff, not anybody [6] else.

[7] **BY MR. TARLOW:**

[8] **Q:** Correct.

---

[9] **A:** Okay. I don't recall that anyone else [10] received another position within IBM, but I'm not [11] certain of that.

[12] **Q:** And you sued Digital Equipment Corporation for [13] age discrimination, is that right?

[14] **A:** Yes.

[15] **Q:** Can you just describe that.

[16] **A:** Let me amend that, I didn't sue them.

[17] **Q:** You had a complaint with the MCAD —

[18] **A:** I filed a complaint with the MCAD.

[19] **Q:** You never moved it to court, is that correct?

[20] **A:** That's correct. It was voluntarily withdrawn.

[21] **Q:** And what was the essence of the allegations in [22] that case?

[23] **A:** I'm trying to think at this point.

[24] **MR. POWERS:** I think he's asking the

---

Page 110

[1] essence, which you say, for instance, is it a claim [2] of age discrimination.

[3] **MR. TARLOW:** Well, I think we've already [4] established that, so maybe I should go beyond that [5] with my question, then.

[6] **THE WITNESS:** It was a case of age [7] discrimination.

[8] **BY MR. TARLOW:**

[9] **Q:** Did it relate to your layoff by Digital [10] Equipment Corporation?

[11] **A:** It didn't relate to the layoff.

[12] **Q:** You were not claiming age discrimination in [13] the layoff?

[14] **A:** I was claiming age discrimination on the job. [15] I don't recall whether I was claiming it as a part [16] of the layoff or not.

[17] **Q:** Do you still have a copy of the Complaint in [18] that action?

[19] **A:** No. Well, I may at home someplace, but ...

[20] **Q:** I asked — we did ask that it be produced, and [21] it wasn't produced. I'm going to ask again that it [22] be produced, just a copy of the Complaint, so we [23] can see what the allegations are.

[24] **MR. POWERS:** We will produce — if there

---

Page 111

[1] is a copy available —

[2] **THE WITNESS:** Six years, eight, how long [3] ago was it?

[4] **MR. POWERS:** — let me talk — we will [5] produce it.

[6] **BY MR. TARLOW:**

[7] **Q:** Did you make allegations in that

---

case similar [8] to the allegations you made in this case, that [9] there was a failure to post jobs?

[10] A: At this point I don't recall the specifics of [11] the Complaint because it's been a number of years. [12] And I don't want to speculate.

[13] Q: I'm just going to ask one more time. Did that [14] case include the same two basic allegations that [15] are part of this case; that is: that you were laid [16] off as a result of your age; and that prior to your [17] layoff, younger employees had obtained jobs over [18] you and the company had failed to post those jobs?

[19] A: Well, as I just said, and I'll repeat it, my [20] answer is that I don't recall the specifics of the [21] Complaint. It's been a number of years. And I'm [22] not going to speculate.

[23] Q: So tell me about your efforts to find a new [24] job after you left IBM. What did you do to find a

---

[1] new job?

[2] A: Well, I started — as soon as I was notified, [3] I started looking aggressively within IBM at [4] anything that would fit. And then after I left the [5] company, I initiated a job search immediately, [6] looking on the Internet and for help wanted, [7] networking, and sent out resumes and letters and [8] electronic applications to numerous companies. And [9] as I recall, probably after about six months, [10] nothing was really forthcoming.

[11] And at that point, I really needed to do [12] something to get some income started, so I went [13] through real estate school and got my New Hampshire [14] real estate license and began selling real estate [15] as a contractor with a real estate company. And [16] I've been doing that ever since.

[17] Q: When you were looking for jobs, what kind of [18] jobs were you looking for?

[19] A: Pretty much along the lines that I had been [20] doing at IBM in terms of marketing communications. [21] Several of them were much lower than the level I [22] had been working at, but they were pretty much in [23] the marketing communications area.

[24] Q: Geographically located where?

---

[1] A: Well, I live in western New Hampshire, and I [2] didn't — wasn't in a position to relocate, so we [3] were looking in southern New Hampshire and north [4] central Massachusetts.

[5] Q: And did you get any interviews?

[6] A: No.

---

[7] Q: You were not offered any jobs?

[8] A: No.

[9] Q: And after six months did you essentially give [10] up on the job search, so to speak?

