UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS ROSSITER<br>      Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION<br>      Defendant. | C.A. No. 04 CR 10069DPW |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant International Business Machines Corporation ("IBM") hereby submits this memorandum of law in support of its motion for summary judgment.

**I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff Dennis Rossiter was hired into IBM's marketing group in 1995 at age 53. He was laid-off in late 2001. Plaintiff asserts age discrimination claims against IBM challenging his lay-off in 2001, his failure to receive promotional opportunities from 1998-2000, and his demotion in 1997.

In late 2001, IBM engaged in a lay-off of 1,200 employees because of a significant downturn in business. IBM established a layoff selection process, based on a skill comparison within narrowly defined skill groups. Plaintiff's supervisor, Patricia McGloin, followed this process and recommended Mr. Rossiter's lay-off because his skills were assessed weakest in his skill group. The plaintiff's RIF claim should be dismissed. First, he cannot establish a <u>prima facie</u> case where four (4) of the five (5) members in his skill group were in the protected class

and two of the five were let go. There can be no inference of discrimination simply because plaintiff (at age 59) happened to be the oldest employee in the group, especially where skill group members at ages 54 and 49 were retained. Further, the lay-off statistics from the larger marketing group do not suggest anything about discrimination: the percentage of employees over 40 actually *increased* after the lay-off and the average age decreased by less than a half-year.

Moreover, even if plaintiff could establish a <u>prima facie</u> case, IBM has more than met its burden of offering a legitimate reason for plaintiff's inclusion in the RIF. Plaintiff cannot show that IBM's stated reason is pretextual: he is unable to challenge the selection process, he is unable to say who should have been laid-off instead of him, the lay-off statistics reveal nothing about discrimination, and he could not offer anything beyond rank speculation that either of the managers involved in his lay-off harbored discriminatory animus. Summary judgment should issue for IBM on plaintiff's RIF claim.

Plaintiff's failure to promote claim is flawed from its inception. Plaintiff contends the jobs at issue were not properly posted, and that he should have had an opportunity to compete for them. However, the undisputed facts show that IBM adhered to its posting policy and practice. Indeed, two of the jobs at issue were posted and plaintiff failed to apply. Also, two of the jobs plaintiff is not sure he even wanted. Further, plaintiff does not have any evidence (and mostly does not even contend) that anyone intended to exclude him or older workers generally from the jobs that were not posted (or that older workers were in any way uniquely affected).

In any case, the promotion claims are untimely under the filing deadlines for the ADEA (300 days) and M.G.L. c. 151B (6 months). The jobs at issue were filled between early 1998 and November 2000. Plaintiff filed his charge at the MCAD on March 11, 2002. Moreover, the

continuing violation theory cannot rescue these claims since failure to promote claims are recognized as discrete acts that are not subject to the continuing violation theory.

Plaintiff was demoted in April 1997. Plaintiff's demotion claim has been long time-barred. A demotion is also a discrete act, and therefore, cannot be rescued by reliance on a continuing violation theory.

For all of these reasons, and those set forth more fully below, IBM's Motion for Summary Judgment should be granted.

## II.  SUMMARY OF UNDISPUTED FACTS

### January 1995: Rossiter's Hiring at Age 53

Plaintiff Dennis Rossiter was hired by IBM in January 1995, at age 53, as the manager of marketing communications for IBM's PowerPC product line. See Defendant IBM's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Statement of Undisputed Facts") at ¶¶ 1, 2.

In or about April 1995, Rossiter began reporting to Mr. James Monahan, the Director of Marketing Communications for IBM's Microelectronics Division ("MD"). Id. at ¶ 3. MD manufactures and sells microprocessors. Id.

### Fall 2001: The Microelectronics Resource Action (The Lay-Off)

As a result of a significant downturn in the microprocessor/semiconductor industry, MD conducted a large scale lay-off in the fall of 2001 of more than 1,200 employees. Id. at ¶ 4. Rossiter does not dispute that IBM had a legitimate reason to engage in a significant lay-off. Id. at ¶ 5.

### Management Structure Within Microelectronics Division at the Time of the Lay-off

In 2001, Rossiter reported to Patricia McGloin Waitt ("McGloin"), the Manager of MD's Integrated Marketing Communications group. Id. at ¶ 6. Rossiter had been reporting to Ms.

