# EXHIBIT E

# In The Matter Of:

*Dennis Rossiter   v.*
*International Business Machines Corporation*

---

*Patricia M. Waitt*
*Vol. 1, December 17, 2004*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA  02110*

*(617) 426-2432*

*Original File WAITT.V1, 142 Pages*
*Min-U-Script® File ID: 1551275984*

# Word Index included with this Min-U-Script®

Page 95

[1] let go, you mean?

[2] **MR. POWERS:** Yes.

[3] A: The last one I can recall was in probably
[4] September of 2001.

[5] Q: What program was that?

[6] A: The one I can recall was a business
[7] server-line program.

[8] Q: Was it implemented?

[9] A: I believe portions of it were implemented.

[10] Q: I know this seems like I'm skipping around,
[11] but in terms of written evaluations, were people at
[12] Rossiter's level supposed to be evaluated on a
[13] yearly basis?

[14] A: Yes.

[15] Q: Okay. And was there some date, such as an
[16] anniversary date or birth date, on which they
[17] usually received their evaluation?

[18] A: All individuals were evaluated on an annual
[19] basis at the end of the year.

[20] Q: Now, you evaluated Dennis Rossiter on or
[21] about December of 2000, correct?

[22] A: That was one of the times, yes.

[23] Q: Did you ever make a written evaluation of
[24] Dennis Rossiter after December of 2000?

Page 96

[1] **MR. TARLOW:** You mean a formal evaluation,
[2] or are you talking about evaluating anything he ever
[3] did?

[4] **MR. POWERS:** A formal performance
[5] evaluation.

[6] A: The last formal performance evaluation, I
[7] believe, of Dennis Rossiter in 2000 would have been
[8] whatever the date is on his form of personal
[9] business commitment document. If that was December
[10] 2000, then that was the date. I would have to check
[11] the records.

[12] Q: And do you recall ever doing a formal
[13] performance evaluation of Dennis Rossiter in
[14] December of 2001?

[15] A: December of 2001? I do not.

[16] Q: Do you recall ever making a conscious
[17] decision not to evaluate Dennis Rossiter in or about
[18] December of 2001?

[19] A: My recollection is that by December 2001
[20] Dennis had been selected to exit the company;
[21] therefore, a formal evaluation was not required.

[22] Q: Okay. Is there any kind of company rule or
[23] regulation or policy that says if you've been
[24] identified for layoff, there would be no evaluation?

Page 97

[1] A: I believe there is.

[2] Q: And he was identified for it and notified
[3] in November. Is that your best memory?

[4] A: Yes, it is. I believe one can request a
[5] formal evaluation, but unless that is done, no
[6] evaluation is required.

[7] Q: Now, when you did the skills assessment of
[8] Dennis Rossiter that appears on Rossiter Depo
[9] Exhibit 5, when you were deciding whether Dennis
[10] Rossiter had in-depth knowledge, for instance, of
[11] the business plan or applied knowledge, were you
[12] evaluating his abilities as of the time of the
[13] evaluation?

[14] A: As of the time of the assessment?

[15] Q: Yes.

[16] A: Yes.

[17] Q: So it's a snapshot of what his present
[18] abilities are?

[19] A: Well, the assessment was of the experience
[20] that I had with the individual on that specific
[21] skill.

[22] Q: Right, but experiences change. Would you
[23] agree with that?

[24] A: Sometimes experiences change.

Page 98

[1] Q: What I'm just trying to determine is — for
[2] instance, someone can grow in a position, correct?

[3] A: That's certainly possible.

[4] Q: And some people, their skills can
[5] deteriorate in a position, correct?

[6] A: That's also possible.

[7] Q: My question to you is, when you were doing
[8] the selection work sheet for Dennis Rossiter, was
[9] your skills assessment what you believed his present
[10] skills were?

[11] A: Yes.

[12] Q: Continuing with Dennis Rossiter Depo
[13] Exhibit 5, under "Assessment," Bullet Point 3, it
[14] states "Applied knowledge. Has designed surveys and
[15] managed research agencies, but research did not meet
[16] validity criteria."

[17] My question to you is, what did you mean by
[18] "did not meet validity criteria"?

[19] A: Dennis managed research for the division,
[20] and when it was finalized and presented to IBM's
[21] market intelligence organization, they identified
[22] that the samples were small and therefore not
[23] statistically valid.

[24] Q: Are you referring to a specific research?

Page 103

[1] specifically on Page 14 of that document, it refers
[2] to "complete the employee's demographic
[3] information." What did you understand the
[4] demographic information to be?
[5]    A: (Reviewing documents) I understood that to
[6] be what part of the organization that individual
[7] resided in.
[8]    Q: And nothing else?
[9]    A: And their title, their — yes, "title"
[10] would be the term.
[11]    Q: Anything else?
[12]    A: Nothing else.
[13]    Q: In looking at Rossiter Depo Exhibit 5, has
[14] there been anything redacted from that document, to
[15] your knowledge?
[16]    A: Not that I know of.
[17]    Q: So is this the entire document — well,
[18] there's a — this first page, is that the entire
[19] first page of your selection work sheet?
[20]    A: Oh, yes, absolutely.
[21]    Q: Okay. Now, continuing with Plaintiff Depo
[22] Exhibit 7, Page 21—
[23]    A: Page 21, you said?
[24]    Q: Yes. Under "Assessment."

