**ATTACHMENT 4**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS ROSSITER )<br>Plaintiff )<br> )<br>v. )<br> )<br>INTERNATIONAL BUSINESS )<br>MACHINES CORPORATION )<br>Defendant )<br>_____) | C.A. No. 04 CR 10069DPW |

## SECOND AFFIDAVIT OF PATRICIA MCGLOIN

1) My name is Patricia McGloin Waitt and I am an employee of International Business Machines, Inc. ("IBM"). At work, I go by the name "Patricia McGloin." My current position is Director, Integrated Marketing Communications IBM Americas.

2) I understand that Mr. Rossiter is taking the position that Karen Smith performed poorly with respect to her responsibility as Integrated Marketing Communications ("IMC") strategist for delivering an IMC plan for the PowerPC business line in 2000 and therefore, had that responsibility removed from her in January 2001 (and was replaced by Cynthia Roy). To be blunt, Mr. Rossiter does not know what he is talking about. I was Ms. Smith's manager at this time and she never performed poorly in this role. To the contrary, Ms. Smith performed well and maintained her responsibility for PowerPC throughout 2001 and into 2002, when I left the group. The only issue with PowerPC, as I testified in my deposition at pages 124-125, was that there was poor direction from the PowerPC business lines in terms of what they were trying to achieve. True and accurate copies of pages 124-125 of my deposition are attached hereto as Exhibit 1. However, Ms. Smith professionally and capably got the job done despite less than clear direction from

the business line. Ms. Smith was supporting other business lines as well in 2001: e.g., the Pervasive Computing and Wireless business lines.

3) A true and accurate copy of Ms. Smith's PBC for 2001 (performance review) is attached hereto as Exhibit 2. Ms. Smith's 2001 PBC reflects the fact that she maintained PowerPC throughout 2001 and that I rated her performance as "Achieved/Exceeded Commitments." I said in her review that "Karen was a great contributor to MD in an exceedingly difficult year." In the "Results" section of the review, Ms. Smith accurately described her results on the PowerPC business line (batestamp pages # I000855-56) in 2001 as follows (emphasis added):

> "As the IMC strategist for Wireless, Digital Video Products Group, Advance Personal Technologies, **PowerPC** and Distribution Channel in the IBM Microelectronics Division, Karen created and periodically reviewed IMC plans for each of the assigned business units in a timely manner that reflected their goals and helped them achieve their financial objectives for the year. ...Created a well thought out integrated marketing communications PPC [PowerPC] plan from existing PPC marketing activities that crossed over several business lines that were singularly threaded activities. The plan unified the activities to effectively increase awareness and association with IBM by 30%...Karen helped clarify processes regarding budgets and IMC planning especially in the tricky PPC [PowerPC] arena resulting in clear understanding of allocations during the fall plan process."

4) As I stated in my initial affidavit, Ms. Smith was not in Mr. Rossiter's skill group because she was a Band level 10. Therefore I was not comparing Mr. Rossiter to Ms. Smith in the lay-off selection process. The Selection Guidelines did not allow for such a comparison. Exhibit 1 to my initial affidavit was the TG U.S. Surplus Selection Guidelines, which governed the selection process for the lay-off. At page 11 of the Guidelines (batestamp page # I001284) it describes how to identify skill groups. It very clearly states that skill group members must be in the "SAME SALARY BAND." The training that we received

2

emphasized this point as well. However, while I was not comparing Rossiter to Ms. Smith, Ms. Smith, in fact, had superior IMC skills to Mr. Rossiter.

5) I understand that Mr. Rossiter is suggesting that I did not follow the process because I did not fill out a selection worksheet for Ms. Smith. Again, he is just plain wrong. I did follow the process established by the company. I did not fill out a selection worksheet for Ms. Smith because she was a sole incumbent of her skill group, Band 10 IMC specialist. As I said in my initial affidavit (and at my deposition) the Selection Guidelines and training emphasized that managers were not to target skill groups of one—i.e., where there were was only one employee in that job category of the same band and managerial level. True and accurate copies of pages 81-82 of my deposition are attached hereto as Exhibit 3. At page 11 (batestamp page # I001284) of the Selection Guidelines (Exhibit 1 to my initial affidavit), it makes this point by stating, "BE FLEXIBILE, BUT NO 'PINPOINTING'- MINIMIZE SKILL GROUPS OF ONE EMPLOYEE."

