# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Dennis Rossiter,** ) | |
|           **Plaintiff** ) | |
| ) | |
| **v.** ) | **C.A. No. 04-CR-10069-DPW** |
| ) | |
| **International Business Machines** ) | |
| **Corporation,** ) | |
|           **Defendant** ) | |
| ) | |

## PLAINTIFF DENNIS ROSSITER'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Dennis Rossiter hereby submits his opposition to the Motion for Summary Judgment filed by Defendant International Business Machines Corporation ("IBM"). Rossiter was laid off by IBM effective on or about January 3, 2002. Rossiter claims that the lay off was based on his age (59), in violation of Massachusetts General Law c. 151B, § 4(1B) (Count I), and in violation of the Age Discrimination in Employment Act ("ADEA") (Count II). As will be shown, genuine issues of material fact preclude the entry of summary judgment, and this case should be resolved by the finder of fact. Indeed, because elusive concepts of motive and state of mind are at issue, and the jury must weigh the credibility of conflicting explanations, summary judgment in discrimination cases is disfavored. Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437, 439-440 (1995).

The issue of timeliness should be dealt with at the outset. Rossiter was excluded from a number of promotional opportunities from 1998 to 2000, and he suffered a demotion in 1997. IBM argues that these earlier actions are untimely. IBM's argument

is inapposite because Rossiter is not bringing an independent claim based on these earlier adverse actions. Rather, these earlier adverse actions should be considered as background evidence of IBM's state of mind and antecedent acts of discrimination for the purpose of determining Rossiter's timely claims concerning his lay-off.

Plaintiff expressly incorporates his Rule 56.1 Statement of Facts in Dispute ("SOF"), on which there are genuine issues to be tried. A brief summary follows:

# I. STATEMENT OF FACTS

1.    IBM hired Rossiter as Manager of Communications for the Power PC business line in January 1995, at job band 10. Rossiter came to IBM with in-depth experience in marketing communications, including positions as Director of Communications at the Fortune 500 companies, Exxon Corporation and Wang Laboratories. SOF 1.1-1.2.

### Age Animus under James Mohanan

2.    Rossiter was 53 years old at the time of his hire. During an interview with James Monahan, who was 39 years old, Monahan asked Rossiter, "Do you still have the fire in your belly to do the job?" Rossiter first reported to Ron Black, who asked Rossiter if he had any trouble reporting to Black, a man in his mid-20s. SOF 1.2-1.4.

3.    Four months after Rossiter's hire, James Monahan became his boss. Rossiter was the oldest employee in Monahan's work group. Monahan told Rossiter that Rossiter was "overqualified," and he stated that he did not know what to do with Rossiter. SOF 1.5.

4.    Rossiter performed marketing communications work for the Information Technology Server business line whose customers were manufacturers and other IBM divisions, and he worked on the naming of products as they came onto the market. Because Monahan underutilized Rossiter, Rossiter developed relationships with corporate

2

personnel to expand his naming functions into branding responsibilities; that is, assuring that as new products came along, they were folded into the IBM brand, a key corporate asset, in a well-planned and cohesive manner. He also developed a web-based newsletter to sales personnel in the field. As a manager in the Microelectronics Division, Rossiter had five to seven employees reporting to him. SOF 1.5-1.6.

5.      Monahan made it clear by his rebuffs to Rossiter's requests for additional responsibilities that he did not want to advance an older guy in the department. SOF 1.6.

6.      In 1997, when Rossiter was 55 years old, Monahan demoted Rossiter, removing his managerial title and reports and reducing his job band to 9.  Monahan told Rossiter that the demotion was part of a leveling of the organization and that now the Division could have only one manager, Monahan.  Subsequent to the demotion, Monahan relegated Rossiter to a cramped cubicle outside of his work group and assigned Rossiter low-level work assignments. SOF 1.7.

