# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENNIS ROSSITER )
      Plaintiff )
  )
v. )      C.A. No. 04 CR 10069DPW
  )
INTERNATIONAL BUSINESS )
MACHINES CORPORATION )
      Defendant )
  )

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**

Defendant International Business Machines Corporation ("IBM") hereby submits this

statement of the material facts of record as to which IBM contends there is no genuine issue to be

tried, and based upon which it moves for summary judgment.

**January 1995:  Rossiter's Hiring at Age 53**

1) Plaintiff Dennis Rossiter was hired by IBM in January 1995, at age 53. See excerpts of

volume I of deposition of Dennis Rossiter ("Rossiter I") at p. 11 attached hereto as

Exhibit A.

2) At the  time, he was hired as the manager of marketing communications for IBM's

PowerPC product line. Rossiter I at pp. 11-12. Marketing Communications (commonly

known as "MARCOM"), contains elements of marketing and communications, including

advertising, and promotions to the outside marketplace, and internal communications to

internal personnel. Rossiter I at pp. 39-40. It was Rossiter's job to come up with a

comprehensive plan for a marketing campaign for IBM's PowerPC product. Rossiter I at

p. 42.

3)    In or about April 1995, Rossiter began reporting to Mr. James Monahan, the Director of

Marketing Communications for the Microelectronics Division.  Rossiter I at p. 14; and

see excerpts from deposition of James Monohan ("Monahan Deposition") at pp. 21-22,

attached hereto as Exhibit B.  Rossiter's basic MARCOM responsibilities remained the

same, although either then or at some point not long thereafter, he switched to supporting

the Server product/business line.  Rossiter I at pp. 14-16, 20-21 (Exhibit A hereto).

IBM's Microelectronics Division ("MD") manufactures and sells microprocessors.  Id. at

p. 89.

**Fall 2001: The Microelectronics Resource Action (The Lay-Off)**

4)     In 2001, there was a significant downturn in the microprocessor/semiconductor industry.

Rossiter I at p. 89; and see Affidavit of Mark Lefebvre (Lefbvre Affidavit"), at ¶ 5

attached hereto as Exhibit C.  As a result, in the fall of 2001, the Microelectronics

Division conducted a large scale lay-off.  Id.  In total, more than 1,200 employees were

laid off in MD.  See Rossiter I at p. 75, and see Age and Title Information which is

Exhibit 4 to Rossiter deposition.[1]  In IBM parlance, a lay-off is called a "Resource

Action."  See Affidavit of Patricia McGloin ("McGloin Affidavit") at ¶ 9 attached hereto

as Exhibit D.

5)    Rossiter does not dispute that IBM had a legitimate reason to engage in a significant lay-

off in the Microelectronics Division.  Rossiter I at p. 89 (Exhibit A hereto).

**Management Structure Within Microelectronics Division at the Time of the Lay-off**

6)    In 2001, Rossiter reported to Patricia McGloin Waitt ("McGloin"), the Manager of the

Microelectronics Division's Integrated Marketing Communications group.  McGloin

Affidavit at ¶6 (Exhibit D hereto).  Ms. McGloin had taken over responsibility for

---

[1] The relevant exhibits to depositions are included at the end of deposition excerpts for each deposition.

MARCOM for MD from James Monahan in early 1998. McGloin Affidavit at ¶¶ 3-4. Rossiter had been reporting to Ms. McGloin since early 1998. Rossiter I at p. 32. Ms. McGloin was 45 years old and Rossiter was 56 when she became Mr. Rossiter's manager in 1998. McGloin Affidavit at ¶ 2; Rossiter I at p. 11.

7) In early 2001, Mark Lefebvre became the Director of MD Marketing. Lefebvre Affidavit at ¶ 3. As Director of MD Marketing, Lefebvre became Ms. McGloin's supervisor. Id. In turn, Mr. Lefebvre's supervisor was Christine King, the Vice President of the Microelectronics Division. Lefebvre Affidavit at ¶ 4. Ms. King's Operations Manager was Maria Lipner. Id.

8) Mr. Lefebvre had a number of other marketing groups (i.e., in addition to Ms. McGloin's group) reporting to him. Lefebvre Affidavit at ¶ 3.

### IBM's Lay-off Guidelines: Methodology for Selecting Employees to Be Laid Off

9) IBM issued training guidelines for the lay-off, called the TG U.S. Surplus Selection Guidelines ("Selection Guidelines"), which set forth the methodology managers were to follow in selecting which employees to lay-off. McGloin Affidavit at ¶ 10, and see Selection Guidelines which are Attachment 1 to Ms. McGloin's Affidavit; Lefebvre Affidavit at ¶ 7. As discussed below, managers were directed to define skill groups by grouping employees together by salary "band." IBM has a system where employees are grouped into bands 1-10. Rossiter I at pp. 46-47 (Exhibit A hereto); McGloin Affidavit at ¶ 8 (Exhibit D hereto). Each of these bands has a salary range associated with it. Id. The next level up from Band 10 is a director level position. McGloin Affidavit at ¶ 8. At the time of the lay-off, Rossiter's position was in Band 9. Id.

10)    On or about October 18, 2001, IBM conducted training for managers in the methodology of selecting employees to be laid-off.  Lefebvre Affidavit at ¶ 8; McGloin Affidavit at ¶ 11.  Lefebvre and McGloin participated in the training.  Id.

11)    The written guidelines and training described two selection methodologies: work elimination (where the person's or group's work would be going away altogether) and staff reduction (where the work remained the same but needed to be done by fewer people).  IBM instructed managers to follow the following multi-step process in conducting a staff reduction:

- Managers were instructed to define so-called skill groups consisting of people in the same job category, in the same salary band level and with the same managerial status (managers and non-managers could not be in the same skill group).  In other words, managers were instructed that they could not compare employees in different job categories, different salary bands or different managerial status.