[11] A: Not entirely. I kept it going in the [12] background while I was preparing for the real [13] estate work and kept sending resumes out as they [14] were appropriate.

[15] It was during a recession at that point, so [16] there weren't a lot of jobs to begin with. But I [17] was basically applying for anything that I saw at [18] almost any level.

[19] Q: And at some point did you stop sending out [20] resumes?

[21] A: No.

[22] Q: You're still doing it today?

[23] A: Occasionally, yeah, if there's something [24] interesting.

---

[1] Q: At some point did you stop your job search in [2] earnest?

[3] MR. POWERS: Objection.

[4] THE WITNESS: No. I mean it's basically [5] applying whenever an opportunity presents itself, [6] and I'm still doing that.

[7] BY MR. TARLOW:

[8] Q: And are you still putting as much energy into [9] it as you did during the first six months?

[10] A: Yes. Probably — yes, probably as much.

[11] Q: Are you sending out as many resumes?

[12] A: Again, it depends on the opportunity. So a [13] lot of them I had already gone — I've already [14] applied to a lot of the ones, you know, other [15] companies and so forth. Those jobs were filled. [16] But as new ones come along, if it's something [17] that's suitable, I will apply.

[18] Q: What was the last job you applied for? Or [19] when was the last job that you applied for?

[20] A: I just talked to Fidelity Investments this [21] week.

[22] Q: About what kind of job?

[23] A: About a call center benefits specialist [24] position.

---

[1] Q: And are you going to get an interview?

[2] A: I decided that I can make more money selling [3] real estate, that to break even on it was below [4] what I'm making now.

[5] Q: So when did you begin selling real

---

estate?

[6] A: I think the beginning of 2002.

[7] Q: You were let go in January of 2002.

[8] A: I'm sorry, then 2003.

[9] Q: Did you have to first study and take an exam?

[10] A: Yes. You have to take the state and national [11] exams.

[12] Q: And before you began selling real estate, did [13] you earn any remuneration from any source?

[14] A: Commonwealth of Massachusetts on —

[15] Q: Unemployment checks?

[16] A: — unemployment.

[17] Q: Nothing beyond unemployment insurance before [18] you began selling real estate.

[19] A: No.

[20] Q: And when did you begin selling real estate in [21] earnest? You think it was early 2003?

[22] A: Yes.

[23] Q: And do you recall what your income was from [24] that source in 2003?

---

[1] A: Approximately $22,000.00.

[2] Q: We're near the end of 2004, so you may have [3] some idea what this year is going to look like.

[4] A: It will be a little bit more. Probably [5] between twenty-two and twenty-five thousand.

[6] Q: And is it a full-time job?

[7] A: Yes.

[8] Q: How many hours a week do you work?

[9] A: I work pretty much forty, fifty hours a week.

[10] Q: And do you get a W-2 from an employer or are [11] you an independent contractor?

[12] A: I'm an independent contractor.

[13] Q: What other sources of income do you have?

[14] A: My wife's income.

[15] Q: What does your wife do?

[16] A: She's sort of a patient care person.

[17] Q: And between your two incomes are you able to [18] support yourselves?

[19] A: At this point, yes, I'm sorry, let me amend [20] that. We have had to draw down on reserves, so we [21] are using up reserves in addition to our income. [22] With the combination, we're able to pay our bills.

[23] Q: And are you still having to draw down on [24] reserves?

---

Page 117

[1] A: Yes.

[2] Q: What reserves are you talking about?

[3] A: Savings.

[4] Q: How much have you had to draw down on savings [5] since leaving IBM?

[6] A: Probably over $50,000.00.

[7] Q: And how does that relate to the total savings [8] that you have? What percentage is that?

[9] A: I don't know.

[10] Q: Is it a specific percentage?

[11] A: It's worrisome that we've had to draw that [12] down. I don't know what the percentage is.

[13] Q: Have you had to draw down any reserves other [14] than savings?

[15] A: Not that I can recall.

[16] Q: Well, does fifty thousand represent fifty [17] percent or more of your savings?

[18] A: I'd have to add up my 401(k)'s and so forth. [19] I don't have that information.

[20] Q: And during the time you were working for IBM, [21] what, if any, plans or thought had you given to [22] when you would retire?

[23] A: We had planned on retiring from IBM at age [24] sixty-five.