McGloin since early 1998, when she took over responsibility for marketing communications ("MARCOM") from Mr. Monahan. Id. at ¶ 6. In early 2001, Mark Lefebvre became the Director of MD Marketing and Ms. McGloin's supervisor. Id. at ¶ 7. He had a number of other marketing groups (i.e., in addition to Ms. McGloin's group) reporting to him. Id. at ¶ 8.

### **IBM's Lay-off Guidelines: Methodology for Selecting Employees to Be Laid-Off**

IBM issued guidelines and conducted training for managers on the methodology for selecting employees to lay-off. Id. at ¶ 9. As discussed below, managers were directed to define skill groups by grouping employees by salary "band." IBM has a system where employees are grouped into bands 1-10. Id. At the time, Rossiter was in Band 9. Id.

In particular, IBM instructed managers on the following multi-step process:

- Managers first were to define skill groups consisting of people in the same job category, in the same salary band level and with the same managerial status (managers and non-managers could not be in the same skill group). In other words, managers were instructed that they could not compare employees in different job categories, different salary bands or different managerial status.

- Managers then were told to define the critical skills required for each skill group.

- Managers then needed to define the proficiency/knowledge level that the skill group members were to possess for each critical skill by using a pre-existing IBM scale, which accorded higher proficiency levels to higher band levels.

- Finally, managers were to conduct skill assessments and to recommend lay-offs based on the assessments (i.e., to lay-off employees whose skills were weaker).

Id. at ¶ 11.

### IBM Directs Lefebvre to Layoff Approximately 20 of His 46 Employees

In October 2001, Mr. Lefebvre was directed to layoff 20 or 21 employees (out of the 46 employees in his groups). Id. at ¶ 12. Mr. Lefebvre told Ms. McGloin that her group was expected to contribute to the lay-off but he did not give her a specific target. Id. at ¶ 13.

### McGloin Applies Criteria and Recommends Rossiter and Others for Lay-off

In following the lay-off methodology, Ms. McGloin first grouped her employees into skill groups. Id. at ¶ 16. In doing so, she readily determined that the skill group with the largest number of incumbents was the Band 9, non-managers, who were in the job category of "IMC Specialist Advanced." Id. This skill group she called "Integrated Marketing Communications Band 9" (hereinafter, the "IMC/Band 9 Skill Group"). Id. This skill group consisted of 5 people: Dennis Rossiter, Ronald Milos, Kathy Weaver, Kathy Spilke, and Deborah Guynn. Id. Based on the relatively large size of this group, Ms. McGloin included it in the lay-off. Id.

Applying the Selection Guidelines, Ms. McGloin defined the skills for this skill group. Id. at ¶ 17. In particular, she chose the following skills (and associated proficiency/knowledge levels): in-depth knowledge of business plans, program development, measurement techniques, use of cross-functional teams, agency operations, and basic financial concepts. Id. at ¶ 18.

Next, Ms. McGloin assessed the skills of the persons in the IMC/Band 9 Skill Group who reported directly to her (Rossiter and Guynn) and she asked Robert Rohrer, a manager in her group, to assess the skills of his direct reports (Milos, Weaver, Spilke). Id. at ¶ 20.

Ms. McGloin's assessment of Rossiter was that he had "Applied Knowledge" in five of the six categories, which signified that he could perform with assistance, and that he had "In-Depth Knowledge" in the remaining category, which signified that he could perform without

5

assistance. Id. at ¶ 22. The overall rankings were as follows, from highest to lowest: Guynn, Milos, Spilke, Weaver and Rossiter. Id. at ¶ 23.

Based on these assessments, McGloin recommended (and Lefebvre approved) the layoff of the two employees with the lowest assessments: Rossiter and Weaver. Id. at ¶ 24. Rossiter was age 59 at the time, and Weaver was 54. Id. The employees retained— Milos, Spilke and Guynn—were ages 54, 49, and 38, respectively. Id.[1]

### The Re-Distribution of Rossiter's Job Functions

Rossiter had two primary job functions: a) creating and managing the Integrated Marketing Communications strategy and plan for the Server product line; and b) group naming coordinator (assisting in choosing product names for new products). Id. at ¶ 27. As for the group naming responsibilities, Mr. Lefebvre had decided before the lay-off to move these from McGloin's group to the person in charge of Brand Marketing and Corporate Programs (Carol McNerney), who was assisted by Ray Chang. Id. at ¶ 28. After Rossiter's lay-off, the naming responsibilities comprised approximately 10-15% of both Ms. McNerney's and Mr. Chang's jobs. Id. Rossiter's IMC responsibilities went to Karen Smith, who was a Band 10 IMC Strategist in Ms. McGloin's department with responsibility for additional product lines. Id. at ¶ 29. At the time, Ms. Smith was age 48 and a 27 year IBM veteran. Id.