Page 104

[1]    A: Uh-huh.
[2]    Q: Do you see where it says "must provide
[3] supporting business examples" —
[4]    A: Yes.
[5]    Q: — open parenthesis, "Use personal
[6] attribute for supporting detail," end of
[7] parenthesis.
[8]    A: I do see that.
[9]    Q: Let's talk about each bullet point of your
[10] assessment of Dennis Rossiter and if you could
[11] identify where in your assessment you provided
[12] supporting business examples.
[13]    A: Okay. The first one. "In-depth knowledge
[14] of business plan." I've given the example of the
[15] networking technology naming architecture.
[16]    Q: So that's the supporting business example?
[17]    A: That's correct.
[18]    Q: Okay.
[19]    A: The next one is "knowledge to develop
[20] programs." The example is that he needed
[21] development in creating simple, effective
[22] approaches.
[23]    Q: So that "needs development" is the
[24] supporting business example?

Page 105

[1]    A: I would say that citing "needs development
[2] in creating simple effective approaches" is a
[3] supporting business example.
[4]    Q: Was there an example that you were aware of
[5] that would have shown how Rossiter applied — had
[6] applied knowledge of developing programs?
[7]    A: Absolutely.
[8]    Q: And what would that be?
[9]    A: Okay. One example is that Dennis was
[10] responsible for naming and branding, and yet he did
[11] not take a programmatic approach to that program.
[12] He did not educate the business lines on IBM's
[13] naming guidelines and therefore received numerous
[14] requests from the business lines for various naming
[15] projects.
[16]    Another example would be in the customer
[17] retention program that Dennis developed. It did not
[18] include specific detail outlining the various
[19] responsibilities of the parties involved.
[20]    Another example is in the customer
[21] testimonial program. Dennis did not outline
[22] specifically the — the ways in which the
[23] testimonials could and could not be utilized. For
[24] example, they could be utilized by advertising, or

Page 106

[1] they could be utilized as speaking engagements, et
[2] cetera. I'm sure there were more examples at the
[3] time, but those are what I recall right now.
[4]    Q: In your opinion in calendar year 2001, did
[5] Dennis Rossiter's overall performance stay the same,
[6] get worse, or get better?
[7]    A: In my opinion in 2001, Dennis's — Dennis's
[8] performance was overall —
[9]    MR. TARLOW: I take it you're saying as to
[10] the prior year, Kevin?
[11]    MR. POWERS: Yes.
[12]    A: I think it had improved over the prior
[13] year.
[14]    Q: So his performance, in your opinion, was
[15] better in the calendar year 2001 than it was in the
[16] year 2000?
[17]    A: In my opinion, yes.
[18]    Q: Okay. After you did the selection work
[19] sheet/staff reduction form for Dennis Rossiter, did
[20] you have a conversation with Mark LeFebvre about
[21] your assessment?
[22]    A: I believe I had a conversation with Mark
[23] regarding all the assessments for the skill group,
[24] not only Dennis Rossiter's.

# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS ROSSITER )  | |
| Plaintiff )  | |
|  )  | |
| v. )  | C.A. No. 04 CR 10069DPW |
|  )  | |
| INTERNATIONAL BUSINESS )  | |
| MACHINES CORPORATION )  | |
| Defendant )  | |
|  )  | |

### AFFIDAVIT OF MARGARET SHINE

1)    My name is Margaret Shine, and I am an employee of International Business Machines Incorporated ("IBM"). I have been an employee of IBM since 1983. I am a Legal Assistant in IBM's legal department. In my job I have access to IBM's human resources information database. The database includes information about every employee's performance reviews, date of birth, and date of hire.  For purposes of this affidavit I have confirmed the following information to be true and accurate as reflected in the IBM human resources  database:

   a)  IBM's annual performance rating system is called the Personal Business Commitment system, and the annual review is called a Personal Business Commitment ("PBC"). Dennis Rossiter's performance ratings as reflected in his PBCs were as follows:

      i.    His 1995 rating was a "3" on a scale of 1-3 (3 being the lowest rating), which, at the time, signified that "more was expected" of the employee.

      ii.    His 1996 rating was a "3" on a scale of 1-3 (3 being the lowest rating), which, at the time, signified that the employee "achieved some commitments."

    iii.   His 1997 rating was a "3" on a scale of 1-3 (3 being the lowest rating), which, at the time, signified that the employee "achieved some commitments."

    iv.   His 1998 rating was a "3" on a scale of 1-4 (3 being the second lowest rating), which, at the time, signified that the employee "achieved some commitments."

    v.   His 1999 rating was a "2" on a scale of 1-4 (2 being the second highest rating), which, at the time, signified that the employee "achieved/exceeded commitments."

    vi.   His 2000 rating was a "2" on a scale of 1-4 (2 being the second highest rating), which, at the time, signified that the employee "achieved/exceeded commitments."

b) Dennis Rossiter's date of birth is January 16, 1942.

c) Kathy Weaver's date of birth is May 6, 1947.

d) Ronald Milos' date of birth is May 6, 1947.

e) Deborah Myers' (nee Guynn) date of birth is October 19, 1963.

f) Robert Rohrer's date of birth is November 11, 1951.

g) Karen Smith's date of birth is February 13, 1953. Ms. Smith commenced her employment with IBM in 1974.

h) Marge Oppold's date of birth is June 27, 1957. Ms. Oppold commenced her employment with IBM in 1981.

i) Kathleen Spilke's date of birth is March 15, 1952. Ms. Spilke commenced her employment with IBM in 1983.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS *11*[th] DAY OF APRIL, 2005.

*Margaret Shine*

Margaret Shine

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS ROSSITER ) Plaintiff ) ) v. ) INTERNATIONAL BUSINESS ) MACHINES CORPORATION ) Defendant ) | C.A. No. 04 CR 10069DPW |

## AFFIDAVIT OF CAROL MCNERNEY

1)    My name is Carol McNerney and I am an employee of International Business Machines,

Inc. ("IBM"). I have been an employee of IBM since 1998.