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 27 DAY OF MAY, 2005.

*Patricia McGloin Waitt*

Patricia McGloin Waitt

3

**EXHIBIT 1**

Page 123

[1] designed to meet the marketing objectives laid out
[2] in a marketing plan.
[3]  Q: This may be a very basic question. Is it
[4] correct that the strategists, the IMC strategists,
[5] were developing — just overall — developing market
[6] plans for product lines?
[7]  A: That's a basic way of looking at it, yes.
[8]  Q: Did Smith have more product lines than
[9] Rossiter or Guynn?
[10]  A: I believe she did.
[11]  Q: How many more?
[12]  A: I believe she had double the amount.
[13]  Q: What product lines did she have?
[14]  A: Pervasive and power PC. She also had
[15] wireless, and my recollection is that there were
[16] changes during the year, so...
[17]  Q: So power PC, pervasive, wireless. Anything
[18] else?
[19]  A: Those are the ones that I recall.
[20]  Q: And what products was Rossiter supporting?
[21]  A: Information technology.
[22]  Q: Anything else?
[23]  A: Not that I can recall as a business line.
[24]  Q: And I'm looking at Rossiter Exhibit 3, and

Page 124

[1] it refers to — under "Rossiter" it says "BLE group
[2] naming coordinator." What is that?
[3]  A: It actually refers to information
[4] technology, business line executive and group naming
[5] coordinator. So information technology was the
[6] business line that he supported, and he also had
[7] responsibility for naming, as we've already
[8] discussed.
[9]  Q: And were Rossiter and Smith required to
[10] develop plans regarding their product lines?
[11]  A: Yes, they were.
[12]  Q: And those, I assume, were written plans
[13] that they had to submit?
[14]  A: Yes, that's correct.
[15]  Q: Did they submit them to you?
[16]  A: Yes, they did.
[17]  Q: And did Smith ever have a problem with
[18] getting her plan done on time?
[19]  A: Not that I can recall.
[20]  Q: No one ever talked to you about the fact
[21] that she was having difficulty getting her plan done
[22] on time or plans done on time?
[23]  A: Not that I recall. I do recall that there
[24] was poor direction from one of her business lines in

Page 125

[1] terms of what they were trying to achieve.
[2]  Q: Did you say "poor"?
[3]  A: Yes, I did.
[4]  Q: Did that cause a delay in the business plan
[5] being finished?
[6]  A: Not that I recall.
[7]  Q: What effect, if any, did it have?
[8]  A: I'm sure it made her frustrated.
[9]  Q: Did she express that frustration to you?
[10]  A: Yeah, she did.
[11]  Q: What was your organizational relationship
[12] with Ed Abrams?
[13]  A: Before I reported to Mark LeFebvre, I
[14] reported to Ed Abrams as a manager.
[15]  Q: When did you begin reporting to LeFebvre?
[16]  A: Probably in February or March 2001.
[17]  Q: At any time during Smith's tenure, during
[18] the time she reported to you, was it necessary for
[19] you and/or necessary for Ed Abrams to intercede and
[20] assist Smith in completing her assignment or
[21] assignments or plan?
[22]  A: No.
[23]  Q: Was there a planning calendar?
[24]  A: In less finite terms, yes.

Page 126

[1]  Q: Well, were there dates which each IMC
[2] strategist had to turn in their plans?
[3]  A: Yes.
[4]  Q: You seem to be indicating through facial
[5] expression that that was a flexible time period. Is
[6] that what you're trying to say?
[7]  A: I could not say that at the same time every
[8] year plans were to be submitted. It changed from
[9] year to year.
[10]  Q: Okay. But were the strategists given
[11] deadlines that they had to meet for submitting the
[12] plans?
[13]  A: Yes.
[14]  Q: Did Smith always meet her deadlines?
[15]  A: As I recall, she did.
[16]  Q: Did Rossiter?
[17]  A: As I recall, he did.
[18]  Q: Did Guynn?
[19]  A: Absolutely.
[20]  Q: At some point after you informed Dennis
[21] Rossiter that he was going to be laid off, did you
[22] tell him that Smith was going to be taking over some
[23] or all of his responsibilities regarding his
[24] business line?