7.      It was the policy and practice for an IBM employee and the employee's manager to sit down and develop the employee's goals for the year.  At the end of the year, the employee summed up his achievements; the manager agreed or disagreed; and the manager assigned a rating for the year's performance.  While goals might occasionally be revised mid-year, Monahan *rewrote Rossiter's goals, indeed the entire evaluation, at the end of the year*, and gave him a lackluster rating along the revised goals.  Monahan never explained why he took this heretofore unheard of and hostile action against Rossiter. Rossiter believed that Monahan rewrote the document to reflect his preconceived, age-stereotyped notions of Rossiter's capabilities and his age-inappropriateness for advancement and to try and get Rossiter to leave. SOF 1.8.

3

8.      Rossiter did not complain to Monahan, the manager who was already victimizing

him, nor to Monahan's superiors, because he did not want to be identified as a

complainer and possibly trigger retaliation.  In addition, Rossiter liked being affiliated

with IBM, which he regarded as one of the finest corporations in American history,

despite the dismissive treatment he experienced. SOF 1.9

<u>Age Animus under Patricia McGloin and Ed Abrams</u>

9.      In late 1997 or early 1998, Patricia McGloin assumed Monahan's responsibilities

and became Rossiter's immediate supervisor.  She was 45 years of age.  Under McGloin,

Rossiter's branding responsibilities developed and became more time-consuming.  When

Rossiter proposed that he assume additional projects, McGloin rebuffed his proposals,

and Rossiter had to work harder than McGloin's other reports to receive the same

performance rating. SOF 1.10.

10.     In June 1999, Ed Abrams became the Integrative Marketing Communications

Director and McGloin's boss.  Mr. Abrams was 28 years of age. SOF 1.11.

11.     Under Abrams' and McGloin's management, the alleged leveling of manager

positions in the Division ended, and manager positions were created for younger

employees, including Marge Oppold, age 42, in Events, and for Kathleen Spilke, age 48,

in Collateral (brochures).  Rossiter had extensive experience in collateral, and he had

produced some of the largest events in IBM's history. SOF 1.12.  Oppold, who joined

IBM as a secretary, was in band 6 in 1996 when Rossiter was a manager at band 10.

McGloin promoted Oppold twice, notwithstanding feedback from a couple of business

lines that she was not performing well. SOF 1.12.  Neither Oppold's nor Spilke's new

position was posted for applications from IBM personnel. SOF 1.13.

4

12.    McGloin transferred Karen Smith, age 47, into her work group in 2000 and made her responsible for the Power PC business line, which Rossiter had previously led. SOF 1.1, 1.14. Smith had trouble developing the core plans for her business line, and Ed Abrams and more senior managers had to intercede to prevent the business lines from taking over Smith's job because of their dissatisfaction with her work. SOF 1.14. Smith lost the Power PC business line to Cynthia Roy (nee Putlitz), age 35, in January 2001. SOF 1.15. McGloin, who *rejected* Rossiter's requests for additional projects and responsibilities, *created* a project for Smith when she lost a major component of her job due to poor performance. SOF 1.16, 2.21.

13.    Notwithstanding McGloin's disparately negative treatment of Rossiter in comparison with his younger co-workers, McGloin wrote a very positive performance evaluation for Rossiter's work performed in 2000, which evidenced his leadership and "take charge" approach to his responsibilities. SOF 1.20, 1.39. Rossiter was awarded 10% bonuses in the two years preceding his lay-off, as well as "cash awards" for special achievements. SOF 1.20.

### Age Animus under Mark Lefebvre and Patricia McGloin

14.    Mark Lefebvre became Director of the Division in January 2001, replacing Ed Abrams. Mr. Lefebvre was 43 years of age. That same month, Lefebvre hired Carol McNerney, age 32 into the Division, at a band 9. She had joined IBM in 1998. SOF 1.21-1.22.

15.    At the Worldwide Communications meeting in New York, which draws IBM personnel from around the world, Lefebvre stated, for all to hear, that the Sam and Dave

music that Rossiter likes and which dates from the 1950s-1960s, "is so far off my time frame that I don't want to talk about it." SOF 1.23.

16.    In July 2001, Carol McNerney began to perform some of Rossiter's naming responsibilities involving all of the business lines within the Division. Rossiter, who had led the Division's naming and branding responsibilities for six years, made a branding presentation at the Worldwide meeting, where McNerney was in attendance. SOF 1.24.