- Managers were instructed to define the critical skills required for that skill group.

- Managers were instructed to define the proficiency/knowledge level the members of the skill group were to possess in each of the critical skills.  These proficiency levels were determined according to a pre-existing IBM scale (which accorded higher proficiency levels to higher band levels) and were also specifically defined in the Selection Guidelines.  The  six proficiency/knowledge levels, in descending order, are as follows:

  → "Comprehensive Knowledge" meaning the employee can give expert advice and lead others; is sought by others for consultation and leadership; has comprehensive ability to make sound judgments;

4

> → "In-depth Knowledge" meaning the employee can perform without assistance; can lead or direct others.

> → "Applied Knowledge" meaning the employee can perform with assistance.

> → "Conceptual Knowledge" meaning the employee has limited ability to perform.

> → "Limited Knowledge."

> → "No Skill."

- Managers were instructed to fill out selection worksheets on an established template where the critical skills were listed in left hand column and the manager's assessment of the employee's proficiency/knowledge level in each skill was listed in the right hand column. In assessing the proficiency level for each skill, managers were instructed to consider the employee's performance reviews (so-called "Personal Business Commitment" or "PBC"), and other job-related information. Managers were instructed to provide supporting examples of their assessments.

- Where managers determined that there was a surplus in a skill group (i.e., that the work could be carried on by fewer employees), they were instructed to identify employees in that skill group for lay-off based on the relative skill assessments (i.e., to lay-off the employees whose skills were assessed to be weaker). If employees' skills were assessed as being identical, seniority was a tie-breaker (i.e., the person with less seniority was to be selected for lay-off).

- The Selection Guidelines and training emphasized that managers were not to target skill groups of one—i.e., where there were was only one employee in that job category of the same band and managerial level.

5

McGloin Affidavit at ¶ 12, and see Selection Guidelines which are Attachment 1 to McGloin Affidavit; Lefebvre Affidavit at ¶ 9.

**IBM Directs Lefebvre to Layoff Approximately 20 of His 46 Employees**

12)    In October 2001, Maria Lipner instructed Mr. Lefebvre that the target number of lay-offs from the groups reporting to him was 20 or 21 out of the 46 employees in his groups. Lefebvre Affidavit at ¶ 10.

13)    Based on this instruction, Mark Lefebvre told Patricia McGloin that her group was expected to contribute to the lay-off but he did not give her a specific target.  Lefebvre Affidavit at ¶ 11; McGloin Affidavit at ¶ 13.  Lefebvre instructed McGloin to determine whether her group could reduce staff while still carrying on the required work.  McGloin Affidavit at ¶ 13.

14)    At the time of the lay-off selections, Ms. McGloin had 14 people in her group, which was called the Integrated Marketing Communications group.  McGloin Affidavit at ¶ 14.

15)    Ms.  McGloin had two subordinate managers, Robert Rohrer and Marge Oppold, both of whom had people reporting directly to them.  McGloin Affidavit at ¶ 15.

**McGloin Applies Selection Criteria to Her Workforce and Recommends Rossiter and Others for Lay-off**

16)    In following the lay-off methodology, Ms. McGloin first grouped her employees into skill groups.  McGloin Affidavit at ¶ 16.  In grouping her employees into skill groups, she readily determined that the skill group with the largest number of incumbents was the Band 9, non-managers, who were in the job category of "IMC Specialist Advanced." Id. IMC stands for Integrated Marketing Communications.  McGloin Affidavit at ¶ 3.  This skill group she called "Integrated Marketing Communications Band 9" (hereinafter, the "IMC/Band 9 Skill Group").  McGloin Affidavit at ¶ 16.  This skill group consisted of 5

people: Dennis Rossiter, Ronald Milos, Kathy Weaver, Karen Spilke, and Deborah Guynn. McGloin Affidavit at ¶ 16. Based on the relatively large number of people in the IMC/Band 9 Skill Group, Ms. McGloin included this group in the lay-off analysis. McGloin Affidavit at ¶ 16.

17)     In accordance with the Selection Guidelines, Ms. McGloin defined the skills necessary for the IMC/Band 9 Skill Group. McGloin Affidavit at ¶ 17. She selected the skills from a pre-existing IBM document entitled "IBM Marketing Professional Career Skills By Job Level Integrated Marketing Communications Discipline" (hereinafter, "Skills List"). Id. The Skills List defines a wide variety of skills that are used by various employees throughout IBM in the IMC discipline. Id.

18)     The skills Ms. McGloin selected from the Skills List for the IMC/Band 9 Skill Group were those she believed reflected the set of skills that would be required for the individuals who would be in the organization going forward, recognizing that the group might be reduced. In particular, she chose the following skills (and associated proficiency/knowledge levels):

      a.    In-depth knowledge of business plans.
      b.    In-depth knowledge of program development.
      c.    In-depth knowledge of measurement techniques.
      d.    In-depth knowledge of use of cross-functional teams.
      e.    In-depth knowledge of agency operations.
      f.    In-depth knowledge of basic financial concepts.

McGloin Affidavit at ¶ 18.

19)     Each of the skills selected by Ms. McGloin has an explanatory definition in the Skills List. McGloin Affidavit at ¶ 19.

20)     Next, Ms. McGloin assessed the skills of the persons in the IMC/Band 9 Skill Group who reported directly to her (Dennis Rossiter and Deborah Guynn) and she asked Robert

Rohrer to assess the skills of the persons who reported directly to him (Ronald Milos, Kathy Weaver, Karen Spilke). McGloin Affidavit at ¶ 20.