Page 118

[1] Q: I'm going to ask you questions about your [2] damages or the harm you've suffered.

[3] Is it true that while you were at IBM you were [4] suffering from — or you felt depressed and you [5] experienced sleeplessness?

[6] A: While I was at IBM?

[7] Q: Yes.

[8] A: From time to time, yeah.

[9] Q: And that was related to what?

[10] A: The way I was being treated.

[11] Q: By who?

[12] A: By the people that I've mentioned in my [13] testimony, Ms. McGloin and principally Monahan.

[14] Q: So when did you begin to feel depressed?

[15] A: When?

[16] Q: Yes, when?

[17] A: They were basically related to the events that [18] I've described. So if I was demoted, certainly the [19] layoff was a major event.

[20] Q: Okay. I'm talking about when you were at IBM. [21] So let's go pre-layoff. You said in your Answers [22] to Interrogatories that you were depressed as a

[23] result of the demotion.

[24] A: The demotion, the lack of opportunity when

Page 119

[1] those came up, the working conditions, the nature [2] of the work that I was being assigned. I was [3] humiliated.

[4] Q: And were you depressed from April '97 when you [5] were demoted through the end of your employment?

[6] A: I think periodically.

[7] Q: And what were the manifestations of the [8] depression?

[9] A: Oh, just a feeling of — what you would [10] expect, a feeling of sadness, worthlessness, [11] relations at home, increased stressed levels. I [12] have a medical condition that's aggravated by [13] stress, and I think we provided the medical records [14] on that.

[15] Q: And that's a dermatological condition?

[16] A: Yes.

[17] Q: Is that psoriasis? What is it?

[18] A: No, it's recalcitrant excema.

[19] Q: And were you frequently depressed during the [20] period you reported to Pat McGloin?

[21] A: "Frequently" meaning what in your —

[22] Q: Weekly.

[23] A: I wouldn't say continually. I would say these [24] are related to events as they came along. And my

Page 120

[1] way of dealing with it was to work my way out of [2] it.

[3] Q: Would you say that you were more upbeat during [4] the time you reported to Pat McGloin than when you [5] worked for Monahan?

[6] A: No.

[7] Q: So you were equally depressed during both [8] periods?

[9] A: I can't quantify it. I mean it was [10] basically — you know, I had points when I knew [11] that I was being treated badly in my view, and I [12] would get upset and depressed about it. But it [13] wasn't every day of every week of every month.

[14] Q: Did you ever seek any treatment for it during [15] the time that you worked at IBM?

[16] A: For some stress I did.

[17] Q: With whom?

[18] A: I saw my principal physician.

[19] Q: When was this?

[20] A: It's in the medical records. I don't remember [21] the dates.

[22] Q: Well, I don't believe there's any-

thing you [23] produced to us, so don't expect that I know it.

[24] A: I don't know the dates.

Page 121

[1] Q: How often?

[2] A: How often what?

[3] Q: Did you seek out treatment for the depression [4] or stress you were feeling?

[5] A: I would say probably maybe one or two [6] occasions with my primary physician.

[7] Q: With anybody else?

[8] A: I didn't see a specialist.

[9] Q: And what did your primary physician do or [10] recommend?

[11] A: He prescribed some medication to get me over [12] the hard spots.

[13] Q: What medication?

[14] A: Some sort of a sedative.

[15] Q: Who was your primary care physician?

[16] A: Frederick Bruch, B-R-U-C-H.

[17] Q: Where is he located?

[18] A: He's at the Dartmouth-Hitchcock Clinic.

[19] Q: Where is that located?

[20] A: Keene, New Hampshire.

[21] Q: You said you did not recall what he [22] prescribed?

[23] A: No. It was some sort of a sedative, but I [24] don't know what it was.

Page 122

[1] Q: How long did you take that sedative for?

[2] A: I didn't take it continually. I would take it [3] if — what would happen is if I was feeling [4] stressed, the recalcitrant excema would kick in, [5] and I would take one of these tablets, and that [6] would sort of break the cycle. And then I wouldn't [7] take — I didn't take them every day.

[8] Q: When you get the recalcitrant excema, where [9] does it show up on you?

[10] A: Basically it could be anywhere on my body.

[11] Q: And how often did you experience sleeplessness [12] during the period you were working for IBM as a [13] result of the depression you suggest that you were [14] experiencing from time to time?