### Rossiter's Challenge To His Selection for Lay-off

Rossiter challenges his lay-off. But, he does not have a problem with McGloin's selection of the six (6) skills, although the proficiency levels he finds "esoteric." Id. at ¶ 31. Although he professed limited understanding of the meaning of these proficiency levels, Rossiter testified that some of the assessments were wrong. In particular, he disagreed with McGloin's

---

[1] Ms. McGloin also recommended the layoff of two employees from another skill group. Id. at ¶ 25. Therefore, in total, McGloin recommended the lay-off of 4 of the 14 employees in her department. Id.

6

assessment that he had "applied knowledge" of "measurement techniques," because he says that he designed surveys and never received feedback that there was a problem. Id. at ¶ 34. He also disagreed with the assessment that he had "applied knowledge" of "financial concepts" because he does not remember even needing prodding or coaching to stay under budget. Id.

Rossiter offered several theories to attack these assessments:

First, Rossiter testified that McGloin produced an inaccurate assessment because she lacked an understanding of MARCOM. Id. at ¶ 32. Second, he testified that the assessment was contrary to his positive performance reviews and, therefore, McGloin had to have made up things to get rid of him. Id. at ¶ 30. Finally, he testified that McGloin's assessment was the result of her unexpressed stereotypes of him as an older man. Id.

Rossiter was unable to point to anyone within his comparison group who had inferior skills to him. Id. at ¶ 35-38. He was unable to comment on Guynn and Milos because he did not work with them enough. Id. at ¶ 35-36. Rossiter testified that Weaver's and Spilke's work performance were comparable to his own (although he did think that Weaver, who was laid-off along with him, was the weakest of the group). Id. at ¶¶ 37-38.

When asked who McGloin should have chosen for lay-off of the group of Band 9, non-managers, he testified, without offering any support: "I don't know because I don't believe that was the way that the layoffs were selected." Id. at ¶ 40. When asked who Ms. McGloin should have laid-off instead of him, he testified: "There were a lot of people in the department with a lot less experience and skills. I can't name names…" Id. at ¶ 39.

Rossiter also believes that Karen Smith, who received some of his job responsibilities, was an inferior performer to him. Id. at ¶ 41. Ms. Smith was not in Mr. Rossiter's skill group (she was a Band 10) and thus, he was not compared to her in the lay-off selection process. Id.

7

Rossiter believes that the lay-off in Lefebvre's group evidences age discrimination based on the following statistical comparison: employees 50 or older comprised 22% of the population, yet 60% were selected for lay-off (6 out of 10). Id. at ¶ 42. This statistic is based on an insufficient sample size and also ignores the bigger picture. The percentage of employees laid-off who were age 35 and younger (5 out of 11) was similar in magnitude. Id. at ¶ 43. Moreover, in the end, the percentage of employees age 40 and older *increased* from 65% to 70%, and the average age of the employees decreased by less than one-half year from 42 to 41.6. Id.

### What Rossiter Has to Say About Alleged Discrimination by McGloin and Lefebvre

Rossiter concedes that Ms. McGloin never made ageist comments. Id. at ¶ 44. He is also unaware of her ever discriminating against other older workers. Id. at ¶ 45. In the last two years that she reviewed him (1999 and 2000), she rated him a "2," signifying an employee who had achieved or exceeded commitments, and he was satisfied with these evaluations. Id. at ¶ 47. Moreover, she was the first manager at IBM to give him a good performance rating. Id. In an effort to show bias, Rossiter vaguely asserted that McGloin resisted his ideas. This assertion is belied by numerous e-mails he produced wherein McGloin praises his ideas. Id. at ¶ 49. Rossiter also claims that McGloin made him work harder than others to achieve the same performance rating – but he conceded he did not know other peoples' ratings. Id. at ¶ 46.

About alleged bias by Lefebvre, Rossiter had little to say other than relate a story about a dinner where Lefebvre supposedly said that Rossiter's favorite music was dated. Id. at ¶ 51.

### Claims Regarding The Earlier Years at IBM: Alleged Discriminatory Comments

Rossiter was interviewed to work at IBM by James Monahan and Ron Black. Id. at ¶ 53. During the interview, Monahan allegedly asked Rossiter "if he still had the fire in the belly?" Id.