2)    In November 2000, I transferred to Technology Group as Marketing Manager. At this

time I was reporting to Mark Lefebvre, then the Director of Marketing Management for

Technology Group.  In early 2001 Mark Lefebvre became the Director of Marketing for

IBM's Microelectronics Division ("MD") and I continued to report to him. In 2001, I was

a Marketing Manager (in Brand Marketing and Corporate Programs), and my job

consisted of corporate marketing liaison and brand marketing manager (which included

ingredient branding and naming). One example of an ingredient branding project I

worked on in 2001 was a project where Nintendo, which uses IBM microprocessors,

agreed to place the IBM logo on its game boxes.

3)    In 2001, on an IBM corporate level, the product naming function was being aligned with

brand management/marketing.

4)    In 2001, within MD, I was the person responsible for Brand Marketing.

5)  In early 2001, Mr. Lefebvre told me that I would have responsibility for product naming, so that the structure within MD would match the structure at the corporate level. Accordingly, he directed me to begin to take over MD's group product naming responsibilities, which had been handled by Dennis Rossiter.  As a result, in the summer and fall of 2001, I became involved in the product naming function although I had not yet formally replaced Mr. Rossiter in this function. For example, prior to Mr. Rossiter's departure, Corporate IBM hired an outside consultant, Interbrand, to help IBM straighten out and inventory the naming of all products, services and offerings.  MD participated in this project. I was the lead person on this project because it was a corporate project. I worked with Mr. Rossiter on the project. Mr. Rossiter was still officially the group naming coordinator.

6)  When Mr. Rossiter was selected for lay-off, his remaining naming responsibilities were shifted to me. I maintained my existing responsibilities in brand marketing and corporate programs, and the naming responsibilities comprised no more than 10-15% of my job after Rossiter's departure.

7)  In the fall of 2001, Ray Chang was assigned to work with me in Brand Marketing and Corporate Programs. Mr. Chang assisted me with market management, brand programs, and corporate programs. I was his "team lead" -- a team lead heads a team on particular projects but is not a supervisor per se. After Mr. Rossiter's departure, Mr. Chang assisted me with the product naming function.  Mr. Chang maintained his existing responsibilities for brand marketing and marketing management (e.g., he continued to work on a branding strategy project for the PowerPC product that he was working on before the lay-

off), and the naming responsibilities he took on comprised a small piece of his overall job

(I would estimate no more than 10-15%).

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 17th DAY OF

APRIL, 2005.

Carol McNerney

# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DENNIS ROSSITER | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 04 CR 10069DPW |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION | ) | |
| Defendant | ) | |
| | ) | |

### AFFIDAVIT OF KAREN SMITH

1)   My name is Karen Smith and I am an employee of International Business Machines, Inc. ("IBM"). I have been an employee of IBM since 1974.

2)   In 2001, I was a Band Level 10, Senior Integrated Marketing Communications Specialist, reporting to Patricia McGloin, the Manager of Integrated Marketing Communications, ("IMC") in the Microelectronics Division ("MD"). In 2001, I was supporting four (4) MD business/product lines: the PowerPC product line, the pervasive computing product line, the wireless product line, and the foundry products. I was responsible, amongst other things, for producing an IMC plan for each of these product lines.

3)   After Dennis Rossiter was laid off in January 2002, I was assigned his former business/product line, the Server/IT product line.  I maintained my existing product lines, and the server responsibilities comprised no more than 5% of my job after Mr. Rossiter's departure. In fact, due to a change in business strategy in MD, not too long after Mr. Rossiter left the company there was no longer a need to prepare an IMC plan for the server product line.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 10 DAY OF APRIL, 2005.

_Karen Smith_

Karen Smith

# EXHIBIT I

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS



DEFENDANT'S
EXHIBIT
# 10
12/10/04 es

|  |  |
|---|---|
| Dennis Rossiter, **Plaintiff** | ) ) ) ) |
| v. | ) C.A. No. 04-CR-10069DPW ) |
| International Business Machines Corporation, **Defendant** | ) ) ) ) ) |

## PLAINTIFF DENNIS ROSSITER'S ANSWERS TO DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATIONS FIRST SET OF INTERROGATORIES

Plaintiff Dennis Rossiter hereby answers, and objects to, through his attorneys, Defendant International Business Machines Corporation's (hereinafter referred to as "IBM") First Set of Interrogatories.

### GENERAL OBJECTIONS

1.   Plaintiff objects to each interrogatory to the extent that it seeks obligations beyond those imposed by the Federal Rules of Civil Procedure.

2.   Plaintiff objects to those interrogatories that seek information that is protected by either the attorney-client privilege or the attorney work-product doctrine.

3.   Plaintiff objects to those interrogatories that are not reasonably calculated to lead to the discovery of admissible evidence relevant to the claims and/or the defenses in this action.

## ANSWERS TO INTERROGATORIES

### Interrogatory No. 1

Identify yourself by stating your full name, date of birth, residence address, and Social Security number.

**Answer:**    Dennis Laurence Rossiter; DOB: January 16, 1942; Residence: 7 Boutwell Road, P.O. Box 8, Hancock, NH 03449; SS No.: 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.

### Interrogatory No. 2

Identify any person who has assisted you in gathering information and/or preparing your answers to these interrogatories, and any person who has assisted you in gathering information or searching for documents in order to respond to the accompanying Defendant's First Request for the Production of Documents.