**EXHIBIT 2**

(2001)

**PBC for Smith, Karen J.: Complete**
**IBM Confidential**

### 1. Employee Information and Assessment Dates

**Employee Information**

| | | | |
|---|---|---|---|
| Serial number | 694201 | Country | **UNITED STATES** |
| Band | 10 | Position title | **Sr.IMC Specialist** |

**Assessment Dates**

Assessment period     2001/01/01 to 2001/12/31   yyyy/mm/dd

Interim review dates

Employee/Manager final review date                 2002/01/18

### 2. Objectives and Results

**Win**

During this assessment period, I commit to Win:

**Win Objectives**
(For the Pervasive and Power PC "business lines":)
* Develop Integrated Marketing Communication plans that accurately reflect the business lines goals/objectives/ and strategies which enable MD's 2001 financial and customer satisfaction commitments.

* Work with IMC functional teams to develop programs and consistent messages for all customer touch points that reach targeted customers, influencers, prospects and field resources.

* Develop an IMC plan that increase PowerPC awareness and association with IBM by 30% .

* Contribute to the success of corporate and Microelectronics branding initiatives.

**Win Results**
* As the IMC strategist for Wireless, Digital Video Products Group, Advance Personal Technologies, PowerPC and Distribution Channel in the IBM Microelectronics Division, Karen created and periodically reviewed IMC plans for each of the assigned business units in a timely manner that reflected their goals and helped them achieve their financial objectives for the year. MD experienced the most severe industry down turn to date causing the plans to be adjusted several times throughout the year to reflect tough budget changes while managing customer expectations. Distribution and PPC were more challenging as there were no previous plans. Leading the team in fall planning she collaborated on enhancing the template used to collect IMC data which in turn drove to the creation of a 3-tier communication strategy that was needed to cohesively unite the individual business line plans.
* Using business value proposition research Karen drove message workshops within her business lines, assisted other strategists in the creation of message workshops for their business lines, drove the creation of and populated a 3-tier communication strategy for the division with messages and themes, presented and got buy-in for inclusion in collateral, advertising, interactive, events, PR and corporate.
* Created a well thought out integrated marketing communications PPC plan from

I000862

existing PPC marketing activities that crossed over several business lines that were singularly threaded activities. The plan unified the activities to effectively increase awareness and association with IBM by 30%.
* Karen played a key role in engaging the business line to consider the merits of using the Ingredient Brand for Nintendo which, with it's name recognition was the breakthrough needed for other OEM and business lines to get engaged. She also drove the Microelectronics communication strategy that reinforced actionable items tied into corporate branding.

### Execute
During this assessment period, I commit to Execute:

**Execute Objectives**
* Drive the execution and project manage the IMC plans, effectively reporting the progress to the business lines.

* Ensure end-to-end integration of all aspects of marketing communications to best leverage our position within the marketplace.

* Manage the expectations of the business line regarding the results of the IMC plans, adjusting to strategy and budget changes.

**Execute Results**
* Karen drove hard many activities, some which were severely impacted by budget cuts. She professionally managed "damage control" with the business lines as their expectations and objectives diminished by consistently showing them how to reuse existing collateral and engaging in the web.
* She executed the creation - up to production - of 2 direct marketing activities that the business lines stated were the "best ever". Three brochures were completed to the final draft stage, 2 event invitations were sent incorporating the image from collateral and created url cards that drove to the web - - prompting a web redesign for 2 business lines which she lead. 4 product briefs, 2 updates, 1 road map and 1 trifold were created using imaginative means to complete as the budget dollars were cut. Two advertising activities - SiGe diorama, and PPC print ad which drove to the web again prompting the redesign of the web page. Tied in PPC portal activity under IMC interactive and drove the inclusion of the PPC newsletter into IMC activity. Successfully engaged all business lines in participating in the highly successful tech e-mail.
* Karen helped clarify processes regarding budgets and IMC planning especially in the tricky PPC arena resulting in clear understanding of allocations during the fall plan process . Due to a downturn in the chip industry budgets were constantly cut throughout the year. Karen took a lead position in relaying often times very bad and discouraging news to the business lines while maintaining their respect and expectations of success in a slow market.