17.    Using a biased, procedurally flawed, and substantively false assessment of Rossiter's job performance, McGloin, on October 26, 2001, identified Rossiter for lay-off, effective January 3, 2002. SOF 1.25, 1.30-1.40. The lay-off assessment is further described below.

18.    On November 16, 2001, *after* Rossiter was selected for lay-off and *before* he was notified, Lefebvre hired Ray Chang, who was in his 20s, into the Division. At the same time that the Division was reducing head count, Lefebvre added a new, very young employee into his Division to replace Rossiter. Chang had no background or experience in the work that the Division performed, and on one of Rossiter's last days at IBM, he was required to sit down with Chang and instruct him on how to perform Rossiter's naming responsibilities. SOF 1.26, 1.28.

19.    Before Rossiter's last day, January 2, 2002, the organizational chart of the Division was changed to identify Carol McNerney as the head of "Brand Marketing and Corporate Programs" for the Division. McNerney, a new, less qualified, and substantially younger employee in the Division took over Rossiter's job. SOF 1.27.

20.    McGloin and Lefebvre assigned Rossiter's marketing responsibilities for the Information Technology business line to Karen Smith, who had lost the same responsibilities for the Power PC business line, due to poor performance. SOF 1.29

### The Older Workers Are Laid Off

21.    The Division had no employees who were 60 or more years old prior to the lay-off. After the lay-off, the Division had no employees who were 55 or more years old. *Every employee who was 55 or older was terminated.*  As the work-life for Americans grows longer, the work-life for employees in IBM's Microelectronics Division grows shorter. SOF 1.41-1.46, 2.18.

22.    Of the 38 employees age 20 through 50, who constituted 82.6% of all employees eligible for lay-off, 26.3% were laid off.  Conversely, of the eight employees over 50, who constituted 17.9% of all employees eligible for lay-off, 75% were laid off. SOF 1.43, 1.45.

### McGloin's *Post Hoc* Attempt to Hide Age Discrimination

23.    McGloin falsely attested at the MCAD that Rossiter was demoted in 1997 because of "concerns with [Rossiter's] work performance," even though she knew that Rossiter was demoted because of a reorganization.  McGloin's motive at the MCAD was to try and reinforce the falsehoods about Rossiter's job performance, which McGloin had written in his lay-off worksheet, and thereby divert attention away from the discriminatory lay-off of Rossiter and other older workers. SOF 1.47.

## II. LEGAL STANDARD

An employer such as IBM may not subject an employee to an adverse employment action because of the employee's age, if that employee is over forty years

old. 29 U.S.C. §§ 623(a)(1), 631(a); G.L. c. 151B, §§ 1(8), 4(1B). Even when an employer is effectuating an otherwise legitimate reduction in force, it is nevertheless under the obligation not to permit considerations of age to determine who is laid off. Sullivan v. Liberty Mutual Insurance Co., 444 Mass. 34, 42 (2005).

Massachusetts and federal laws prohibit age discrimination, whether it is based on consciously biased decision-making, or whether it is the product of unconscious bias. Thomas v. Eastman Kodak Co., 183 F.3d 38, 58–60 (1st Cir. 1999); Lipchitz v. Raytheon Co., 434 Mass. 493, 503 n.16 (2001) ("Employment decisions that are made because of stereotypical thinking about a protected characteristic or members of a protected class, whether conscious or unconscious, are actionable under G.L. c. 151B.").

There is a wide range of ways to demonstrate that the reason for a discharge was because of a person's age. The most commonly utilized avenue for proving discrimination with circumstantial evidence follows the burden-shifting formula set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973), as modified by later cases. The legal standards of G.L. c. 151B and the ADEA are often different, and the differences will be highlighted below.

The plaintiff's initial burden is not onerous, and simply requires the plaintiff to produce evidence supporting a prima facie case of age discrimination. Sullivan, 444 Mass. at 40. The prima facie burden is demonstrated in a reduction in force case where the plaintiff (1) is over forty; (2) performed his job at an acceptable level; (3) was laid off; and (4) the lay-off occurred in circumstances that would raise a reasonable inference of unlawful discrimination. Sullivan, 444 Mass. at 41, 45. While the fourth element is an

imprecise standard, it can be further illustrated by the case law, and will be fleshed out further below.