21)   Ms. McGloin conducted the skill assessments in late October 2001. McGloin Affidavit at ¶ 21. In making the skill assessments of the people who reported directly to her, Ms McGloin relied on her knowledge of the employees' recent work and of their previous work (including reviewing their performance reviews). Id.

22)   Ms. McGloin's skill assessment of Rossiter, which she documented on the required Selection Worksheet, was that he had "Applied Knowledge" in 5 of the 6 skill categories, which signified that he could perform with assistance in those skill categories. McGloin Affidavit at ¶ 22. In accordance with the Guidelines, Ms. McGloin provided supporting examples of her assessment of Rossiter. McGloin Affidavit at ¶ 22 and see Rossiter's Selection Worksheet attached thereto as Attachment 3. At her deposition, Ms. McGloin provided additional examples in support of her assessment of Rossiter's skills. See excerpts from deposition of Patricia McGloin Deposition at pp. 98-101, 103-106, copies of which are attached hereto as Exhibit E.

23)   The following chart reflects the relative assessments by Mr. Rohrer and Ms. McGloin of the IMC/Band 9 Skill Group, where numbers 1 through 6 reflect the proficiency/ knowledge level (1 = comprehensive knowledge; 2 = in-depth; 3 = applied; 4 = conceptual; 5 = limited; 6 = no skills). On this scale, the lower the number the higher the skill level. McGloin Affidavit at ¶ 23.

| IMC/Band 9 Skill Group | Business plan | Develop Programs | IMC measure-ment techniques | To use cross-functional teams | Agency operations | Basic financial concepts | Avg. of ratings |
|---|---|---|---|---|---|---|---|
| Guynn | 2 | 1 | 2 | 1 | 1 | 2 | 1.5 |
| Milos | 2 | 2 | 2 | 1 | 3 | 2 | 2 |

| Spilke | 2 | 2 | 2 | 2 | 3 | 2 | 2.16 |
|---|---|---|---|---|---|---|---|
| Weaver | 2 | 2 | 3 | 2 | 2 | 3 | 2.33 |
| Rossiter | 3 | 3 | 3 | 2 | 3 | 3 | 2.83 |

McGloin Affidavit at ¶ 23, and see Selection Worksheets for the other skill group members attached thereto as Attachment 4.

24) Based on these relative assessments, McGloin recommended the layoff of the two employees with the lowest overall assessments in the IMC/Band 9 Skill Group: Rossiter and Kathy Weaver. McGloin Affidavit at ¶ 24. McGloin made this recommendation to Mark Lefebvre, who, relying on McGloin's greater knowledge of the employees involved, approved the recommendation. McGloin Affidavit at ¶ 24; Lefebvre Affidavit at ¶ 12. Rossiter was age 59 at the time, and Weaver was 54. Affidavit of Margaret Shine ("Shine Affidavit") at ¶ 1, attached hereto as Exhibit F. The employees retained in the IMC/Band 9 Skill Group—Ron Milos, Kathy Spilke and Deborah Guynn—were ages 54, 49, and 38 respectively. Id.

25) After going through the selection process for other skill groups in her department, Ms. McGloin also recommended the layoff of two other employees from a Band 8 skill group. McGloin Affidavit at ¶ 25. Mr. Lefebvre approved these selections as well. McGloin Affidavit at ¶ 25. Therefore, in total, McGloin recommended the lay-off of 4 of the 14 employees in her department. McGloin Affidavit at ¶ 25.

26) In accordance with the Guidelines, Rossiter was informed of his selection for lay-off on or about November 28, 2001, and he was given until early January 2002 to try to obtain another job in the company. McGloin Affidavit at ¶ 26. Rossiter was not able to obtain another job and his termination date from the company was January 3, 2002. Rossiter I at p. 81.

9

**The Re-Distribution of Rossiter's Job Functions**

27)     McGloin and Lefebvre had to re-distribute Rossiter's job function in light of his lay-off. McGloin Affidavit at ¶ 27; Lefebvre Affidavit at ¶ 14. Rossiter had two primary job functions: a) creating and managing the Integrated Marketing Communications strategy and plan for the Server product line; and b) group naming coordinator (this relates to choosing product names for new products). McGloin Affidavit at ¶ 27.

28)     As far as the group naming coordinator responsibilities, even before the lay-off, Mr. Lefebvre had decided to move the naming function from McGloin's group to the person in charge of Brand Marketing and Corporate Programs (Carol McNerney), because on a corporate level, the product naming function was being aligned with brand management/marketing. Lefebvre Affidavit at ¶ 15; and see Affidavit of Carol McNerney ("McNerney Affidavit") at ¶ 5, which is attached hereto as Exhibit G. Therefore, Mr. Lefebvre wanted the naming of Microelectronics products to be aligned with the MD Brand Marketing function, which was under Ms. McNerney. Lefebvre Affidavit at ¶ 15; McNerney Affidavit at ¶ 5. As a result, when Rossiter was selected for lay-off, his naming responsibilities were taken over by Carol McNerney. Lefebvre Affidavit at ¶ 15. Ms. McNerney maintained her existing responsibilities in brand marketing and corporate programs, and she estimates that the naming responsibilities comprised approximately 10-15% of her job after Rossiter's departure. McNerney Affidavit at ¶ 6. McNerney was a "team lead" in Brand Marketing and Corporate Programs (a team lead heads a team on particular projects but is not a supervisor per se) and was assisted by Ray Chang, a recent hire out of college. Lefebvre Affidavit at ¶ 16. After Rossiter's departure, Mr. Chang assisted Ms. McNerney with the naming function.

Lefebvre Affidavit at ¶ 16; McNerney Affidavit at ¶ 7. Mr. Chang maintained his existing responsibilities (in brand marketing and marketing management), and the naming responsibilities he took on comprised approximately 10-15% of his job. McNerney Affidavit at ¶ 7.