[15] A: It could have been, again, related to events. [16] If there was a particular event going on, "event" [17] meaning an opportunity lost or something like that, [18] sleeplessness might go on for two or three nights.

[19] Q: You were claiming at the same

time that you [20] were employed at IBM — well, strike that. When [21] did your case against Digital get resolved?

[22] **A:** I don't recall.

[23] **MR. TARLOW:** I'll be right back.

[24] (Pause.)

Page 123

[1] BY MR. TARLOW:

[2] **Q:** This is a letter we got from the MCAD with the [3] information that they had about your case. They [4] don't have a file, but they have a printout. And [5] it indicates on this printout from the MCAD that [6] the case was closed — was conciliated in December [7] 1999. Does that ring a bell — refresh your [8] memory?

[9] **A:** No.

[10] **Q:** Well, the point I was going to raise is: were [11] you claiming emotional distress in that case [12] against Digital Equipment Corporation?

[13] **A:** I'd have to refer to the Complaint. I don't [14] recall at this point.

[15] **Q:** Were you experiencing any emotional distress [16] as a result of the events that you were complaining [17] about in the Digital case during the time you [18] worked for IBM?

[19] **A:** No, I don't believe so. I believe at that [20] point, once I started with IBM, I put the Digital [21] thing behind me.

[22] **Q:** Did you report that to the MCAD, you dropped [23] your emotional distress at that point?

[24] **MR. POWERS:** Well, wait a minute. I

Page 124

[1] don't think he's saying that he dropped the [2] emotional distress. I think he's saying that once [3] he joined IBM, he no longer experienced emotional [4] distress.

[5] **MR. TARLOW:** Well, I'd like to see if [6] that's consistent between the two cases, because he [7] joined IBM shortly after leaving DEC. And he [8] continued to be suing DEC for some number of years [9] while working at IBM. And I would be surprised if [10] he wasn't claiming ongoing emotional distress as a [11] result of the events at DEC that is overlapping [12] with what he's talking about here.

[13] **MR. POWERS:** Well, you're never going to [14] find that out.

[15] **MR. TARLOW:** Why is that?

[16] **MR. POWERS:** Well, you have all the [17] documents.

[18] **MR. TARLOW:** Have you produced everything [19] that you have regarding the case against DEC? [20] You've produced nothing.

[21] **MR. POWERS:** I don't have anything, so [22] you can ask him.

[23] BY MR. TARLOW:

[24] **Q:** Do you have any files at home regarding the

Page 125

[1] case against DEC?

[2] **A:** I'd have to check. I don't know. It's been a [3] number of years.

[4] **MR. TARLOW:** I think it's clearly [5] relevant. But more relevant, I think, having gone [6] through this exercise today than we even realized [7] before.

[8] **THE WITNESS:** It's a matter of public [9] record —

[10] **MR. POWERS:** You don't have to argue [11] about. I don't dispute relevancy. If we have — [12] if he has in his possession documents regarding the [13] case against DEC, we will produce them.

[14] BY MR. TARLOW:

[15] **Q:** Were there any other events in your life [16] during your tenure with IBM, before your layoff, [17] that were causing you stress or occasional feelings [18] of being depressed?

[19] **A:** When was the date that I joined IBM? I'm [20] sorry, was it 19 —

[21] **Q:** '95.

[22] **A:** '95. Not that I can recall at the moment.

[23] **Q:** And how did the events at IBM affect your — [24] that's before your layoff — affect your

Page 126

[1] relationships or your marriage?

[2] **A:** Well, I became withdrawn and uncommunicative [3] with my wife, caused me stress, wondering what was [4] going on. And generally it was just a hard time [5] because we had come so close to retiring and had a [6] plan on what we were going to do retirement-wise, [7] and basically all of that went away.

[8] **Q:** But I'm talking about the period before your [9] layoff. I'm talking about the period where you [10] said you were feeling at least occasional [11] depression and stress as a result of the events —

[12] **A:** Well, I tend to keep things to myself, and I [13] don't like to bring my wife into it and have her [14] worry, so I would just generally clam up. And she [15] knows when I get quiet that something's bothering [16] me. But I normally don't talk to her about all of [17] these things.

[18] After the layoff, it was a different story. [19] But you're not asking me about that.

[20] **Q:** Did you have a good marriage before you went [21] to work at IBM?