Rossiter, who was then 53, believes this question showed bias against older workers. Id. Mr. Monahan had direct input into the hiring decision and recommended Rossiter's hire. Id. at ¶ 54.

Rossiter reported to Mr. Monahan from April 1995 through the end of 1997. Id. at ¶ 57. At some point, Monahan told Rossiter that he was "overqualified," which Rossiter interpreted as ageist. Id. Rossiter recalls no other comments by Monahan reflecting age bias. Id. at ¶ 58.

### Claims Regarding The Earlier Years at IBM: The Demotion

In 1997, Mr. Monahan's boss, Jesse Parker, required him to restructure MARCOM so that Monahan would be the only manager in the group. Id. at ¶ 60. As a result, in April 1997, Mr. Rossiter went from a Band 10 to Band 9 and he no longer had people reporting to him. Id. at ¶ 59. Rossiter understood immediately that his salary was partially frozen and any salary increases would be severely restricted. Id. at ¶ 61. Monahan informed Rossiter that this demotion was the result of "a general flattening of management levels." Id. at ¶ 59.

### Rossiter Claims That He Was Not Considered For a Number of Promotions

Mr. Rossiter claims that "subsequent to [his] demotion, IBM promoted younger, less experienced employees to manager positions. New jobs were created for which [he] was well-qualified, but never considered, because the jobs were not posted. Rather, IBM gave the jobs to younger, less qualified employees." Id. at ¶ 64. Rossiter believes all of these promotional opportunities were required to be posted under IBM's job posting policy. Id.

IBM's job posting policy for internal jobs provided that, with certain exceptions, regular Band 10 and below, non-executive positions and temporary assignments were to be posted. Id. at ¶ 65. Under this policy, executive level positions, including Director positions (which are above a Band 10) generally are not posted. Id. The policy also provided that where there is an

expansion of a current position-holder's mission (a "hierarchical movement"), it is not an opening and is not posted. Id.

Rossiter claims he was excluded from the following jobs for discriminatory reasons:

**Director, Integrated Marketing Communications (Technology Group) Position**

In late 1998 or early 1999, IBM combined its Microelectronics business with its Storage business to create the "Technology Group." Id. at ¶ 68. IBM hired Ed Abrams as the Director, Integrated Marketing Communications, Technology Group ("IMC Director") in June 1999. Id. This was executive/director level, not subject to the posting policy and not posted. Id. Rossiter does not contend that the non-posting was directed at him personally, or older workers generally. Id. at ¶ 69.

**Technology Group Events Manager and Technology Group Collateral Manager**

In September 1999 and May 2000, Ed Abrams expanded Marge Oppold's and Kathy Spilke's existing roles due to the changed responsibilities of the new Technology Group business unit. Id. at ¶¶ 72-79. These were not new jobs but hierarchical movements that were expansions of existing roles and did not need to be and were not posted. Id. Rossiter cannot say whether Ed Abrams, the manager who promoted Oppold and Spilke, had an animus against older workers. Id. at ¶ 74. Rossiter was equivocal about whether he would have even taken the Collateral Manager position if it had been offered to him. Id. at ¶ 79. Rossiter does not claim that non-posting of these positions affected just him or older workers. Id. at ¶¶ 73, 77.

**PowerPC Marketing Communications Manager and/or Programs Manager Position**

This position *was* posted and Rossiter did not apply. Id. at ¶ 82. Cynthia Roy (nee Putlitz), who was a Power PC Marketing Manager, applied and was hired in November 2000. Id.

10

at ¶¶ 83-84. Rossiter is not aware of the hiring manager, Wendy Arnette, having any age bias. Id. at ¶ 85. Rossiter may not have taken this job even had it been offered to him. Id.

### Technology Group Interactive Marketing Manager Position

This was a new job, responsible for managing the Technology Group's web-based marketing. Id. at ¶ 88. It *was* posted and Rossiter did not apply. Id. Robert Rohrer did apply and in July 2000 was hired by Ed Abrams based on demonstrated skills in web based marketing. Id.

### Microelectronics Integrated Marketing Communications Manager

In late 1997 or early 1998, Ms. McGloin became Microelectronics Integrated Marketing Communications Manager as part of a reorganization, in which a number of marketing groups were combined. Id. at ¶ 95. The position consisted of Mr. Monahan's former responsibilities and the responsibilities Ms. McGloin had in her job managing Field Programs. Id. at ¶ 96.

### March 2002, Rossiter Files at the MCAD

Rossiter filed his MCAD charge of discrimination on March 11, 2002. Id. at ¶ 97.