**Answer:**    No one assisted Plaintiff in gathering information or searching for documents. Plaintiff prepared the answers to his interrogatories and provided them to his counsel.

### Interrogatory No. 3

Identify all persons who were witnesses to any of the occurrences, events, facts or circumstances described in your Complaint and/or who have knowledge of any facts pertaining thereto, and state the specific occurrences, events, facts or circumstances to which each person was a witness.

**Answer:**    IBM Microelectronics managers: Mark LeFebvre, Patricia McGloin, and James P. Monahan, and the IBM Microelectronics Human Resources Department.

**Interrogatory No. 4**

Identify all persons, including but not limited to friends, family members, and medical or mental health care providers, with whom you discussed any of the occurrences, events, facts or circumstances described in your Complaint and/or who have knowledge of any facts pertaining thereto.

**Answer:**     In January 2002, Plaintiff discussed the occurrences, events, facts or circumstances described in his Complaint with his two sisters, Carol F. Bonnar of Boston, Massachusetts, and Nancy R. Mobley of Westwood, Massachusetts. He has also discussed his case with his spouse, Alison F. Rossiter.

**Interrogatory No. 5**

Identify every document which supports your contention that IBM terminated your employment, or otherwise acted concerning the terms and conditions of your employment on the basis of age.

**Answer:**     IBM Microelectronics Division Resource Action ("MERA") information package, as provided by IBM to Plaintiff, November 28, 2001.

**Interrogatory No. 6**

Identify every document, not identified in the preceding Interrogatory No. 5, which you contend evidences wrongful conduct of any kind directed at you by IBM or which otherwise supports the claims asserted in the Complaint.

**Answer:**     Plaintiff objects to this interrogatory on the grounds that it seeks information that is in the possession and/or under the control of IBM. Without

waiving his objection, Plaintiff refers IBM to his Human Resources file for the

performance review conducted by Plaintiff's manager, James P. Monahan,

wherein Mr. Monahan reduced Plaintiff's employment job "band" and

eliminated Rossiter's manager title, stating that the action was part of an averred

organizational restructuring; that is, reducing the number of management

positions. Subsequently, additional management positions were created by IBM

and filled by younger, less qualified individuals. For his demotion, Plaintiff

refers IBM to its records pertaining to Plaintiff, for April 1, 1998. Plaintiff also

refers the Defendant to his response to Document Request No. 3 and produced

documents.

## Interrogatory No. 7

To the extent that you are claiming that you were denied promotions or

otherwise deprived of the opportunity to be laterally transferred to another

position within IBM on the basis of age discrimination, identify with respect to

each such promotion or lateral transfer:

     (a)    the job title;

     (b)    when the position became available;

     (c)    the person who filled the position;

     (d)    what steps, if any, did you take to apply for the position; and
            to the extent you applied, the results of your application.

**Answer:**    Plaintiff objects on the grounds that the interrogatory seeks

information, which is in the possession and/or under the control of IBM; Plaintiff

has requested that IBM provide the information; and IBM has failed to provide the requested information. Without waiving these objections, Plaintiff states that he has requested information from IBM concerning the following positions:

> Director, Integrated Marketing Communications – Technology Group;
> Corporate Events Operations Manager (James Hasl, Director);
> Technology Group Events Manager;
> Technology Group Collateral Manager;
> PowerPC Marketing Communications Manager and/or Programs Manager;
> Technology Group Brand Marketing & Corporate Programs Manager;
> Technology Group Interactive Marketing Manager; and
> IBM Microelectronics Server Group Marketing Services Manager.

**Interrogatory No. 8**

Identify all health care providers, including mental health care providers, you have consulted from November 1, 1992 through the present and for each health care provider, state the reason you sought treatment, the nature of treatment you received, the dates you received treatment, and whether you are claiming that you received this treatment as a consequence of IBM's alleged unlawful conduct.

**Answer:**    Plaintiff suffers from a chronic dermatological condition commonly called eczema, which can be exacerbated by stress. Plaintiff had flare-ups of this condition subsequent to his demotion and subsequent to his termination. His treating physician is Dr. Richard Seymour at the Cheshire Medical Center/Dartmouth-Hitchcock, at 580 Court Street, Keene, New Hampshire 03431. Following Plaintiff's termination, he saw Dr. Seymour on

April 22, 2002; December 17, 2002; April 23, 2003; July 28, 2003; July 29, 2003, September 18, 2003; October 9, 2003; and March 24, 2004, respectively.

**Interrogatory No. 9**

Identify all prescription medications you have taken since November 1, 1992, including in your answer the duration and frequency of your use of the medication and the name of the physician who prescribed the medication.

**Answer:**     Plaintiff's primary care physician, Dr. Frederick Bruch of the Cheshire Medical Center, prescribed valium for Plaintiff on March 6, 2002.

**Interrogatory No. 10**

Identify each element of damages including, without limitation, lost wages, emotional distress, and attorneys' fees and costs, which you claim to have suffered as a direct result of IBM's alleged unlawful conduct, and for each type of damage, identify:

(a)     the amount of damages you claim to have suffered;

(b)     the facts and method of calculation on which you base the claim that you have suffered that amount of damage; and

(c)     any documents that support your claim.

**Answer:**     Plaintiff objects to this interrogatory to the extent that it seeks information that is protected by the attorney-client privilege and the attorney work-product doctrine. Without waiving his objection, Plaintiff states that the precise amount of certain damages has not yet been determined. Plaintiff asserts that as a result of IBM's discriminatory conduct, he has suffered loss of salary,

loss of retirement benefits, and loss of benefits; lost career opportunities, from the time of his termination to the present; and loss of career opportunities into the future due to his age at the time of termination, diminishment of his professional reputation through his termination, and age discrimination in the labor market.