### Team
During this assessment period, I commit to Team:

**Team Objectives**
* Communicate frequently and build proactive relationships with assigned and cross business lines.

* Work closely with Media and Public relations team to ensure appropriate positioning for announcements, and to effectively promote material to enhance IBM's image externally.

* Link to other divisions within IBM to promote microelectronics capabilities

* Attend a minimum of two weeks professional skills development

**Team Results**
* Karen was a key contributor to the acceptance of IMC capabilities and was sought after by the business lines for advice and ideas.
* She is well respected within the PR and Media relations group and actively participates in their activities and assists the business lines with

I000863

```
"stories" and "angles" to engage PR .
* She engaged and gave input to the corporate Linux group, Wireless marketing
council, Pervasive group, Server Power4 Regatta messaging resulting in 4 lead
stories on the IBM and MD home pages, articles and good press. Drawing on her
background in market management and communication skills she was sought after
for ad-hoc presentations, market analysis, competitive positioning activities
and she pulled together the Technology Group overview presentation  for sales.

* Met minimum 2 week professional skills commitment, would have done more but
budget cuts prevented attendance.
```

### 3. New Hire Assessment

Is the employee a new hire?                                  **No**

### 4. Overall Rating and Assessment

Overall contribution is determined considering:

- Results achieved against commitments
- Full scope of job responsibilities (including people management for those in management positions) and how well the employee fulfils these responsibilities)
- Band
- Demonstrated behavior
- Any customer, peer, or other input received
- Manager's own observations
- Impact of the employee's results/behaviors on the organization
- Results/behaviors of others with similar job responsibilities and band (except where determining if the employee's performance was unsatisfactory)

**Rating   Achieved/Exceeded Commitments**

**Overall Assessment:**

```
Karen was a great contributor to MD in an exceedingly difficult year. As
strategist for the Pervasive BLE, Karen used her marketing management
expertise to assist them in the development of a marketing strategy as a
precursor to an IMC plan.  She forced thinking to move from tactical,
short-term and about a single customer to strategic, proposing a view of the
larger market trends with information appliances. With the wireless
organization, she made great strides in developing low-cost approaches to
meeting their objectives, and drove the development of a top-notch direct
marketing campaign until canceled for budgetary reasons. Karen's sense of
maturity and ability to synthesize complex information made a large impact as
she proposed and led the development of a go-to-market analysis, ultimately
resulting in an approach which forms the bedrock for our 2002 plans.  Her
persistence and customer orientation drove her to doggedly pursue several
initiatives which would have withered on the vine without her effort.  She has
contributed by using her executive communication skills in developing the TG
customer presentation and multiple presentations to corporate IMC. Karen is a
great asset to the team.
```

### 5. Signature List

The individuals who need to review and sign this PBC Assessment.

**1st Signature: Employee    Smith, Karen J.   (SN:694201897 )**
Signed

Optional Comments: If the employee wishes to do so, any comments concerning the assessment (for example, agreement) may be indicated in the space provided below.
```
Although the industry situation has been bleak this year, there are still
interesting challenges ahead. I look forward to using my creative skills to
achieve great results in 2002.
```

I000864

**2nd Signature: Manager    McGloin, Patricia   (SN:970686897 )**
Signed

Record here only those additional significant items brought up during the discussion by either you or the employee which are not recorded elsewhere in this document.