After the plaintiff produces evidence sufficient to establish a prima facie case, the employer must not only give a lawful reason for its employment decision, but must also produce credible evidence to show that the reason advanced was the real reason. Blare, 419 Mass. at 441-442. The defendant's articulation must be clear and specific, and not vague. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981). The requirement imposed on employers to proffer a supported and detailed articulated reason is more onerous under Chapter 151B than under the ADEA. Woods v. Friction Materials, Inc., 30 F.3d 255, 263 (1st Cir. 1994).

After the employer articulates and supports its justification for the lay-off, the burden returns to the plaintiff to generate an inference of discrimination by demonstrating that one or more of the reasons advanced by the defendant was a pretext (not the real reason). Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 118 (2000); Lipchitz v. Raytheon Co., 434 Mass. 493, 502 n.14 (2001). Proof of pretext alone, along with a prima facie case, will get a plaintiff over the summary judgment hurdle in a G.L. c. 151B case because it generates an inference of discrimination. Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 117–18 (2000). In contrast, under the ADEA, proof of a prima facie case and proof of pretext alone *may*, but will not necessarily, create an inference of discrimination sufficient to withstand a summary judgment motion. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148–149 (2000). The First

9

Circuit acknowledges that the Massachusetts law regarding proof of pretext is perhaps more liberal than federal law. Joyal v. Hasbro, Inc., 380 F.3d 14, 17 (1st Cir. 2004).[1]

### III. THE EVIDENCE RAISES A REASONABLE INFERENCE THAT ROSSITER WAS LAID OFF BECAUSE OF HIS AGE

**A.    Rossiter Has Established a Prima Facie Case**

Rossiter has clearly established a prima facie case of age discrimination. First, Rossiter was 59 years old when he was terminated. SOF 1.2, 1.27. Thus, he was in the protected class of those above 40.

Second, Rossiter was performing his job in an acceptable manner. Sullivan, 444 Mass. at 41. Rossiter's performance evaluation for 2000 was very positive, with a rating of "Meets/Exceeds Commitments" and praise for Rossiter's initiative and "take-charge" approach to his responsibilities. SOF 1.20, 1.39. Rossiter's performance in 2001 was at an even higher level. SOF 1.35. Rossiter also received performance-related bonuses and cash awards for achievement in the two years preceding his lay-off. SOF 1.20. Indeed, given that the separation of employment was a lay-off, defendant does not contest that Rossiter was performing his job in an acceptable fashion. Def.'s Mem., at 14 ("In short, Rossiter was not let go for poor performance"); Sullivan, 444 Mass. at 41 ("in a reduction in force case the discharge is not the result of the employer concluding that an individual is not performing well").

Third, effective January 2002, Rossiter was laid off. SOF 1.27. It is uncontested that he suffered an adverse job action.

---

[1] IBM argues that at the third stage, Rossiter must demonstrate the existence of pretext for age discrimination. Def.'s Mem., at 17. However, as the Supreme Judicial Court cases cited above and the Joyal case demonstrates, a prima facie case, combined with evidence of simple pretext, are sufficient evidence under c. 151B to preclude summary judgment on the issue of the existence of discrimination.

Fourth, the circumstances of the lay-off generate an inference that discrimination was involved:

New, Substantially Younger Hires and a Poor Performer Replaced Rossiter

Mark Lefebvre hired Carol McNerney, who was 32, into the Division in January 2001, turned over many of Rossiter's naming responsibilities to her by July, and *after* Rossiter was notified of his lay-off but *before* he was out the door, McNerney's position on the organizational chart was changed to head of "Brand Marketing and Corporate Programs." SOF 1.22, 1.27. Rossiter had been successfully performing branding responsibilities for years, and he was far more qualified in branding than McNerney, as evidenced by his presentation on branding at IBM's Worldwide Communications meeting in New York, where McNerney was in attendance. SOF 1.24, 127. McNerney took over Rossiter's job. SOF 1.27.