29) Rossiter's IMC responsibilities were distributed to Karen Smith, who was a Band 10 IMC Strategist in Ms. McGloin's department. McGloin Affidavit at ¶ 29. Ms. Smith had product lines that she was already supporting and she simply added the business line that Rossiter had been supporting (the Server line). McGloin Affidavit at ¶ 29. Ms. Smith estimates that the responsibility for the Server line comprised less than 5% of her total job after Rossiter's departure. See Affidavit of Karen Smith at ¶ 3, attached hereto as Exhibit H. At the time of the lay-off, Ms. Smith was 48 years old and was a 27 year IBM veteran. Shine Affidavit at ¶ 1.

**Rossiter's Challenge To His Selection for Lay-off**

30) Initially, Rossiter testified that he does not know if McGloin's recommendation that he be laid-off was discriminatory. Rossiter I at pp. 78-79 (Exhibit A hereto). However, subsequently he testified that he believes that McGloin's skill assessment of him was contrary to his performance reviews (since his last performance reviews were good) and that she therefore had to have made up things to get rid of him. Rossiter I at p. 86. He also testified that he believes her skill assessment of him was the result of her unexpressed and unobserved preconceived stereotypes of Rossiter as an older man. Rossiter I at pp. 87-89.

31) Rossiter does not, however, have a problem with McGloin's selection of the six (6) skills that she used for purposes of the selection assessment process, although the proficiency levels he finds to be "esoteric." Rossiter I at pp. 105-107.

32) Rossiter believes McGloin produced an inaccurate assessment of his skills, at least in part, because she lacked an understanding of, and was relatively inexperienced in, marketing communications and so was unable to assess him accurately. Rossiter I at pp. 108-111, 125-127.

33) Rossiter does not agree with McGloin's assessment of his skills, in part, because he does not understand the terms "in-depth knowledge" and "applied knowledge." Rossiter I at pp. 106-108.

34) Nevertheless, Rossiter specifically disagreed with McGloin's assessment that he had only "applied knowledge" of "measurement techniques," because he says that he designed surveys and never received feedback that there was a problem. Rossiter I at pp. 124-125. He also specifically disagreed with McGloin's assessment that he had only "applied knowledge" of "financial concepts" because he does not remember any instance where he needed prodding or coaching to stay under budget. Rossiter I at pp. 126-127.

35) Rossiter is unable to compare his work performance with Deborah Guynn's because he did not work with her much. Rossiter I at pp. 97-98. He does not know if Guynn was talented. Rossiter I at p. 98. He is not familiar with Guynn's background. Rossiter I at p. 100.

36) Similarly, Rossiter could not compare his work to Ronald Milos because he did not know Mr. Milos or get a chance to observe Mr. Milos' work. Rossiter I at pp. 98-99. He did not know Mr. Milos' background. Rossiter I at p. 100.

37)  Rossiter testified that Kathy Weaver's work performance was comparable to his, and that she was a talented employee. Rossiter I at p. 99.

38)  Rossiter testified that Kathy Spilke's work performance was comparable to his, and that she was a talented employee. Rossiter I at p. 99.

39)  When asked who Ms. McGloin should have laid-off instead of him, he testified: "There were a lot of people in the department with a lot less experience and skills. I can't name names…[but] any one of those people, based on the skill sets that were needed to continue forward with the department, would've been higher on the list that I was." Rossiter I at p. 102-103.

40)  When asked to assume that McGloin had to choose between the group of Band 9, non-managers, who she should have chosen, he testified: "I don't know because I don't believe that was the way that the layoffs were selected. So it's a hypothetical situation that I don't think is rooted in the reality of the way it was done." Rossiter I at p. 103. Rossiter did testify that Kathy Weaver was the weakest performer and had the weakest skills in the group of Band 9, non-managers. Rossiter I at p. 135.

41)  Rossiter also believes that Karen Smith, who received some of his job responsibilities after his lay-off, was a less experienced and an inferior performer to him. Rossiter I at pp. 115-120. Ms. Smith was not in Mr. Rossiter's skill group (she was a Band 10) and thus, he was not compared to Ms. Smith in the lay-off selection process. McGloin Affidavit at ¶ 30 (Exhibit D hereto).

42)  Rossiter believes that the age statistics of the lay-off in Lefebvre's group evidences age discrimination. In reaching this conclusion, he relies on the information provided to him by IBM at the time of his lay-off, which contained information about the ages of the

people let go and retained in Mr. Lefebvre's group. Rossiter I at pp. 72-75, and see Age and Title Information which is Exhibit 4 thereto. In particular, he relies on the fact that this information shows a) that employees 50 or older comprised 22% of the population in Lefebvre's group before the lay-off; and b) 60% of the employees 50 or older were selected for lay-off. Rossiter did not know what percentage of people 49 and under got laid off. Rossiter I at p. 74.

43)    The age statistics of the lay-off in Lefebvre's group are as follows:

- Mr. Lefebvre's group consisted of 46 employees before the lay-off.

- 45% of the employees 35 years old or younger (or 5 of 11) were laid-off.

- Before the lay-off, the percentage of employees in Lefebvre's group age 40 or older was 65%; after the lay-off that percentage increased to 70%.

- 22% of the employees (or 10 employees) before the lay-off were 50 or older;

- 37% of the employees (or 6 employees) laid-off were 50 or older;

- 35% of the employees (or 16 employees) before the lay-off were under the age of 40;

- 44% of the employees (or 7 employees) laid-off were under 40.

- The average age of the employees in Mr. Lefebvre's group before the lay-off was 42; after the lay-off the average age was 41.6.

Rossiter I at pp. 73-75, and see Age and Title Information which is Exhibit 4 thereto.