[22] **A:** Yes.

[23] **Q:** Did you continue to have a good marriage while [24] you were working at

IBM?

Page 127

[1] **A:** Yes.

[2] **Q:** And what are the damages or the harm you've [3] suffered as a result of the layoff?

[4] **MR. POWERS:** Do you mean emotional —

[5] **MR. TARLOW:** Well, he can tell me the [6] categories. And for the moment — so it can be [7] either economic — I expect it to be economic — [8] and/or emotional.

[9] **THE WITNESS:** I don't have an answer on [10] the economic part of it. And the emotional, I've [11] sort of been describing that as we've been going [12] along here.

[13] BY MR. TARLOW:

[14] **Q:** The only thing we've talked about so far as [15] far as emotionally is what occurred while you were [16] working at IBM. So what harm have you incurred or [17] experienced emotionally as a result of the layoff?

[18] **A:** Well, I mean this was a very difficult thing [19] to deal with it at this particular time of my life. [20] Second only to a death in the family or some- [21] thing, this was a very, very serious — a blow both [22] psychologically and financially to me.

[23] All of our financial plans were put on hold. [24] We had to just adapt and spend down some of our

Page 128

[1] reserves. So, from a financial standpoint, it was [2] very stressful.

[3] I have these other medical conditions that got [4] triggered.

[5] And as I was just relaying, my communication [6] at home became difficult, and my wife was stressed [7] as a result of the financial difficulties that we [8] were anticipating.

[9] **Q:** You said you had medical conditions that were [10] triggered, is that more than one?

[11] **A:** No, just the — basically the recalcitrant [12] excema.

[13] **Q:** How many flare-ups did you experience of the [14] recalcitrant excema?

[15] **A:** Usually once it starts, it's hard to get back [16] under control, so it would ebb and flow, but it was [17] continuing there for several months.

[18] **Q:** Is that something that you experience absent [19] stress?

[20] **A:** Not as much, but occasionally with temperature [21] changes it might, but generally it's stress related [22] in my particular case.

[23] **Q:** And did you seek any treatment from any health [24] care professional as a

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS ROSSITER | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| INTERNATIONAL BUSINESS | ) |
| MACHINES CORPORATION | ) |
| Defendant | ) |
| | ) |

C.A. No. 04 CR 10069DPW

## NOTICE OF TAKING DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30, the Defendant, International

Business Machines Corporation, by its attorneys, will take the deposition of **Keeper of Records of**

**Dartmouth-Hitchcock Hospital**, on **January 4, 2005**, at the offices of Prince, Lobel, Glovsky &

Tye, LLP, 585 Commercial Street, Boston, Massachusetts, commencing at **10:00 a.m.** and

continuing from day to day until concluded.  Please note that in lieu of appearance, the deponent

may produce the records set forth in Schedule A.

You are invited to attend and cross-examine.

Respectfully submitted,

**INTERNATIONAL BUSINESS
MACHINES CORPORATION**

By its attorneys,

Daniel S. Tarlow, BBO #552920
Laurie F. Rubin, BBO #564947
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, MA 02109
(617) 456-8000

Dated:  December 23, 2004

## SCHEDULE A

1.    All documents concerning **Dennis Rossiter, DOB 1/16/42,** including but not limited to all reports, diagnoses, prognoses, medical histories, x-rays, photographs, charts, clinical notes, memoranda, statements, correspondence, communications, test results, clinical and insurance records, prescriptions and bills (whether payable by Dennis Rossiter or any third parties) relating to any physical health or mental  health concerns, conditions, illnesses or disabilities he had or may have had at any time.  Correspondence and communications include, but are not limited to, emails and letters, as well as notes of conversations and telephone calls. Without limiting the foregoing,  please produce all records of Dr. Richard Seymour and Dr. Frederick Bruch concerning Dennis Rossiter.