### III.  ARGUMENT

1. **The RIF Claim Fails Because IBM had a Legitimate Reason for Conducting a Large Scale Lay-Off and Rossiter Cannot Show Pretext or Discrimination**

   a)  The Plaintiff Cannot Establish a Prima Facie Case of Age Discrimination

Plaintiff cannot establish a prima facie case of age discrimination. The "purpose of the prima facie case is to identify those circumstances where the employer's actions, if left unexplained, are more likely than not based on unlawful discrimination." Lewis v. City of Boston, 321 F.3d 207, 216 (1st Cir. 2003).[2] Plaintiff tries to make this showing based on the

---

[2] Age discrimination claims follow the traditional burden-shifting framework. E.g., Baralt v. Nationwide Mut. Ins. Co., 251 F.3d 10, 16 n.8 (1st Cir. 2001) (ADEA), cert. denied, 534 U.S. 1127 (2002); Heard v. Commonwealth of

11

following: Employees 50 or older comprised 22% of Lefebvre's group, yet 60% (6 out of 10) were selected for lay-off. Among the members of his skill group, he and Weaver were laid-off (at ages 59 and 54), while Milos, Spilke, and Guynn were retained (at ages 54, 49, and 38).

These comparisons do not enable plaintiff to meet his burden. Here, the statistics do not suggest anything about discrimination at all: the percentage of employees over 40 in Lefebvre's organization actually *increased* after the lay-off. Further, the average age of the employees in Lefebvre's group before the lay-off was 42; after the lay-off, it had decreased less than a half-year, to 41.6. See Hannebrink v. Brown Shoe Co., 110 F.3d 644, 646 (8th Cir. 1997) (no statistical basis for age discrimination where the average age of employees declined by only one-half year after layoffs); see Stidham v. Minnesota Mining and Mfg, Inc., 399 F.3d 935, 938 (8th Cir. 2005) (4% decline in the workforce over the age of 40 and a half year decrease in the average age of the work force was not statistically significant). Rossiter focuses on one statistic only (the percentage of people over fifty who were laid-off). This selective statistic also fails because it is based on a small number of employees and therefore not probative of anything. E.g., Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 16 (1st Cir. 1998).

There is also no inference of discrimination based on the fact that one or more "younger" members of the skill group were retained.[3] Put in context, all but one of the five skill group members were in the protected class and two of the five were let go. There can be no inference

---

Massachusetts, Massachusetts Rehabilitation Comm'n, 2003 U.S. Dist LEXIS 14233, at *8-9 (D. Mass. 2003) (M.G.L.c 151B). For a RIF, the prima facie case consists of the following elements: 1) plaintiff was a member of the protected class; 2) he performed his job adequately; 3) he was terminated; and 4) the employer did not treat age neutrally in making its decision to terminate him or retained personnel outside of his protected class in the same position. Lewis, 321 F.3d at 214. Under Massachusetts law, the fourth prong requires "some evidence that would raise a reasonable inference of unlawful discrimination." Sullivan v. Liberty Mutual Ins. Co., 444 Mass. 34, 45, 825 N.E. 2d 522, 533-34 (2005).

[3] See Knight v. Avon Prods., Inc., 438 Mass. 413, 424-425, 780 N.E.2d 1255, 1265-265 (2003) (requiring age difference of at least five years under c. 151B and citing to ADEA cases requiring five to ten years).

of discrimination simply because Rossiter happened to be the oldest employee in the group – otherwise that would give the oldest employee job protections that the anti-discrimination laws do not contemplate. See Sullivan, 444 Mass. at 44-45 & n.15, 825 N.E. 2d at 533 & n.15 (in some cases, "the employer's retention in the plaintiff's same position of an employee who is outside the plaintiff's protected class, without more, would not necessarily permit a reasonable inference of discrimination").