Plaintiff's demotion and termination caused economic damages and physical and emotional damage in the following specific ways:

Plaintiff's Demotion

In Plaintiff's IBM performance evaluation, dated January 13, 1998, his then immediate supervisor, James P. Monahan, made the following entry in Plaintiff's performance evaluation:

> *Following a department reorganization and a general flattening of management levels across marketing late in 1Q, Dennis was given project management responsibility for a number of important customer programs.*

Although not stated explicitly in the written performance evaluation, Mr. Monahan informed Plaintiff in his verbal presentation of the performance evaluation that Plaintiff would be stripped of his management title and bonus range and that Plaintiff's job band level would be reduced from a level 10 to a level 9 due to organizational requirements expressed by Mr. Monahan as "*a general flattening of management levels.*" This band reduction was later documented in Plaintiff's employee record in April 1998.

Additionally, Mr. Monahan told Plaintiff verbally that he, Mr. Monahan did not know what to do with Plaintiff – that Plaintiff was "over-qualified" for the work available. "Project management" meant "special assignments," which is

7

IBM-speak for "your job is endangered because we're telling you that we don't know what to do with an 'over-qualified' employee."

This particular review was deeply frustrating and hurtful to Plaintiff because he had been through a year managing *"less experienced employees in remote locations, saddled with an over-taxed budget and few people resources."* (Same performance evaluation).

Because reorganizations are a fact of life in large corporations and because there were no strong negatives in Plaintiff's performance evaluation indicating a basis for firing Plaintiff, Plaintiff felt there was nothing that he could do to reverse this decision to "flatten management levels." Thereafter, Plaintiff carried on to successfully complete his new work assignments, as reflected in future performance evaluations. However, Plaintiff's demotion resulted in additional disparate treatment of Plaintiff:

(1)     While Plaintiff's salary was not reduced, the latitude for future salary increases was severely restricted due to the way IBM structured its salary/compensation program. Essentially, Plaintiff's salary expansion was partially frozen and limited to modest, if any, increases in future years. His salary increase would never approach, on a percentage basis, those of other department members who received comparable performance ratings.

(2)     Plaintiff was assigned to a small, cramped cubicle with a large post jutting into the space, further restricting his work area. The cubicle was not in

Plaintiff's department's area, but rather, was amid the contract workers and the order-processing department – a noisy interior space away from the windows.

(3)     Plaintiff was assigned to work on "naming;" that is, designating names for new products as they were brought to market, in keeping with IBM's brand image. This work was formerly assigned to a low-level employee and was described by Alex Tognino, an IBM attorney, at an April 2001 corporate meeting in Armonk, New York, as "*the septic tank of IP law.*"

(4)     Plaintiff's IBM career was on a backslide at that point. All of the work that he had done to become a knowledgeable and skilled employee over the years, the travel away from home, the late hours, and the frustrations dealing with limited resources to do his job went unappreciated and unnoticed.

(5)     Plaintiff felt extremely frustrated and stressed, but he accepted the decision as necessary for the organization, and he needed a job.

(6)     However, subsequent to Plaintiff's demotion, IBM promoted younger, less experienced employees to manager positions. New jobs were created for which Plaintiff was well-qualified, but never considered, because the jobs were not posted. Rather, IBM gave the jobs to younger, less qualified employees. Plaintiff then realized that when he put the pieces together: the demotion, the cramped work space away from his department; the partially frozen salary; the low-level work assignments; and new jobs being awarded to younger employees, without posting, IBM was sending him a clear message: As one of the oldest employees in the marketing group, he was not valued, even though his

9

experience and skill set exceeded those of other employees who were now new managers.

(7)    As a result of this realization, Plaintiff felt depressed, angry, and deeply frustrated.  He was embarrassed and demeaned by these intentional actions, and he felt that his IBM manager was doing everything short of involuntary termination to force Plaintiff out of the company.

(8)    Plaintiff suffered from sleeplessness, diminished ability to concentrate, stress-related flare-ups of a chronic dermatological condition, and tension in his relationship with his wife.

Plaintiff's Termination

Plaintiff's termination occurred at a time when he was particularly vulnerable.  As one of the oldest employees in the marketing group, and just days away from his 60th birthday at the time of his termination, Plaintiff and his wife were making plans to build a small retirement home and map out their financial future in retirement.  Plaintiff's termination changed everything:

(1)    All plans for building the retirement home came to a dead stop.

(2)    Plaintiff and his wife had to discard any projections for retirement financial planning because such projections had become untenable when Plaintiff's income went to zero over night.

(3)    At 60 years of age, Plaintiff's job opportunities were very limited, even though he applied for numerous jobs, which were well below his IBM compensation level.

(4)    As Plaintiff's job search extended fruitlessly over several months, Plaintiff and his wife started to spend down their financial reserves to meet their obligations.

(5)    Their sale of securities to raise cash increased their tax exposure for capital gains, and another expense piled on top of their already drastically-reduced budget.

(6)    Finally, after months of an unsuccessful job search, Plaintiff decided that he had to change his strategy for producing income because neither employment nor a steady job was forthcoming.

(7)    Plaintiff, therefore, attended classes to prepare for becoming a real estate agent and successfully passed the New Hampshire and the national real estate exams for licensure in the Summer of 2002.

(8)    Plaintiff signed on as a contract real estate agent in New Hampshire and has been listing and selling real estate since that time.

(9)    Plaintiff's first year's earnings as a real estate agent were 20% of what he was earning at IBM – barely enough to pay for the most basic of living expenses.