**3rd Signature: Reviewer    Lefebvre, Mark F.   (SN:751287897 )**
Signed

**Optional Comments:**

I000865

**EXHIBIT 3**

Page 79

[1] by looking at Exhibit 8?
[2] **A:** Correct.
[3] **Q:** Specifically, Page 3 of Exhibit 8?
[4] **A:** That's correct.
[5] **Q:** Let's take this page by page.
[6] **A:** Okay.
[7] **Q:** With regard to Page 1 of Exhibit 8, that's
[8] the selection work sheet for Deborah Guynn?
[9] **A:** That's correct.
[10] **Q:** Is that your signature at the bottom of the
[11] page?
[12] **A:** Yes, it is.
[13] **Q:** Did you actually enter this information on
[14] a screen on your computer?
[15] **A:** Yes, I did.
[16] **Q:** Let's go to the selection work sheet for
[17] Ron Milos.
[18] **A:** (Witness complies)
[19] **Q:** Did you fill out this document, or was the
[20] document filled out by Robert Rohrer?
[21] **A:** Robert Rohrer filled out this document.
[22] **Q:** Is that your signature on the second page
[23] of Mr. Milos's selection work sheet?
[24] **A:** Yes, it is.

Page 80

[1] **Q:** Kathleen Spilke. Was this selection work
[2] sheet that's part of Depo Exhibit 8 filled out by
[3] you or Robert Rohrer, to your knowledge?
[4] **A:** This was filled by Robert Rohrer and
[5] approved by me.
[6] **Q:** And that is your signature on the second
[7] page?
[8] **A:** Correct.
[9] **Q:** And how about Kathryn Weaver? Was her
[10] selection work sheet filled out by you or Robert
[11] Rohrer?
[12] **A:** This was also filled out by Robert Rohrer
[13] and approved by me.
[14] **Q:** So let's go back, because I think your
[15] earlier testimony was that you filled out the
[16] selection work sheet for Weaver and Spilke. In
[17] light of Exhibit 8, does that change your testimony
[18] in any way?
[19] **MR. TARLOW:** Objection.
[20] **A:** I don't believe I made that statement.
[21] **Q:** Okay.
[22] **A:** I thought I made a statement that I filled
[23] out the work sheets for individuals who reported
[24] directly to me.

Page 81

[1] **Q:** I thought you had said that those were —
[2] that there were four of those individuals, and that
[3] those individuals who reported to you and on whom
[4] you filled out work sheets included Weaver and
[5] Spilke.
[6] But is it your testimony that you did not
[7] fill out work sheets for Weaver and Spilke?
[8] **A:** Yes, it is.
[9] **MR. TARLOW:** Objection.
[10] **Q:** Okay. And so let's go back to what I
[11] thought was my original question, but let's ask it.
[12] This is just an objective question. Other than
[13] Mr. Rossiter and Ms. Guynn, did you fill out any
[14] selection work sheets for anyone in the October,
[15] November, December time frame?
[16] **A:** Selection work sheets. I did, yes.
[17] **Q:** Who?
[18] **A:** Maura Roach.
[19] **Q:** Okay. Anyone else?
[20] **A:** Not that I recall.
[21] **Q:** Was there a selection work sheet filled out
[22] for Karen Smith?
[23] **A:** I don't believe there was, no.
[24] **Q:** Was there a reason for that?

Page 82

[1] **A:** Yes, there certainly was.
[2] **Q:** What was that?
[3] **A:** The instructions for the process were to
[4] identify groups of individuals with similar skills,
[5] and not to have skill groups of one individual.
[6] Karen Smith was a group of one individual as a
[7] Band 10 non manager, therefore, by definition,
[8] having no surplus.
[9] **Q:** Okay. Let's go back to Rossiter Depo
[10] Exhibit 5, please.
[11] **A:** (Witness complies)
[12] **Q:** At the time that you filled out this
[13] document, did you believe it was going to be used by
[14] you or someone else in order to make a decision who,
[15] if anyone, was going to be laid off?
[16] **A:** Yes, I did understand that.
[17] **Q:** And at the time that you filled this out,
[18] did you have the belief that someone who reported to
[19] you had to be laid off?
[20] **A:** Yes, it certainly looked that way.
[21] **Q:** So is it fair to say that when you were
[22] doing the selection work sheet, or sheets, that you
[23] understood that your assessment would be important
[24] to the person who you assessed's future with the