Further, *after* McGloin had identified Rossiter for lay-off, and *before* Rossiter was notified, Lefebvre hired Ray Chang into the Division to work with McNerney. SOF 1.26. Chang was just out of college and had no background or experience in any of the work performed by the Division. SOF 1.26. At the same time that the Division was reducing head count, Lefebvre added a new, twenty-something employee to the count. SOF 1.26. Rossiter was required to sit down with this new, less qualified and substantially younger employee and instruct him about how to perform Rossiter's naming responsibilities. SOF 1.28. Karen Smith, who was retained and was eleven years younger than Rossiter was given Rossiter's business line. Specifically, Smith, who had lost the Power PC business line to Cynthia Roy (nee Putlitz), due to Smith's poor performance, was assigned Rossiter's comparable responsibilities for the Information Technology business line, after

11

Rossiter was terminated. SOF 1.14-1.15, 1.29. <u>Koster v. Trans World Airlines, Inc.</u>, 181

F.3d 24, 31 (1st Cir. 1999) (prima facie case satisfied where plaintiff's job duties were

taken over by other employees, some of whom were younger); <u>Hidalgo v. Overseas</u>

<u>Condado Ins. Agencies, Inc.</u>, 120 F.3d 328, 333-334 (1st Cir. 1997) (reassignment of job

duties of laid off employee satisfies prima facie case). The fact that the replacement(s)

was more than five years younger than Rossiter is significant, and supports the

discrimination claim. <u>Knight v. Avon Prods., Inc.</u>, 438 Mass. 413, 424–25 (2003);

<u>O'Connor v. Consol. Coin Caterers Corp.</u>, 517 U.S. 308, 309–13 (1996).

<u>The Oldest Employees Lost their Jobs and Age Was Not Treated "Neutrally"</u>

**Of the 46 employees in the Microelectronics Division, the oldest four**

**employees were laid off.** <u>Sullivan</u>, 444 Mass. at 45 n.14. This fact in itself is sufficient

to establish a prima facie case. <u>Sullivan</u>, 444 Mass. at 45 n.14 (if an employer had five

employees in a department (four women and one man), and the employer laid off the only

male and retained all the females, that would satisfy the prima facie burden for sex

discrimination). *Prior to the lay-off*, the 46 employees ranged in age from 22 to 59.

There were *no employees 60 or older*. SOF 1.42. *After the layoff*, there were 30

employees in the Division, and their ages ranged from 24 to 54. SOF 1.43. There were

*no employees 55 or older*. SOF 1.44. Thus, this lay-off, which potentially affected only

46 employees in the Microelectronics Division, successfully reduced the upper age limit

of the employees in the Division by 5 years, from 59 to 54. No one age 55 or above

survived the cut. SOF 1.4. Four years earlier, in the absence of a lay-off, Rossiter had

been demoted when he reached the age of 55. SOF 1.46. <u>See MacDissi v. Valmont</u>

Industries., Inc., 856 F.2d 1054, 1058 (8th Cir. 1988) (termination of 2 oldest members of 9-person department permits inference that age was a factor in their selection).

Moreover, the overall statistics of the layoff indicate that "age was not treated neutrally." Alvarez-Fonseca v. Pepsi Cola of Puerto Rico, 152 F.3d 17, 24 (1st Cir. 1998). Prior to the lay-off, there were 38 employees 20 through 50 years of age, and they represented 82.6% of all the employees who were eligible for lay-off. SOF 1.43. Of those 38 employees, aged 20 through 50, only 26.3% were laid off. SOF 1.45. Conversely, prior to the lay-off there were eight employees who were over 50 years old, and they represented 17.39% of all the employees who were eligible for lay-off. SOF 1.43. Of the eight individuals who were over 50 years of age, 75% were laid off. SOF 1.45. This striking over-representation of employees over 50 among those selected for lay-off further establishes a prima facie case. While the inference of discriminatory selection may be strengthened by a larger statistical group, a large group is not required to create the inference. Walter B. Connolly, Jr., et al., Use of Statistics in Equal Employment Opportunity Litigation § 2.01[3] (11th ed. 1995); MacDissi, 856 F.2d at 1058 ("There is no minimum sample size prescribed either in federal law or in statistical theory").