**What Rossiter Has to Say About Alleged Discrimination by McGloin Generally**

44)    Rossiter concedes that Ms. McGloin never made any comments that exhibited age bias. Rossiter I at p. 71. Rossiter also initially testified that McGloin treated him with respect and that they "had a professional relationship." Rossiter I at p. 79.

14

45)     Rossiter has no knowledge of McGloin discriminating against any other employee on the
        basis of age.  He does not know how she treated other older workers.  Rossiter I at p. 80;
        see excerpts from volume II of deposition of Dennis Rossiter ("Rossiter II") at p. 102,
        copies of which are attached hereto as Exhibit A-1.

46)     Overall, Rossiter claims that he had to work harder than other people under McGloin to
        achieve the same performance rating.  Rossiter II at pp. 72-74 (Exhibit A-1).  He
        conceded, however, that he was unaware of the ratings that she gave other employees.
        Rossiter I at pp. 97-100, 117.

47)     Moreover, in the last two years that Ms. McGloin conducted performance reviews for Mr.
        Rossiter (1999 and 2000), she rated him a "2" (signifying an employee who had achieved
        or exceeded commitments) on his annual PBC performance ratings and he was satisfied
        with these evaluations.  Rossiter I at pp. 143-144.  McGloin Affidavit at ¶ 31 (Exhibit D
        hereto).  Indeed, McGloin was the first IBM manager to give Rossiter a rating of 2.
        Rossiter's earlier managers had consistently given him lower "3" ratings (signifying an
        employee who had met some, but not all,  commitments).  Rossiter I at pp. 142-144;
        Shine Affidavit at ¶ 1 (Exhibit F hereto).

48)     McGloin's initial evaluation of Rossiter (for the year 1998) was also at the "3" level, but
        her assessment of him improved over time.  McGloin Affidavit at ¶ 31.  While Rossiter
        was pleased with her later evaluations of him, he claims that McGloin's earlier 1998
        performance rating of him (as a 3) shows an "underlying prejudice against older people."
        Rossiter II at pp. 70-71.

49)     Rossiter also claimed that he experienced a lot of resistance to his ideas from McGloin.
        Rossiter II at pp. 73-75.  Asked about specifics, Rossiter mentioned a customer retention

proposal he made that the "senior marketing team" thought was a good idea, but McGloin did not adopt. Rossiter II at p. 74. But on further reflection, he was not sure if this proposal pre-dated McGloin becoming his manager. Rossiter II at p. 74. Moreover, in discovery, Rossiter produced numerous e-mails from McGloin praising Rossiter's performance, contribution and ideas. Rossiter II at pp. 80- 92. Rossiter maintains that McGloin also sent e-mails where she was dismissive, but these dismissive e-mails he did not retain. Rossiter II at p. 89, and see various e-mails from Patricia McGloin to Rossiter which are Exhibit 16 thereto.

50) Rossiter says that he never complained about what he felt was Ms. McGloin's discriminatory treatment of him because he did not want to be viewed as a "malcontent." Rossiter II at pp. 77-79.

### What Rossiter Has to Say About Alleged Discrimination by Lefebvre

51) Rossiter testified that he believes Mark Lefebvre's approval of his lay-off selection was motivated by age discrimination because Lefebvre once made a comment that Rossiter believes evidences ageism, and because of the age statistics of the lay-off in Lefebvre's group. Rossiter I at pp. 69-71, 72-74. The alleged ageist comment by Lefebvre occurred during a group dinner where Lefebvre asked people what type of music they enjoy. Rossiter I at pp. 69-70. When it got to Rossiter's turn, he said he liked Sam & Dave, to which Lefebvre allegedly responded something to the effect of "I'm not going to touch that" and "That is so far off my time frame that I don't want to talk about it." Id. Rossiter does not recall any other comment by Lefebvre that evidenced ageism. Rossiter I at p. 71; Rossiter II at pp. 59-61.

### What Rossiter Has to Say About Alleged Discrimination by Rohrer

16

52)   Rossiter has no reason to believe that Robert Rohrer discriminated against older workers, but he did feel that Rohrer was dismissive of him when Rossiter would seek out web related assignments to try to get some experience in web marketing.  Rossiter I at pp. 137-140.  Rossiter did not know if this dismissiveness was just Rohrer's personality or if Rohrer harbored stereotypes about older workers.  Rossiter I at pp. 137-139.

**Rossiter's Claims Regarding His Earlier Years at IBM:  Alleged Discriminatory Comments**

53)   Rossiter was interviewed to work at IBM by James Monahan and Ron Black.  Rossiter I at pp. 49-50.  Rossiter alleges that during Mr. Monahan's interview of him he asked Rossiter "if he still had the fire in the belly?" Id.  Rossiter believed then that the question strongly showed a biased attitude against older workers.  Id.

54)   Mr. Monahan had direct input into the hiring decision and recommended Rossiter be hired.  See Monahan Deposition at pp. 13-16, 18 (Exhibit B hereto).

55)   Rossiter alleges that soon after he went to work for IBM, his first manager, Ron Black, asked Rossiter if he would have any problems reporting to Mr. Black.  See excerpts of Rossiter I at pp. 50-54.  Mr. Rossiter took this to mean that Mr. Black was uncomfortable with Rossiter because he was older than Mr. Black.  Id.

56)   Mr. Black never made any other comments that Rossiter felt exhibited age bias, and he treated Rossiter with respect.  Rossiter I at pp. 53-54.

57)   Rossiter reported to Mr. Monahan from April 1995 through the end of 1997.  Rossiter I at pp. 14, 31-32.  At some point, Rossiter could not remember when, Monahan told Rossiter that he was overqualified and that he did not know what to do with Rossiter.  Id. at pp. 27-32.  Rossiter asked Monahan if he was trying to get rid of him and Monahan did not have a "cohesive response." Rossiter I at pp. 32-33.  Rossiter believed that

17

Monahan's "overqualified" comment showed that "he was not in favor of having an older

guy in the department that was going to be advancing." Rossiter I at pp. 55-56.