4

Dennis Rossiter, et. al., Plaintiff(s)
vs.
International Business Machines Corporation, et. al., Defendant(s)



Service of Process by
**APS International, Ltd.**
**1-800-328-7171**

APS International Plaza
7800 Glenroy Road
Minneapolis, MN 55439-
3122

**AFFIDAVIT OF SERVICE — Corporate**

PRINCE, LOBEL, ET AL
Mr. Daniel S. Tarlow
585 Commercial Street
Boston, MA 02109-1024

Service of Process on:
--Dartmouth Hitchcock Hospital, by serving the Keeper of the Records
Court Case No. 04-CR-10069DPW

State of: _New Hampshire_ ) ss.
County of: _Cheshire_

**Name of Server:** _Steven R Rowell_ , undersigned, being duly sworn, deposes and says that at the time of service, s/he was over the age of twenty-one, was not a party to this action;

**Date/Time of Service:** that on the _24th_ day of _December_ , 20 _04_ , at _0930_ o'clock _A_ M

**Place of Service:** at _590 Court Street_ , in _Keene, NH 03431_

**Documents Served:** the undersigned served the documents described as:
Subpoena in a Civil Case with Cover Letter and Schedule A

**Service of Process on:** A true and correct copy of the aforesaid document(s) was served on:
Dartmouth Hitchcock Hospital, by serving the Keeper of the Records

**Person Served, and Method of Service:** By delivering them into the hands of an officer or managing agent whose name and title is: _Shirley Esterman Charge Nurse_

**Description of Person Receiving Documents:** The person receiving documents is described as follows:
Sex _F_ ; Skin Color _W_ ; Hair Color _Red_ ; Facial Hair _N/A_
Approx. Age _55_ ; Approx. Height _5' 7"_ ; Approx. Weight _160_

[X] To the best of my knowledge and belief, said person was not engaged in the US Military at the time of service.

**Signature of Server:** Undersigned declares under penalty of perjury that the foregoing is true and correct.

Subscribed and sworn to before me this _12_ day of _December_ 20 _04_

_Steven R Rowell_    _12-27-04_
Signature of Server          (Date)

_Virginia L Yogt_
Notary Public          (Commission Expires)

**APS International, Ltd.**
APS File #: _069600-0001_

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE 12-24-2004 | PLACE 590 Court St. Keene N.H. |
|---|---|---|
| SERVED | | |

SERVED ON (PRINT NAME)  
Dartmouth Hitchcock Hospital

| SERVED BY (PRINT NAME) By hand To Shirley Esterman | TITLE Charge Nurse @ Dartmouth Hitchcock |
|---|---|

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on 12-24-2004  
DATE

_____  
SIGNATURE OF SERVER

109 Highland St  
ADDRESS OF SERVER

Brattleboro VT 05301

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

TRANSACTION REPORT

DEC-27-2004 MON 04:02 PM

FOR:

RECEIVE

| DATE | START | SENDER | RX TIME | PAGES | TYPE | NOTE | M# | DP |
|------|-------|--------|---------|-------|------|------|-----|-----|
| DEC-27 | 04:01 PM | CAG 800-538-5299 | 1'51" | 2 | RECEIVE | OK | | |

EXHIBIT 4

# RODGERS, POWERS & SCHWARTZ LLP

18 Tremont Street
Boston, MA 02108
Tel. (617) 742-7010
Fax (617) 742-7225

*ATTORNEYS AT LAW*

Linda Evans
Email levans@TheEmploymentLawyers.com

October 12, 2004



Laurie F. Rubin, Esq.
Prince, Lobel, Glovosky & Tye
585 Commercial Street
Boston, MA 02109-1024

Re:    Dennis Rossiter v. International Business Machines Corporation
       C.A. No. 04-10069-DPW

Dear Ms. Rubin:

Enclosed please find Plaintiff Dennis Rossiter's Response to Defendant International
Business Machines Corporation's First Request for the Production of Documents and
produced documents.

If you have any questions, please contact our office.

Very truly yours,

Linda Evans

Linda Evans

Enclosures

CovLtr1stDrsCt10.12.04

Harvey A. Schwartz, P.C.
Kevin G. Powers
Elizabeth A. Rodgers
Jonathan J. Margolis
Robert S. Mantell
Linda Evans
Laurie A. Frankl

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Dennis Rossiter,      ) <br>          **Plaintiff**   ) <br>              ) <br> **v.**                     ) <br>              ) <br> **International Business Machines**   ) <br> **Corporation,**            ) <br>          **Defendant**   ) | **C.A. No. 04-CR-10069DPW** |

### PLAINTIFF DENNIS ROSSITER'S RESPONSE TO DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS

Plaintiff Dennis Rossiter hereby responds and objects, through his attorneys, to Defendant International Business Machines Corporation's ("IBM") First Request for the Production of Documents. Plaintiff will re-produce the documents that he produced in the MCAD proceedings, which have bates-stamp numbers 000000-000171. Any produced document with a higher number is a document not previously produced. Plaintiff will not re-produce documents which the Defendant produced and/or provided to the Plaintiff when he requested his personnel file.