There is no infererence of discrimination and plaintiff cannot establish a prima facie case.

b)  IBM Has Met Its Burden of Proffering a Non-Discriminatory Reason

IBM has met its burden of articulating a legitimate non-discriminatory reason for plaintiff's lay-off. Heard, 2003 U.S. Dist LEXIS 14233, at *10-11. IBM engaged in a massive lay-off of 1,200 employees because of a significant downturn in business. IBM established a process for selecting employees to lay-off, based on a skill comparison within narrowly defined skill groups. Plaintiff's supervisor, Patricia McGloin, followed this process and recommended Mr. Rossiter's lay-off because his skills were assessed weakest in his skill group.

c)  Plaintiff Cannot Show IBM's Reason Is Pretextual

At the third stage, the presumption of discrimination disappears, Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995), and the burden returns to the plaintiff to prove that IBM's reason is a pretext for discrimination. Heard, 2003 U.S. Dist LEXIS 14233, at *11 ("The burden on plaintiff at this point in the McDonnell Douglas analysis is heavy.") (quoting Dow v. Donovan, 150 F. Supp. 2d 249, 264 (D. Mass. 2001)). Plaintiff cannot meet his burden. He mounts a number of challenges but none rise above the level of speculation.

i)  Plaintiff Cannot Show Pretext Based On Assertions of Satisfactory Job Performance

Plaintiff challenges his skill assessment in the following ways:

First, plaintiff claims that McGloin was mistaken because she lacked marketing knowledge and therefore could not judge him appropriately. This argument fails because the anti-discrimination laws do not require that employers get it right, only that they do not act for discriminatory motives. In assessing pretext, the issue is not whether the employer's articulated reason is correct, but whether the employer believes the reason to be correct. E.g., Sullivan, 444 Mass. at 56-57, 825 N.E.2d at 542; Mesnick v. General Elec. Co., 950 F.2d, 816, 825 (1st Cir. 1991) ("courts may not sit as super personnel departments, assessing the merits - or even the rationality - of employer's nondiscriminatory business decisions").

Second, plaintiff argues that the assessments are at odds with his performance reviews and he was not criticized previously for failings with respect to these skills. He misses the point. Ms. McGloin concluded that he did indeed possess the skills, but at a lower level than others. Since this was a RIF, some people had to be let go, even if they performing satisfactorily. In Golder v. Lockheed Sanders, Inc., 1996 U.S. Dist. LEXIS 15943 (D.N.H. 1996), the district court discussed this critical distinction between a performance review and a forced ranking in a RIF:

> Finally, the court turns to [plaintiff's] claims that he had a broad range of ... skills .... When, as here, an employee is released as part of a [RIF], proof of his or her ability to perform the job adequately is, at best, only minimally relevant because someone has to be terminated. Unfortunately, although that person may well be qualified ..., the employer may simply be unable to retain him or her for economic reasons. "That co-workers and direct managers may have thought he did a good job, or that he did not 'deserve' the ratings or did not 'deserve' to get laid-off, is close to irrelevant. ... Proof of general qualifications is less relevant in a reduction-in-force claim because someone has to be let go." [Id. at *13 (quoting Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 235 (4th Cir. 1991)).]

In short, Rossiter was not let go for poor performance but instead based on an assessment of his skills relative to others in his skill group.

14

Third and finally, Rossiter relies heavily on his own assessment of his skills, performance and experience. However, it is well established that a plaintiff cannot establish pretext based on self-serving assessments of his own performance. See, e.g., Shorette, 155 F.3d at 15 (employee's opinion regarding his job qualifications is not probative of pretext); Heard, 2003 U.S. Dist LEXIS 14233, at * 19 (same).

      ii)      <u>Plaintiff Cannot Establish Pretext Because He Cannot Show That Other Members of the Skill Group Should Have Been Laid-Off Instead of Him</u>

Plaintiff's claim also fails because he cannot point to anyone in his skill group who should have been laid-off instead of him. See Lewis v. City of Boston, 2002 U.S. Dist. LEXIS 6173, at *17 (D. Mass. 2002) (no showing of pretext, in part, because plaintiff failed to show that another position was more appropriate for elimination), aff'd, 321 F.3d 207 (1st Cir. 2003). When the plaintiff was asked who should have been laid-off from the skill group, he replied, "I don't know" and that he could not "name names." Rather than responding to the question, he relied on unsupported speculation that he did not "believe that was the way that the layoffs were selected." Moreover, Rossiter's assessment of the other skill group members reveals that he either had no ability to judge their skills or that he viewed their skills as comparable to his own.

      iii)     <u>Plaintiff Cannot Show Pretext Merely Because His Functions Were Transferred to Others</u>

Plaintiff cannot show pretext simply because his job functions were transferred to other employees. His naming responsibilities moved to Carol McNerney, the person in charge of Brand Marketing, assisted by Ray Chang. Mr. Rossiter's IMC responsibilities went to Karen Smith, a Band 10 IMC Specialist in McGloin's group. Ms. Smith was 48 at the time and a 27 year IBM veteran. McNerney, Chang and Smith all retained their previous responsibilities; the added functions comprised a small portion of their jobs.