(10)    As a new agent, Plaintiff was competing with hundreds of established agents, and he realized that it will take him years to build an income stream anywhere near what he was earning at IBM.

In summary, Plaintiff's termination had an immediate and severe impact on his family's finances, his retirement plans, and the future financial security of

Plaintiff and his wife. They had to spend down their retirement savings, cut life insurance expenses, and delay paying property taxes – risking property seizure. Plaintiff's IBM pension has been diminished, and Plaintiff's family lost their health, dental, and life insurance benefits. As a result, the material quality of their lives today is restricted, fraught with financial stresses, and fundamentally and irrevocably altered for the worse.

In addition to economic duress, Plaintiff has suffered, continues to suffer, and will suffer in the future emotional distress as a result of IBM's constructive and actual termination of his career. Plaintiff's physical and emotional pain has taken various forms and has caused multiple symptoms. Plaintiff withdrew from his family and friends and suffered from stress-related flair ups of a chronic dermatological condition. Plaintiff took medication to treat the condition, but his deep sadness, frustration, and feeling that he had let his wife down did not abate. Plaintiff felt worthless after many years of successful advancement in high technology. He gained weight. Plaintiff's intimate relations with his wife ceased. Plaintiff would wake up in the middle of the night going over in his mind how IBM had promoted younger, less experienced employees, tried to force Plaintiff to leave, and when that did not work, terminated his employment. Plaintiff could not even enjoy simple pleasures, such as reading a book, because he could not concentrate for any period of time without lapsing into a rehashing of IBM's discriminatory conduct towards him.

12

Plaintiff has suffered and continues to suffer anxiety about his unpredictable/unstable income, and he faces a future without opportunity to retire. At the age of 60, Plaintiff was forced to abandon his career in the high technology industry, which had provided him with enormous satisfaction, and begin all over again as an entry-level sales person in real estate. Plaintiff was dedicated to IBM; his identity was closely tied to his work; and Plaintiff's termination dealt a savage blow to his self-esteem. As a result of his termination, Plaintiff lost the collegiality of his professional peers and the meaningfulness that he had derived from his career.

**Interrogatory No. 11**

Identify all efforts on your part or on your behalf to obtain employment after October 1, 2001. With respect to each effort, identify:

    (a)    each prospective employer contacted;

    (b)    each communication, written or oral, relating to such efforts, and the results of your efforts.

**Answer:**    Plaintiff refers IBM to the Defendant's archived documents on Plaintiff's former IBM computer and to Plaintiff's response to Document Request No. 15 and produced documents.

**Interrogatory No. 12**

Identify all employment you obtained after your termination from IBM. With respect to each, identify:

    (a)    the name, address, and telephone number of your employer;

13

(b)     your job title;

(c)     the total compensation you received and your weekly or annual
        salary;

(d)     the name of your supervisor; and

(e)     the dates of employment and the reason(s) for your
        termination, if applicable.

**Answer:**     Plaintiff is self-employed, as a licensed New Hampshire Real Estate

Broker.  Plaintiff was briefly affiliated with another Coldwell Banker agency in

Amherst, New Hampshire, and then transferred in the Fall of 2002 to his current

agency, Coldwell Banker Residential Brokerage, 104 Route 101A, Amherst, New

Hampshire 03031.  Plaintiff's supervisor is Carole Byatt.

## Interrogatory No. 13

Describe fully and in complete detail all sources of income and/or support

received by you since your termination from IBM, including but not limited to the

following:

(a)     the source of the income;

(b)     the amounts received; and

(c)     the dates upon which the income was received.

**Answer:**     Plaintiff's income stream from 2002 to the present has been:

2002    $5,194 IBM vacation pay & $19,968 unemployment compensation;

2003    $21,718 real estate commissions & $9,841 sale of personal property;

2004    $11,440 real estate commissions.

14

**Interrogatory No. 14**

      If you have engaged the services of an employment agency, job counselor or search firm, please list the name and address of the firm or individual counselor, the contact person and the date of initial contact.

**Answer:**    Plaintiff refers IBM to his response to Document Request No. 15 and produced documents.

**Interrogatory No. 15**

      Identify any and all expert witnesses you intend to call to testify at the trial in this case, and for each expert, state the substance of the facts and opinions to which said expert is expected to testify, and a summary of the grounds for each opinion.

**Answer:**    Plaintiff has not made a final determination concerning the expert witness(es) he will call to testify at the trial of this action and will provide the requested information upon determination.

**Interrogatory No. 16**

      Identify all non-expert witnesses you plan to call at trial and the subject matter of their expected testimony.

**Answer:**    Plaintiff has not made a final determination concerning the non-expert witnesses he will call to testify at the trial of this action and will provide the requested information upon determination.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, on this

_13th_, day of October 2004.


_Dennis L. Rossiter_
Dennis Rossiter

Signed before me 10/13/04
Michael Eland
Comm exp. 12/06/05

Respectfully submitted,

Dennis Rossiter
By his Attorneys,


Kevin G. Powers, BBO #405020
Linda Evans, BBO #635078
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010


IntAns


CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on   10/14/04   .

_Linda Evans_

16

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS ROSSITER<br>Plaintiff )<br>)<br>)<br>v. )<br>)<br>INTERNATIONAL BUSINESS )<br>MACHINES CORPORATION )<br>Defendant ) | C.A. No. 04 CR 10069DPW |

## AFFIDAVIT OF EDWARD ABRAMS

1) My name is Edward Abrams and I am an employee of International Business Machines Incorporated ("IBM"). I have been an employee of IBM since September 1995. Currently, I am the Vice President, Marketing Program Management of Sales and Distribution.