Statistical evidence of the workforce is properly considered in an individual disparate treatment case. Lipchitz, 434 Mass. at 508. Statistics of workforce imbalance are often a "telltale" sign of discrimination. International Brotherhood of Teamsters v. Unites States, 431 U.S. 324, 340 n.20 (1977); see also Buckley Nursing Home, Inc. v. MCAD, 20 Mass. App. 172, 176 n.4 (1985) (statistical evidence may be probative to show the presence of discriminatory motive). The statistical picture need not be perfect;

13

the statistics need only be adequate to assist in the generation of a reasonable inference. See, e.g., Lipchitz v. Raytheon Co., 434 Mass. 493, 508-509 (2001). The plaintiff need not provide the age and qualification of every applicant for the hundreds of positions. Lipchitz, 434 Mass. at 508.

The evidence here shows that everyone over the age of fifty-four was purged in the lay-off. This information is definitely admissible, and persuasive, based on the on-point cases of MacDissi, 856 F.2d at 1058-1059 and Lipchitz, 434 Mass. at 508-509.

**B.     IBM's Proffered Reason for Rossiter's Termination is a Pretext**

Lay-Off Procedures Were Flawed and Rossiter's Worksheet Was Rife with Falsehoods

McGloin's application of the lay-off guidelines was subjective and procedurally flawed, and her worksheet on Rossiter was rife with falsehoods about Rossiter's job performance. McGloin inexplicably selected three skills for assessment that were not critical to performance in the integrated marketing communications discipline, and she never consulted the document that lists the skills, prior to selecting employees for elimination. SOF 1.30-1.31. McGloin could not testify to the fact that Guynn performed at a higher skill level than Rossiter -- she could only state that her assessments showed that Guynn's skill levels in the specific skills McGloin selected (3 of which were not critical skills) were higher than Rossiter's. SOF 1.31.

McGloin and Lefebvre distorted the term "different job categories" by substituting "band" for "skills," which are much more inclusive. The "job category," Integrated Marketing Communications, transcends "bands," and all employees with the interchangeable skills within that discipline/job should have been evaluated and compared with one another. SOF 1.32. McGloin's and Lefebvre's distortion of the

14

comparator groups allowed them to shield certain employees, such as Karen Smith, who was performing the exact same work as Rossiter, from comparison along the same skill sets. SOF 1.32.

Contrary to the guidelines, McGloin did not subject all employees in her group to an evaluation for lay-off. The guidelines required that a manager *first* complete worksheets on employees and *then* identify "surplus." SOF 1.33. In her rush to eliminate the oldest employees in her group, McGloin reversed and subverted the directions. She *first* identified what she considered to be "surplus;" that is, band 9, with three 50 plus year-olds, and *then* she completed worksheets for those employees. SOF 1.33. McGloin failed to complete worksheets for all employees in her department. She was not required to lay off a specified number of employees nor eliminate two employees from one band and none from another. SOF 1.33, 2.5. McGloin did not complete worksheets for Karen Bates (age 46) and Deborah Long (age 40), who reported directly to her and were both in band 7. Therefore, in the absence of a skills assessment for Bates and for Long, McGloin had absolutely no way of knowing whether either (or both) of them was deficient in the skills needed to go forward and constituted "surplus" in her group. SOF 1.33, 2.5.

Step 3 of the guidelines instructed managers to integrate personal attributes, such as creativity, judgment, planning, teamwork, and leadership within the assessments, which McGloin utterly failed to do. SOF 1.34. Just four days prior to McGloin's selection of Rossiter for lay-off, she singled out Rossiter in an e-mail to her team for his ability to make a persuasive and influential presentation to Lefebvre. SOF 1.34.