58)     Rossiter does not recall any other comments by Monahan that Rossiter believes reflect

age bias. Rossiter I at pp. 55-58.

**Rossiter's Claims Regarding His Earlier Years at IBM:  The Demotion**

59)     Mr.  Rossiter was initially hired as a Band 10, and he had 5-7 people reporting to him.

Rossiter I at pp. 45-47.  In April 1997, Mr.  Rossiter was demoted by Mr.  Monahan to a

Band 9 and he no longer had people reporting to him.  Rossiter I at pp. 45-47, 63;

Rossiter II at p. 52.  Rossiter testified that Monahan told him he was being demoted due

to a general re-leveling in the organization.  Rossiter II at pp. 52-53; Monahan Deposition

at pp. 31-33.  In his Answers to Interrogatories, Rossiter described the communication as

follows:

> "Monahan informed Plaintiff in his verbal presentation of the performance
> evaluation that Plaintiff would be stripped of his management title and
> bonus range and that Plaintiff's job band level would be reduced from a level
> 10 to a level 9 due to organizational requirements expressed by Mr.
> Monahan as *"'a general flattening of management levels.'"*

See Plaintiff's Answers to Interrogatories at answer 10, attached hereto to as Exhibit I.

60)     Mr.  Monahan testified that his boss, Jesse Parker, determined that there would be only

one manager in the MARCOM organization (which would be Mr.  Monahan) and

therefore, Monahan was directed by Mr.  Parker to demote Mr.  Rossiter from a Band 10

people manager to a Band 9 program manager.  See Monahan Deposition at ¶¶ 31-33

(Exhibit B hereto).

61)     According to plaintiff, one result of his demotion, which he understood immediately, was

that his salary was partially frozen and any future salary increases would be severely

restricted.  Rossiter II at pp. 96-99 (Exhibit A-1 hereto); Plaintiff's Answers to

Interrogatories at answer 10 (Exhibit I hereto).

**Rossiter Believed Monahan's Actions Were Discriminatory, but Decided Not to Avail Himself of IBM's Mechanisms for Complaining About Discrimination.**

62)    Rossiter concluded at the time that the demotion and comments (the "fire in the belly"

and "overqualified" comments) by Monahan were the result of age bias against Rossiter.

Rossiter I at pp. 55-56, 62, 63-64.  Rossiter concluded that he was never going to get a

fair shake by Monahan due to his age, that his career was "dead in the water" and that

overall the situation was hopeless and not likely to improve.  Rossiter I at pp. 55-56, 62-

64, 68.  Rossiter understood that IBM had a mechanism for complaining about

discriminatory treatment, but he never availed himself of the complaint process (the

"Open Door Process") or otherwise complained about the discrimination he believed he

was experiencing under Monahan.  Rossiter I at pp. 65-68.  Rossiter did not complain

because he had a generalized and pre-existing fear of retaliation although he had not

observed anything at IBM that contributed to that fear.  Id.

63)    Rossiter never observed Monahan's treatment of other older workers.  Rossiter I at p. 61.

**Rossiter Claims That He Was Not Considered For a Number of Promotional Opportunities for Discriminatory Reasons**

64)    Mr. Rossiter claims that "subsequent to [his] demotion, IBM promoted younger, less

experienced employees to manager positions.  New jobs were created for which [he] was

well-qualified, but never considered, because the jobs were not posted.  Rather, IBM

gave the jobs to younger, less qualified employees."  Plaintiff's Answers to

Interrogatories at answer 10 (Exhibit I hereto).  Rossiter believes all of these promotional

opportunities should have been posted and that IBM's job posting policy required all

19

positions be posted.  Rossiter I at p. 122.  Rossiter never actually applied for any internal

jobs at IBM until he was informed of his lay-off in late 2001.  Rossiter II at pp. 4-5.

65)    At all relevant times, the IBM job posting policy for internal job opportunities provided

that regular Band 10 and below, non-executive positions and temporary assignments were

to be posted.  The policy provided the following exceptions to the posting requirement

for Band 10 and below, non-executive positions: a) physician and lawyer positions were

not posted; b) lateral or hierarchical movement within a department and shift practice

moves were excluded from the posting requirement; and c) senior management could

exclude a specific job from being posted.  See Affidavit of Edward Abrams at ¶ 2

("Abrams Affidavit"), attached hereto as Exhibit J.  Under this posting policy, executive

level positions, including Director positions (which are above a Band 10) generally do

not get posted.  Abrams Affidavit at ¶ 3.  In addition, where there is simply an expansion

of the mission of a current position-holder (a "hierarchical movement"), it is not

considered a job opening and it does not get posted.  Abrams Affidavit at ¶ 3.

66)    In his Answers to Interrogatories, Rossiter identified a number of specific

promotions/positions that he was excluded from for possibly discriminatory reasons:

      a)    Director, Integrated Marketing Communications - Technology Group;
      b)    Technology Group Events Manager;
      c)    Technology Group Collateral Manager;
      d)    PowerPC Marketing Communications Manager and/or Programs
          Manager;
      e)    Technology Group Interactive Marketing Manager; and
      f)    IBM Microelectronics Server Group Marketing Services Manager.

Plaintiff's Answers to Interrogatories, at answer 7.

In his deposition testimony, Rossiter also mentioned that he should have been considered for the position held by his boss, Patricia McGloin, Microelectronics Integrated Marketing Communications Manager. Rossiter I at pp. 155-156.