### GENERAL OBJECTIONS

1.      Plaintiff objects to each request to the extent that it seeks obligations beyond those imposed by the Federal Rules of Civil Procedure.

2.      Plaintiff objects to those requests that seek documents, which are in the possession and/or under the control of the Defendant.

3.    Plaintiff objects to those document requests that are not reasonably calculated to lead to the discovery of admissible evidence relevant to the claims and/or the defenses in this action.

## RESPONSES

### Request No. 1

Any and all documents including, but not limited to, personal notes, memoranda or logs you maintained, in any form, which evidence, reflect, refer or relate to your employment by IBM, your work performance, and the evaluation of your work performance.

**Response:**    Plaintiff objects to this request on the grounds that it seeks documents, which are in the possession and/or under the control of IBM. Without waiving his objection, Plaintiff will produce responsive documents.

### Request No. 2

All memoranda or other communications between you and any employee of IBM or anyone associated with IBM.

**Response:**    Plaintiff refers the Defendant to his responses to Document Request Nos. 1, *supra*, and 3, 4, 7, 9-11, 15, *infra*, and produced documents.

### Request No. 3

Any and all documents concerning the facts underlying the allegations contained in paragraph 8 of the Complaint that you were "functionally demoted, treated differently than younger employees in [your] Group, and not offered the opportunity to compete for positions offered to younger employees."

**Response:**    Plaintiff will produce documents responsive to the request.

## Request No. 4

Any and all documents concerning the facts underlying the allegations contained in paragraph 10 of the Complaint about the two "younger employees" who you claim "took over [your] job duties and responsibilities."

**Response:**    Plaintiff objects on the grounds that the request seeks documents, which are in the possession and/or under the control of IBM.  Without waiving this objection, Plaintiff will provide responsive documents.

## Request No. 5

Any and all documents concerning the facts underlying the allegations contained in paragraph 13 of the Complaint that "[y]ounger, less experienced employees filled jobs for which the plaintiff was well qualified."

**Response:**    Plaintiff refers IBM to his response to Document Request No. 4, *supra*, and produced documents.

## Request No. 6

Any and all documents concerning the facts underlying the allegations contained in paragraph 14 of the Complaint that "[s]ome of these jobs that were filled by employees who were younger than the Plaintiff were not posted to the IBM `Jobs Book.'

**Response:**    Plaintiff objects on the grounds that the request seeks documents, which are in the possession and/or under the control of IBM.  Plaintiff cannot

produce documents, which were never posted and available for Plaintiff to obtain. For these reasons, Plaintiff has no documents responsive to the request.

### Request No. 7

Any and all documents concerning the facts underlying the allegations contained in paragraph 15 of the Complaint that "[f]illing positions without first posting them in the IBM's 'Jobs book' was a violation of company policy."

**Response:**    Plaintiff will produce documents responsive to the request.

### Request No. 8

Any and all documents concerning the facts underlying the allegation contained in paragraph 16 of the Complaint that "[w]ithin IBM's Microelectronics Division's Marketing Group, employees in the 50+ age category comprised 22% of the employee population, but were subjected to 60% of the lay-offs within their age grouping."

**Response:**    Plaintiff refers IBM to documents previously produced by IBM, with Bate Stamp Nos. I001134-I001194.

### Request No. 9

Any and all documents concerning any positions which you applied for at IBM, including but not limited to applications for employment and correspondence sent to or received in connection with such positions and notes regarding all communications about such positions.

**Response:**    Plaintiff objects on the grounds that the documents sought are in the possession and/or under the control of IBM. Plaintiff's job search correspondence

was stored on his IBM-provided computer hard drive, which Plaintiff turned in to

the Defendant at the time of his termination.  Plaintiff will produce those

responsive documents that are in his possession and/or under his control.  Plaintiff

also requests that IBM locate Plaintiff's archived communications concerning

positions at IBM and provide Plaintiff with a copy of all retrieved

communications.