To the extent that Mr. Rossiter is suggesting that McNerney, Chang, or Smith should have been laid-off instead of him, he is ignoring IBM's lay-off selection process. None of these employees were in Rossiter's skill group and thus Rossiter was not compared to them. See Sullivan, 444 Mass. at 56, 825 N.E.2d at 541 (employee could not show pretext by claiming that her employer compared her to the wrong employees: it is not the court's "task" to "evaluate the soundness of [an employer's] decision making"). Rossiter does not and cannot possibly suggest that IBM's selection process for this large scale lay-off, or the definition of skill groups in that process, was in any way directed at him personally or older workers generally. Moreover, the mere fact that Rossiter's responsibilities were distributed to others (even younger employees) does not assist him in showing pretext. Cf. Lewis, 2002 U.S. Dist. LEXIS 6173, at * 13-14 ("It is not sufficient to demonstrate that some of plaintiff's responsibilities ... were redistributed to existing non-protected personnel because that fact alone does not undermine the need for the reduction in force or suggest that it was accomplished by discrimination.")

    iv)    <u>Plaintiff Cannot Show Pretext Based on the Lay-Off Statistics</u>

The lay-off statistics do not help Rossiter in showing pretext any more than they did in establishing a prima facie case (see pp. 11-12, supra). As a general proposition, "in a disparate treatment case ... the central focus 'is less whether a pattern of discrimination existed [at the company] and more how a particular individual was treated, and why.'" LeBlanc v. Great American Ins. Co., 6 F.3d 836, 848 (1st Cir. 1993) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 156 (1st Cir. 1990)), cert. denied, 511 U.S. 1018 (1994). On the pretext issue, plaintiff's analysis fails both because the statistics suggest nothing about age discrimination, and because the selective statistic that plaintiff focuses on (the percentage of employees 50 or older laid-off) does not take into account IBM's stated reason for his lay-off. See Sullivan, 444 Mass.

at 55-56, 825 N.E.2d at 541 (relying on federal cases for the principle that statistics that do not account for legitimate nondiscriminatory explanations do not establish pretext).

Overall, plaintiff has no evidence that IBM's stated reason for his layoff is pretextual.

d)  Plaintiff Cannot Establish A Pretext for *Discrimination*

To survive summary judgment, Rossiter must prove that IBM's proffered explanation for his lay-off selection was not just a pretext, but a pretext *for age discrimination*. See, e.g., Rivera-Aponte v. Restaurant Metropol #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003) (ADEA); Lee v. President & Fellows of Harvard College, 60 Mass. App. Ct. 836, 837 n.2, 806 N.E.2d 463, 464 n.2 (2004) (c. 151B). Plaintiff cannot possibly prove this, as there is no probative evidence of age bias on the part of McGloin or Lefebvre, the individuals who participated in his selection.

About Lefebvre, Rossiter had little to say other than Lefebvre supposedly commented that the music Rossiter liked was dated. This does not even rise to the level of a stray remark.

About McGloin, Rossiter acknowledges that she never said anything that revealed age bias. He is unaware of her ever discriminating against other older workers. While he claimed that he had to work harder than younger workers to get the same ratings, he admitted that he was unaware of others' ratings. Similarly, although he claimed that she was dismissive of his ideas, he could hardly think of an example, and the documentary evidence that he produced shows that she often praised him. Indeed, she was the first IBM manager to give him a good evaluation. See Stidham, 399 F.3d at 940 (evidence that manager who decided to eliminate plaintiff's position had, at the same time, given her a positive evaluation, tends to show manager had no discriminatory animus). In the end, Rossiter relies on nothing but speculation that McGloin had an unobserved (and unexpressed) bias against older workers. Such speculation cannot defeat summary judgment.

\*\*\*

Where plaintiff cannot challenge the selection process, where he cannot say who should have been laid-off instead of him, where the lay-off statistics reveal nothing about discrimination, and where he cannot offer anything beyond rank speculation that either of the managers involved in his lay-off harbored any discriminatory animus, he cannot show pretext or discrimination. Summary judgment should issue for IBM on plaintiff's RIF claim.