2) I am familiar with IBM's job posting policy and practice that was in effect in 1999 and 2000. For internal job opportunities, that job posting policy provided that regular Band 10 and below, non-executive positions and temporary assignments were to be posted. The policy provided the following exceptions to the posting requirement for Band 10 and below, non-executive positions: a) physician and lawyer positions were not posted; b) lateral or hierarchical movement within a department and shift practice moves were excluded from the posting requirement; and c) senior management could exclude a specific job from being posted. A true and accurate copy of the current job posting policy for internal job opportunities, which is either identical or the same in all material respects to the policy that existed in 1999 and 2000, is attached hereto as Attachment 1.

3) Under this posting policy, executive level positions, including Director positions (which by definition are above a Band 10) generally do not get posted. In addition, where there is simply an expansion of the mission of a current position-holder (a "hierarchical movement"), it is not considered a job opening and it does not get posted.

4) In late 1998 or early 1999, IBM created a new business unit called the Technology Group by combining IBM's Microelectronics business with its Storage business.

5) I was hired as Director, Integrated Marketing Communications, Technology Group ("IMC Director") in June 1999. This position was director level and therefore not subject to the posting policy. Accordingly, the position was not posted.

6) When I became IMC Director, I became Patricia McGloin's supervisor. Marge Oppold was already working for Patricia McGloin in the events marketing area (planning marketing events such as trade shows). In addition, Kathleen Spilke was already working for Patricia McGloin in the "collateral" area (creating marketing brochures etc.).

7) When Technology Group was formed, the bulk of the business consisted of Microelectronics products. However, over time, in order to bring coherence and efficiencies to the new group's marketing efforts, there was a push to give additional group-wide responsibilities to certain positions that had formerly been dedicated to Microelectronics products.

8) As part of the above described effort to bring coherence and efficiencies to the Technology Group's marketing efforts, in September 1999, I promoted Marge Oppold to the position of Technology Group Events Manager. This was not a new job but simply an expansion of Oppold's existing responsibilities in event marketing. In the revamped position, the bulk of Oppold's responsibilities were a continuation

of her previous responsibilities in event planning/management for Microelectronics products. Therefore, by IBM's policy and practice, this job did not need to be posted and it was not posted.

9) I also promoted Kathleen Spilke to Technology Group Collateral Manager in or about May 2000. In this position, the bulk of Spilke's responsibilities were a continuation of her previous responsibilities for collateral for Microelectronics products. Therefore, by IBM's policy and practice, this job did not need to be posted and it was not. In essence, like Marge Oppold's promotion, this was not a new job as it was just an expansion of what Spilke had already been doing.

10) In 2000, I created the position of Technology Group Interactive Marketing Manager. This was a new job that was responsible for managing web-based marketing for the Technology Group. This position was posted through IBM's job posting system. Dennis Rossiter did not apply for the position. Robert Rohrer did apply for the position as did a number of other candidates. On or about July 16, 2000, I hired Robert Rohrer for the position based on his demonstrated skills in working in web based marketing. Rohrer had most recently managed web based marketing for IBM's Global Services Division.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 21ˢᵗ DAY OF MARCH, 2005.


EDWARD ABRAMS

# **ATTACHMENT 1**

# New job opportunities

Types of openings posted

All regular Band 10 and below, non-executive positions and temporary assignments are posted. Physician and lawyer positions are not posted. Lateral or hierarchical movement within a department and shift practice moves are excluded. Senior management may also exclude a specific job from being posted.

The Job Opportunity Bank does not post available International Assignments.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A temporary assignment is a position created for a specific period of time and may include projects or engagements. These assignments fulfill a business need and may be used to provide developmental opportunities for employees.

Full time temporary positions are posted. Individuals interested in pursuing part time temporary assignments, including Personal LOA Work Options, should discuss this possibility with the hiring manager.

Some assignments may require extended travel or relocation.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Opportunities for international assignment may exist in some areas of the business. The duration and requirements of the assignments are established by the receiving country. Common requirements for an employee to be considered for an international assignment may include:

- Expertise in critical skills
- Fluency in the language of the receiving country
- A history of excellent performance

# EXHIBIT K

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DENNIS ROSSITER | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 04 CR 10069DPW |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION | ) | |
| Defendant | ) | |
| | ) | |

### AFFIDAVIT OF WENDY MCGEE

1. My name is Wendy McGee (nee Arnette) and I am an employee of International Business Machines Corporation (IBM). I have been an employee of IBM since 1989.

2. In 2000, I was the Program Director of PowerPC Marketing in the IBM Technology Group. I reported into and supported the PowerPC product line. PowerPC is an IBM microprocessor architecture for chip design.

3. In November 2000, I was hiring manager for a position entitled PowerPC Marketing Communications Manager. I posted the position through IBM's job posting process. Dennis Rossiter did not apply for the position.

4. Cynthia Roy (nee Putlitz), who was at the time a Power PC Marketing Manager, applied for the position. Ms. Roy was the only person from within the PowerPC business group that did apply.

5. In November 2000, I hired Ms. Roy as the PowerPC Marketing Communications Manager. I hired Ms. Roy because she had worked in product marketing in the PowerPC business line and therefore, she had the technical understanding of the product that I was looking for.

6. The posting listed Raleigh, North Carolina as the location of the PowerPC Marketing Communications Manager position. However, I was willing to consider someone who was located in either Raleigh (where I was located and where there were a number of PowerPC design teams) or Burlington, Vermont (where the PowerPC development lab was located). The person who held the position would have to travel between Raleigh and Burlington. Ms. Roy was already working in Burlington, Vermont for the PowerPC business line and continued to do so as the PowerPC Marketing Communications Manager.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY
THIS 16th DAY OF FEBRUARY, 2005.