The content of McGloin's lay-off assessment of Rossiter evidences that she falsely testified that when she assessed Rossiter, she was evaluating his abilities as of the

15

time of the lay-off. SOF 1.35. McGloin's annual evaluation of Rossiter for his work in 2000 was excellent, and she admitted that his performance in 2001 was at an even higher level. SOF 1.35. For this reason, McGloin was compelled to reach back to *1998* to support the false, negative statement that Rossiter "needs coaching to stay within budgetary guidelines." SOF 1.35. This statement was patently false. With the exception of one instance in 1998 when Rossiter's proposed budget for a series of promotional seminars was deemed excessive, Rossiter never received any criticism about his ability to limit costs and stay within budget. SOF 1.35.

Similarly, McGloin falsely wrote that Rossiter had "designed surveys and managed research agencies, but research did not meet validity criteria." SOF 1.36. Rossiter worked in collaboration with a well-regarded external research company and IBM's own internal research professionals. The surveys that Rossiter managed were very expensive, and if a survey had not been done correctly in terms of the sample size, the measurement techniques used, or the validity and/or the reliability of the survey, Rossiter's IBM research colleagues – in advance of launching the research in the field – would have called it to his attention. SOF 1.36. Rossiter oversaw numerous surveys, and he at no time received any negative feedback or indication that there was a validity problem with the surveys. SOF 1.36. Westinghouse Elec. Supply Corp. v. MCAD, 9 Mass. L. Rptr. 661 (1999) (poor performance is a pretext where no prior complaint).

McGloin's assessment of Rossiter's proficiency level as having "applied knowledge," along five of the six criteria, was false and contrary to McGloin's prior recognition of Rossiter's leadership abilities. SOF 1.37. In IBM parlance, "applied knowledge" means "can perform with assistance," while "in-depth knowledge" means

"can perform without assistance; can lead or direct others." Beyond general guidance and goal-setting, Rossiter did not require remedial assistance from McGloin, and as his last performance evaluation attested, he led and/or directed others. SOF 1.20, 1.37. He should have been assigned a proficiency level of "in-depth knowledge" on all lay-off assessment criteria. SOF 1.37. Rossiter had been Director of Communications at Fortune 500 companies, and McGloin's depiction of Rossiter as needing assistance to perform his job tasks is not credible. SOF 1.2, 1.32

McGloin acknowledged Rossiter's "take charge" approach to his job in her evaluation of Rossiter's 2000 performance, which makes no reference to Rossiter requiring assistance and which uses forceful and assertive descriptors of Rossiter's performance. SOF 1.20, 1.39. These descriptors include "persevered with little cohesive input," "remained actively involved," "pressing hard for key elements," "stepped in to handle sales alerts," "adopted his responsibility as key strategist," "responsibly drove," and "received unsolicited good words from the Business Lines, marketing, intelligence, and corporate naming areas as someone who has good insights and is responsive." SOF 1.20, 1.39. Rossiter received bonuses and cash awards for his achievements. SOF 1.20.

McGloin's false depiction of Rossiter's proficiency level in her lay-off assessment, as well as her false statements about Rossiter's budgetary and survey skills, were intended to, and did, set up Rossiter for termination. SOF 1.40. An employer's asserted strong reliance on subjective feelings about lay off candidates may mask discrimination. Koster v. Trans World Airlines, Inc., 181 F.3d 24, 32 (1st Cir. 1999).

In this instance, McGloin's lay-off assessments were not only procedurally flawed and subjective, but with respect to Rossiter, her assessment was knowingly false and was made for the purpose of removing Rossiter, her oldest employee, from her group.

<u>The Division's State of Mind Also Evidences Pretext</u>

Evidence of a corporate state of mind or a discriminatory atmosphere may help support the finding of pretext, and "is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discrimina[tion]." <u>Conway v. Electro Switch Corp.</u>, 825 F.2d 593, 597 (1st Cir. 1987). Rossiter was subjected to a myriad of small and large cuts throughout his employment at IBM, which evidenced age animus and a corporate state of mind, which was both unfamiliar with fifty-something "dinosaurs" and hostile toward Rossiter's professional development and/or advancement.