**Director, Integrated Marketing Communications (Technology Group) Position**

67)    The position of "Director, Integrated Marketing Communications, Technology Group," was the position held by Rossiter's boss's boss, Ed Abrams (i.e., Rossiter's boss Patricia McGloin reported to Mr. Abrams prior to reporting to Mark Lefebvre). Rossiter I at p. 155; Rossiter II at pp. 6, 9.

68)    In late 1998 or early 1999, IBM created a new business unit called the Technology Group by combining IBM's Microelectronics business with its Storage business. Abrams Affidavit at ¶ 4. Ed Abrams was hired as the Director, Integrated Marketing Communications, Technology Group ("IMC Director") in June 1999. Abrams Affidavit at ¶ 5. This position was director level and therefore not subject to the posting policy. Id. Accordingly, the position was not posted. Id.

69)    Rossiter believes that the position should have been posted, and that he should have been considered for the job. Rossiter I at p. 155; Rossiter II at pp. 9-13. Rossiter does not know who hired Abrams into the position. Rossiter II at p. 10. Rossiter does not contend that the non-posting was directed at him personally, or older workers generally. Rossiter II at pp. 10-12. Rossiter does not know Abrams's qualifications for the job, but believes that Abrams was less qualified than Rossiter for the job. Rossiter II at p. 14.

**Technology Group Events Manager Position**

70)     Marge Oppold was working in MD Marketing, in the events marketing area (planning marketing events such as trade shows), before Ms. McGloin became the manager of IMC in early 1998. McGloin Affidavit at ¶ 4; Rossiter I at pp. 112-113, 158.

71)     When Technology Group was formed, the bulk of the business consisted of Microelectronics products. Abrams Affidavit at ¶ 7. However, over time, in order to bring coherence and efficiencies to the new group's marketing efforts, there was a push to give additional group-wide responsibilities to certain positions that had formerly been dedicated to Microelectronics products. Id.

72)     As part of the above described effort to bring coherence and efficiencies to the Technology Group's marketing efforts, in September 1999, Ed Abrams promoted Marge Oppold to the position of Technology Group Events Manager. Abrams Affidavit at ¶ 8. This was not a new job but a hierarchical movement that was an expansion of Oppold's existing responsibilities in event marketing. Abrams Affidavit at ¶ 8; Rossiter II at pp. 16-17. In the revamped position, the bulk of Oppold's responsibilities were a continuation of her previous responsibilities in event planning/management for Microelectronics products. Abrams Affidavit at ¶ 8. Therefore, by IBM's policy and practice, this job did not need to be posted and it was not posted. Abrams Affidavit at ¶ 8.

73)     Rossiter's does not know if the non-posting of this position was directed at him. Rossiter II at p. 24. He cannot say that the non-posting affected only older workers. Rossiter II at pp. 20, 24-25. He agreed the non-posting would have affected all workers, young or old alike, who might have been interested in the job. Rossiter II at pp. 19-20, 22-25. Rossiter believes that he was more qualified than Oppold for the Events Manager job

22

because he had previously managed large events and comprehensive exhibition schedules. Rossiter II at p. 29.

74) Rossiter does not know if Ed Abrams or Pat McGloin promoted Oppold into this position. Rossiter I at p. 158; Rossiter II at pp. 17-18. Rossiter cannot say whether Ed Abrams had an animus against older workers because he did not deal with him enough. Rossiter II at pp. 18-19. Rossiter does not know of any instances of Abrams exhibiting age animus. Rossiter II at p. 21. But he believes that Abrams may have had a mind set that he wanted younger people in certain jobs like the Oppold job. Rossiter II at pp. 18-19.

**Technology Group Collateral Manager Position**

75) Kathleen Spilke was working in MD Marketing, in the collateral marketing area (putting together brochures etc.), before Ms. McGloin became the manager of IMC in early 1998. McGloin Affidavit at ¶ 4.

76) Ed Abrams promoted Kathleen Spilke to Technology Group Collateral Manager in or about May 2000. Abrams Affidavit at ¶ 9. In this position, the bulk of Spilke's responsibilities were a continuation of her previous responsibilities for collateral for Microelectronics products. Abrams Affidavit at ¶ 9; Rossiter II at p. 25. Therefore, by IBM's policy and practice, this hierarchical movement did not need to be posted and it was not. Abrams Affidavit at ¶¶ 8, 9. In essence, like Marge Oppold's promotion, this was not a new job since it was just an expansion of what Spilke had already been doing. Abrams Affidavit at ¶ 9.

77) Rossiter believes that the non-posting of the position was directed at him (although he did not know if the hiring manager was Abrams or McGloin) but the non-posting did not affect just him or older workers. Rossiter II at pp. 26-27.

78) Rossiter believes that his overall qualifications were better than Spilke's for the job because prior to coming to IBM he had handled broader communications activities for major corporations. Rossiter I at pp. 160-162.

79) Rossiter was equivocal about whether he would have even taken the position if it had been offered to him. Rossiter I at p. 161.

80) At the time Ms. Spilke assumed the position of Technology Group Collateral Manager, she was 48 years old and a 17 year IBM veteran having started at IBM in 1983. Shine Affidavit at ¶ 1.

**PowerPC Marketing Communications Manager and/or Programs Manager Position**

81) Wendy McGee (nee Arnette) was the Program Director of PowerPC Marketing in the IBM Technology Group. See Affidavit of Wendy McGee at ¶¶ 1 and 2, attached hereto as Exhibit K; Rossiter I at p. 162. She reported into and supported the PowerPC product line. McGee Affidavit at ¶ 2. PowerPC is an IBM microprocessor architecture for chip design. Id.

82) Ms. McGee was the hiring manager for the position entitled PowerPC Marketing Communications Manager. Id. at ¶ 3. She posted the position through IBM's job posting process. Id. Dennis Rossiter did not apply for the position. Id.