**Request No. 10**

Any and all documents that you contend evidences wrongful conduct of

any kind by IBM or which otherwise supports the claims asserted in the

Complaint.

**Response:**    Plaintiff will produce documents responsive to the request.

**Request No. 11**

Any and all documents concerning any claim or charge of discrimination or

retaliation that you made against IBM or any other person or entity, including but

not limited to charges made with the Massachusetts Commission Against

Discrimination, Equal Employment Opportunity Commission, or any other

federal, state or local court, agency or entity.

**Response:**    Plaintiff will produce documents responsive to the request.  Plaintiff

also refers IBM to MCAD C.A. No. 95-SEM-0909 (age claim settled and

voluntarily withdrawn) and Middlesex Superior Court C.A. No. 2003-03174

(insurance claim for personal injury).

**Request No. 12**

Any and all documents concerning damages you suffered as a direct result of IBM's alleged unlawful conduct.

**Response:** Plaintiff will produce documents responsive to the request and supplement his production when Plaintiff obtains additional tax documents concerning his income in 2002 and 2003.

**Request No. 13**

Any and all documents concerning visits or consultations you have had with any physicians or health care professionals (including mental health professionals) as referred to in Interrogatory No. 8, including but not limited to medical records, doctor's notes, test results or medical reports.

**Response:** Plaintiff will produce document responsive to the request.

**Request No. 14**

Any and all documents concerning expenses you have paid with regard to visits or consultations with any physicians or health care professionals (including mental health professionals) as referred to in Interrogatory No. 8 including, without limitation, all receipts and invoices.

**Response:** Most of Plaintiff's medical expenses were covered by insurance, and uncovered expenses would approximate $2,000. Plaintiff refers IBM to his response to Document Request No. 13, *supra*, and produced documents.

**Request No. 15**

Any and all documents concerning your efforts to secure alternative employment since October 1, 2001, including but not limited to applications for employment and correspondence sent to or received from prospective employers and notes regarding all communications with prospective employers.

**Response:**    Plaintiff will produce documents responsive to the request. Plaintiff also refers IBM to the company's archived communications that were on the hard drive of Plaintiff's IBM-provided computer.

**Request No. 16**

Any and all documents concerning your employment, subsequent to your employment at IBM, including but not limited to documents which reveal your titles and/or duties, the period of employment, the name of the employer and the amount of compensation you received.

**Response:**    Plaintiff is a private contractor affiliated with Coldwell Banker Residential Brokerage. If Plaintiff locates his contractor agreement with Coldwell Banker, he will supplement his production with the agreement.

**Request No. 17**

All local, state, and federal tax returns, including, estimated taxes, for 2002 through the present, and filed by you and/or your wife, if applicable.

**Response:**    Plaintiff objects to this request on the grounds that it seeks documents that invade the privacy rights of Plaintiff's spouse. Without waiving

his objection, Plaintiff refers IBM to his response to Document Request No. 12, *supra*, and produced documents.

### Request No. 18

Any and all documents concerning any positions which you applied for at IBM and any responses you received to any inquiries or applications you submitted.

**Response:**    Plaintiff objects on the grounds that the request seeks documents, which are in the possession and/or under the control of IBM and the request is redundant. Without waiving his objections, Plaintiff refers the Defendant to his response to Document Request No. 9, *supra*, and produced documents.

### Request No. 19

Any and all documents identified in response to Interrogatory No. 5.

**Response:**    Plaintiff refers IBM to documents previously produced by the Defendant, with Bate Stamp Nos. I001134-I001194.

### Request No. 20

Any and all documents identified in response to Interrogatory No. 6.

**Response:**    Plaintiff refers IBM to his responses to Document Request Nos. 1, 3, 4, 7, 9-11, *supra*, and produced documents.

### Request No. 21

Any and all documents upon which you intend to rely or introduce into evidence at the trial of this case.

**Response:**    Plaintiff has not made a final determination about the documents that he will introduce into evidence at the trial of this case action.

**Request No. 22**

Any and all reports, statements, accounts or documents prepared on your behalf by any person identified as an expert witness in response to Interrogatory No. 15.

**Response:**    There are no documents responsive to the request.

Dennis Rossiter
By his Attorneys,

Kevin G. Powers, BBO #405020
Linda Evans, BBO #635078
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

DRs

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on  10/12/04 .
_____ Linda Evans _____

9