### 2. The Promotion Claims Fail Because They are Time-Barred and, in Any Case, There is No Evidence of Discrimination

The plaintiff has identified a number of jobs that he says were not, but should have been posted, and that he was excluded from based on his age. The undisputed facts demonstrate:

First, two of the jobs were posted and Rossiter failed to apply.[4]

Second, Rossiter has nothing to link the non-posting of the remaining four positions[5] to age discrimination. He has no evidence that IBM's exceptions to its posting policy – which exclude executive/director level jobs or jobs that are expansions of a person's existing duties – are discriminatory or even that they disproportionately affect older workers. He does not contend that the non-posting policy affected just him or older workers.

Third, for all six positions (posted *and* non-posted), Rossiter does not know the hiring manager, or, if he knows the manager, he is not aware of any age bias on the part of that person.

Finally, Rossiter is not sure he even wanted two of the jobs (Roy's and Spilke's).

\*\*\*

---

[4] These were: Technology Group Interactive Marketing Manager (filled by Rohrer in July 2000) and PowerPC Marketing Communications Manager (filled by Cynthia Roy in November 2000).

[5] These are his boss's job and his boss's boss's job and two jobs that were expansions of the incumbents' existing duties. These jobs were filled by the following persons: (1) Director, Integrated Marketing Communications Technology Group: Abrams – June 1999; (2) Microelectronics Integrated Marketing Communications Manager: McGloin – early 1998; (3) Technology Group Events Manager: Oppold – September 1999, and (4) Technology Group Collateral Manager: Spilke – May 2000.

Plaintiff's promotion claims are untimely under the filing deadlines for the ADEA (300 days) and chapter 151B (6 months).[6] The jobs were filled between 1998 and November 2000. Plaintiff filed his MCAD charge on March 11, 2002. These claims are all long time-barred.

Nor can plaintiff save these claims by reliance on a continuing violation theory. First, the touchstone of a continuing violation theory is relatedness. See Lawton v. State Mut. Life Assurance Co. of America, 924 F.Supp. 331, 340 (D. Mass. 1996) (no continuing violation under federal or Massachusetts law where the "employment decisions were made over a period of several years, by different individuals, for different reasons"), aff'd, 101 F.3d 218 (1st Cir. 1996). Here, there is no relatedness: the time periods, the players, and the circumstances are all over the map. There is no common thread except that plaintiff now says he would have liked to compete for these jobs (of course, he did not apply for the jobs that were posted and two of the jobs he was not really interested in).

Moreover, the continuing violation theory cannot rescue these claims since failure to promote claims are now recognized as discrete acts that are not subject to the continuing violation theory. E.g., Williams v. Giant Food, Inc., 370 F.3d 423, 429 (4th Cir. 2004) and Morrison v. Northeast Essex Community College, 56 Mass. App. Ct. 784, 793-794, 780 N.E.2d 132, 140 (2002) (both citing AMTRAK v. Morgan, 536 U.S. 101, 114 (2002)).

Finally, the plaintiff has not brought forth any evidence to suggest that there was age discrimination in any of these decisions. Without belaboring the point, the evidence is that IBM adhered to its posting policy and practice. Indeed, two of the jobs were posted and plaintiff did not apply. Also, two of the jobs plaintiff is not sure he even wanted. Further, plaintiff does not have any evidence (and mostly does not even contend) that anyone intended to exclude him or

---

[6] Under chapter 151B, for claims arising on or before November 5, 2002, there is a six-month period in which a plaintiff must file a charge with the MCAD; see St. 2002, c. 223, § 1 (amending G.L. c. 151B, § 5).

older workers generally from any of the jobs that were not posted (or that older workers were in any way uniquely affected). Cf. Heard, 2003 U.S. Dist. LEXIS 14233, at *17 (calling a theory of discriminatory failure to post problematic where plaintiff was not the only person denied consideration for the position nor did he contend that all employees denied consideration were in the protected category). In the end, plaintiff's promotion claims are just an amalgamation of faulty assumptions and weak speculation, and they should be dismissed.

### 3. The Plaintiff's Demotion Claim is Long Time-Barred

Plaintiff was demoted in April 1997 by James Monahan. Plaintiff's demotion claim has been long time-barred. For the reason stated above with respect to the failure to promote claims, included that a demotion is a discrete act, the demotion claim cannot be rescued by reliance on a continuing violation theory.

## IV. CONCLUSION

For all of the above reasons, summary judgment should be granted in IBM's favor.

Respectfully Submitted,

**INTERNATIONAL BUSINESS MACHINES CORPORATION**

By its attorneys,

/s/ Daniel S. Tarlow
Daniel S. Tarlow, BBO #552920
Laurie F. Rubin, BBO #564947
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, MA 02109
(617) 456-8000

Dated: May 4, 2005