*Wendy McGee*
Wendy McGee

# EXHIBIT L

16CH201664

# RODGERS, POWERS & SCHWARTZ LLP

30 Federal Street
Boston, MA 02110
Tel. (617) 482-7771
Fax (617) 338-1923

*ATTORNEYS AT LAW*

Kevin G. Powers
Email  kgpowers@TheEmploymentLawyers.com

March 8, 2002

Ms. Abigail Soto-Colon
Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place
Boston, MA  02108

Re:   Complainant:       Dennis Rossiter
      Respondent:        International Business Machines Corp., Inc.

Dear Ms. Soto-Colon:

Enclosed please find a completed charge form for the complainant.

Please feel free to contact me if you have any questions.

Sincerely,

Kevin G. Powers

KGP/nes
enclosure

Harvey A. Schwartz, P.C.
Kevin G. Powers
Elizabeth A. Rodgers
Jonathan J. Margolis
Robert S. Mantell
(of counsel) Linda Evans
Kimberly H. Scheckner

I000008



**MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION**
**AND EEOC**
**CHARGE OF DISCRIMINATION**

This form is affected by the Privacy Act of 1974.                                                    Page 1/2

| | |
|---|---|
| Enter Charge Number: FEPA: | MOST RECENT OR CONTINUING DISCRIMINATION VIOLATION DATE: **January 3, 2002** |
| EEOC: | FILING DATE: |

| | |
|---|---|
| NAME (Indicate Mr., Ms., or Mrs.)<br>**Mr. Dennis Rossiter** | HOME TELEPHONE NO. (Include area code)<br>**(603) 525-3523** |

STREET ADDRESS
**P.O. Box 8**
**7 Boutwell Road**

| | |
|---|---|
| CITY, STATE, ZIP CODE<br>**Hancock, NH 03449** | COUNTY<br>**Hillsborough** |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY,
APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO
DISCRIMINATED AGAINST ME (If more than one list below):

| | |
|---|---|
| NAME<br>**International Business Machines Corporation (IBM)** | NUMBER OF EMPLOYEES/MEMBERS<br>**100+** |
| STREET ADDRESS<br>**281 Winter Street.** | TELEPHONE NO. (Include Area Code)<br>**1(800) 426-4969   [1-800-IBM4YOU]** |
| CITY, STATE, ZIP CODE<br>**Waltham, MA 02451** | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY,
APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO
DISCRIMINATED AGAINST ME (If more than one list below):

| | |
|---|---|
| NAME | NUMBER OF EMPLOYEES/MEMBERS |
| STREET ADDRESS | TELEPHONE NO. (Include Area Code) |
| CITY, STATE, ZIP | |

**CAUSE OF DISCRIMINATION BASED ON:**

RACE [ ]     COLOR [ ]     SEX [ ]     PREGNANCY (SEX) [ ]     SEXUAL ORIENTATION [ ]     AGE [ ✔ ]

SEXUAL HARASSMENT [ ]     RELIGION [ ]     NATIONAL ORIGIN [ ]

DISABILITY/HANDICAP/LONG-TERM MEDICAL CONDITION [ ]     RETALIATION [ ]

OTHER (Specify):

The Particulars Are As Follows:

### Please see attached Complaint

I000009

Page 2/2

[✓] I also want this charge filed with the EEOC.

I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I swear or affirm subject to the pains and penalties of perjury that I have read the above charge and that it is true to the best of my knowledge, information and belief.

*Dennis L. Rossiter*
Signature of Complainant
**Dennis L. Rossiter**

SWORN TO AND SUBSCRIBED BEFORE ME THIS _28_ DAY OF _FEB_ , 2002

NOTARY PUBLIC: *Frances L. LaMarca*

MY COMMISSION EXPIRES: _____

FRANCES L. LaMARCA
Notary Public
My Commission Expires October 16, 2003

Respectfully submitted,

The Complainant,
By his attorneys,

_____
KEVIN G. POWERS
BBO #405020

Rodgers, Powers & Schwartz
18 Tremont Street – Suite 500
Boston, Massachusetts 02108
(617) 482-7771

I000010

# ATTACHMENT A

1) I, Dennis L. Rossiter, am 60 years old, my date of birth is January 16, 1942.

2) In 1995 I began working in the Marketing Group of IBM's Microelectronics Division.

3) I was the oldest employee in the Marketing Group in which I worked.

4) While working for IBM, I received excellent performance evaluations, and positive input from supervisors and fellow employees.

5) On January 3, 2002 I was laid off.

6) Preceding my lay off, I was functionally demoted, treated differently than younger employees in my Group, and not offered the opportunity to compete for positions offered to younger employees, and for which I was well qualified.

7) Although I was laid off, my job was, in fact, not eliminated. Two younger employees took over my job duties and responsibilities and displaced me.

   Of these younger employees who took over my job, one had been removed from an identical job to the one I was losing. This employee was being re-assigned to my job after having failed to perform adequately in her prior assignment. The other employee displacing me was a recent college graduate in his early twenties, who had been with IBM less than a year, to the best of my knowledge.

8) Younger, less experienced employees filled jobs for which I was well qualified. Some of these jobs were not posted to the IBM "Jobs Book", which was a violation of company policy.

9) Within IBM Microelectronics Division's Marketing Group, employees in the 50+ age category comprised 22% of the employee population, but were subjected to 60% of the lay-offs within their age grouping.

I000011