Even before Rossiter was hired, James Monahan asked him in a telephone interview, "Do you still have the fire in your belly to do the job?" SOF 1.3. Rossiter's first boss, Ron Black, who was in his mid-20s, asked Rossiter if he had any trouble reporting to Black. SOF 1.4. After Rossiter began reporting to Monahan, Monahan told him that he was "overqualified" and Monahan stated that he did not know what to do with Rossiter. SOF 1.5. Accordingly, Monahan underutilized Rossiter, and when Rossiter requested additional responsibilities, Monahan rebuffed him making it clear that he did not want to see an older employee in the department advance. SOF 1.5-1.6. In 1997, when Rossiter was 55 years old, Monahan demoted Rossiter, removing his managerial title and his reports and reducing his job band from 10 to 9. SOF 1.7. The

18

purported reason for Rossiter's demotion was a leveling of the organization, which would leave Monahan as the sole manager in the Division. SOF 1.7.

Subsequent to Rossiter's demotion, Monahan relegated him to a cramped cubicle outside of his work area and assigned Rossiter to low-level work assignments. SOF 1.7. Contrary to IBM's policy and procedure whereby an employee is evaluated at the end of the year along the goals that were established at the beginning of the year, Monahan *rewrote* Rossiter's *goals at the end of the year* and then proceeded to evaluate his achievements against the revised goals. SOF 1.8. Rossiter believed that Monahan rewrote the document to reflect his preconceived, age-stereotyped notions about Rossiter's capabilities and his age-inappropriateness for advancement and to get Rossiter to leave. SOF 1.8.

When Ed Abrams and Patricia McGloin became Rossiter's bosses, Rossiter stood by as they "cherry picked" younger, less qualified employees for professional development and/or promotion by creating new manager positions and not posting the positions for others to apply. SOF 1.12, 2.21. Marge Oppold, for example, who was only at band 6 when Rossiter was a band 10 manager in 1996, was made Manager of Events, notwithstanding the fact that Rossiter had produced some of the largest events in IBM's history. SOF 1.12. Rossiter told McGloin on numerous occasions that he was eager for new opportunities and projects, particularly web-related projects, and McGloin rebuffed his requests. SOF 1.16.

McGloin transferred Karen Smith into her group and put her in charge of the Power PC business line, which Rossiter had headed at the time of his hire in 1995. SOF 1.1, 1.14. Smith was performing her job so poorly that Ed Abrams and other senior

managers had to intercede to keep her work in the Division, and eventually the Power PC line was transferred to Cynthia Roy (nee Putlitz). SOF 1.14-1.15. McGloin, who repeatedly *rebuffed* Rossiter's requests for additional projects, then *created* a web-based project for Smith because she had lost a major component of her job. SOF 1.14-1.17. McGloin's creation of a project for Smith to keep her in the group, and her rejection of Rossiter's requests to expand his job responsibilities, evidenced McGloin's disparate negative treatment of Rossiter, who was eleven years older than Smith, in favor of McGloin's age peer, Karen Smith. SOF 1.17. During her deposition, McGloin attempted to mask her discriminatory, age-based animus towards Rossiter by falsely testifying that Ed Abrams never had to intercede on behalf of Smith due to Smith's performance-related problems with the Power PC product line. SOF 1.19.

<u>The Retention of Less-Qualified Employees Evidences Pretext</u>

The fact that Rossiter was better qualified to perform the naming and branding responsibilities of the Division than either Carol McNerney or Ray Chang, who were retained, also creates an inference that the preferred reason for Rossiter's termination is a pretext for age discrimination. SOF 1.22-1.28. <u>Koster v. Trans World Airlines, Inc.</u>, 181 F.3d 24, 32 (1st Cir. 1999). Indeed, Lefebvre was so poised to eliminate Rossiter and replace him with a younger worker that Lefebvre *hired Ray Chang into the Division mid-layoff* and required that Rossiter sit down with Chang and tell him how he could best replace Rossiter. SOF 1.26, 1.28.

## **CONCLUSION**

For the forestated reasons, Plaintiff Dennis Rossiter requests that this Court deny Defendant IBM's motion for summary judgment in its entirety.

Respectfully submitted,

Dennis Rossiter
By his Attorneys,

Kevin G. Powers, BBO #405020
Robert S. Mantell, BBO #559715
Linda Evans, BBO #635078
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

RossiterOppositionSJ

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on ____5/8/05____

_____Linda Evans_____