83) Cynthia Roy (nee Putlitz), who was at the time a Power PC Marketing Manager, applied for the position. Id. at ¶ 4 . Ms. Roy was the only person from within the PowerPC business group that did apply. Id.

84) In November 2000, Ms. McGee hired Ms. Roy as the PowerPC Marketing Communications Manager. McGee Affidavit at ¶ 5; Rossiter I at p. 162. Ms. McGee hired Ms. Roy because she had worked in product marketing in the PowerPC business line and therefore, she had the technical understanding of the product that McGee was looking for. McGee Affidavit at ¶5.

85) Rossiter's limited dealings with the hiring manager, Wendy Arnette, were professional. Rossiter II at p. 31. Rossiter is not aware of Wendy Arnette having an animus against older workers. Rossiter II at pp. 31-32. Rossiter may not have taken this job even had it been offered to him. Rossiter I at p. 163.

86) Rossiter believes that *if* the job was not posted (as noted above, the job was posted), the non-posting was directed at him personally, "in that [he] was included in a group of probably older people who wouldn't have been considered for that position as a result of it not being posted." Rossiter II at p. 32. He does not know what other older workers were affected or if younger workers who would have been interested in the position would also have been affected. Rossiter I at pp. 32-33.

**Technology Group Interactive Marketing Manager Position**

87) The position of Technology Group Interactive Marketing Manager was filled by Robert Rohrer. Rossiter I at p. 164.

88) Ed Abrams was the hiring manager for the position of Technology Group Interactive Marketing Manager. Abrams Affidavit at ¶ 10. This was a new job that was responsible for managing web-based marketing for the Technology Group. Id. This position was posted through IBM's job posting system. Id. Dennis Rossiter did not apply for the position. Id. Robert Rohrer did apply for the position as did a number of other candidates. Id. On

or about July 16, 2000, Ed Abrams hired Robert Rohrer for the position based on his demonstrated skills in working in web based marketing-- Rohrer had most recently managed web based marketing for IBM's Global Services Division. Id.

89)    At the time Mr. Rohrer was hired for the position of Technology Group Interactive Marketing Manager, he was 48 years old and a 23 year IBM veteran having started at IBM in 1977. Shine Affidavit at ¶ 1.

90)    Rossiter does not know who hired Rohrer for this position. Rossiter II at pp. 36-37 Again, *if* the position was not posted (as noted above, it was posted), Rossiter believes that it was directed at him as "included in the group of older workers," but he does not know if the alleged non-posting was directed at older workers. Rossiter II at p. 37.

91)    Rossiter believes that he was qualified for the position of Technology Group Interactive Marketing Manager because when he was reporting to James Monahan prior to 1998 he had a person reporting to him who put together the first website for IBM Microelectronics products. Rossiter II at p. 37.

92)    Rossiter believes that he was more qualified than Rohrer for the position but he does not know what Rohrer's experience or qualifications were for the position. Rohrer II at pp. 37-38, 44.

93)    In December 2000, Rossiter rated himself as having no skills in the technical aspects of web-based marketing, and very limited experience in the strategic use of web based marketing. Rossiter II at pp. 38-43, and see Rossiter's Individual Development Plan which is Exhibit 12 to Rossiter's deposition.

**IBM Microelectronics Server Group Marketing Services Manager Position**

26

94)    The position of IBM Microelectronics Server Group Marketing Services Manager was filled by Philip Bender. Rossiter II at p. 44. Rossiter does not recall when Bender filled the position but he believes it was more than a year before Rossiter departed IBM in January 2002. Rossiter II at p. 48. The position was posted and Rossiter did not apply. Rossiter II at pp. 44-45. In fact, he was not interested in this position. Rossiter II at pp. 45-46. Initially, Rossiter was concerned that this position would "co-opt" his job because he felt that it duplicated his job. Rossiter II at pp. 46-47. But he does not contend that the senior manager who created this position, whose identity he does not know, created the position in order to detract from Rossiter's position. Rossiter II at pp. 46-47. And, in the end, he and Bender worked things out to Rossiter's satisfaction. Rossiter II at p. 47.

**Microelectronics Integrated Marketing Communications Manager**

95)    Ms. McGloin was hired to work at IBM in February 1997 by Jesse Parker, then the IBM Microelectronics Division's Director of Marketing. McGloin Affidavit at ¶ 3. In late 1997 or early 1998, at the time that James Monahan left the company, Jesse Parker re-organized Microelectronics Division Marketing by combining the group Ms. McGloin was working in with Mr. Monahan's former group. Id. As part of the reorganization, Mr. Parker asked Ms. McGloin to take over Mr. Monahan's responsibilities in addition to the job functions she was already performing in managing Field Programs. Id.

96)    Accordingly, McGloin took on the position of Microelectronics Integrated Marketing Communications Manager as part of a reorganization in which a number of marketing groups were combined. Id. The position consisted of Mr. Monahan's former responsibilities and the responsibilities Ms. McGloin had in her then current job in

27

managing Field Programs.  Id. Ms. McGloin took on this combined job in late 1997 or

early 1998.  Id.

**March 2002, Rossiter Files at the MCAD**

97)     Rossiter filed his MCAD charge of discrimination on March 11, 2002.  A true and

accurate copy of Rossiter's MCAD Charge is attached hereto as Exhibit M.

98)     Rossiter filed his Complaint in this action on January 12, 2004.

Respectfully submitted,

**INTERNATIONAL BUSINESS
MACHINES CORPORATION**

By its attorneys,

   /s/  Daniel S. Tarlow
Daniel S. Tarlow, BBO #552920
Laurie F. Rubin, BBO #564947
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, MA 02109
(617) 456-8000

Dated: _____

28