# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Dennis Rossiter,<br>        **Plaintiff** | ) ) ) ) | |
| **v.** | ) ) | C.A. No. 04-CR-10069-DPW |
| International Business Machines Corporation,<br>        **Defendant** | ) ) ) ) ) | |

### PLAINTIFF DENNIS ROSSITER'S RULE 56.1
### STATEMENT OF FACTS IN DISPUTE

Plaintiff Dennis Rossiter (hereinafter referred to as "Plaintiff" or "Rossiter")

hereby submits a Rule 56.1 Statement of Facts in Dispute ("SOF") in support of his

Opposition to Defendant International Business Machines Corporation's (hereinafter

referred to as "Defendant" or "IBM") Motion for Summary Judgment. The SOF sets

forth Plaintiff's Statement of Facts, under the designation 1.0, and then sets forth

Statements of the Defendant in Dispute, under the designation 2.0. Statements in the

Defendant's Statement of Facts will be referred to as "Def.'s SOF." "Exhibits" refer to

attachments to this SOF. "Tabs" refer to attachments to the Defendant's SOF.

### 1.0     ROSSITER'S STATEMENT OF FACTS

### The Experienced Older Employee

1.1     IBM hired Rossiter as Manager of Communications for the Power PC Product

line in January 1995, at the level-10 job band. Plaintiff reported to Ron Black, Director

of Marketing for Power PC, in the Microelectronics Division. Rossiter Dep. (Vol. 1), at

11-12, 14, Exhibit 1. Power PC was the brand name for a microchip that at the time was

the central processor unit for all Apple computers. Id. at 12. The customers for IBM's microelectronic products were manufacturers and other divisions of IBM. Id. at 15-16.

1.2    Plaintiff was 53 years old at the time of his hire, and he brought in-depth experience in marketing communications and a broad array of marketing skills to his new position. Rossiter Aff., ¶¶ 1-3, Exhibit 2. Market communications ("Marcom") is a subset of marketing, which entails promoting a product in the marketplace and gaining awareness of and preference for a product. Rossiter Dep.(Vol. 1), at 10, Exhibit 1. Plaintiff had previously been the Director of Communications at Fortune 500 companies, including Exxon Corporation and Wang Laboratories; he had managed major advertising programs for Wang Laboratories; and he had headed international marketing projects. Plaintiff had acquired in-depth experience in the marketing disciplines of advertising, collateral (brochures), events (e.g., trade shows), product catalogues, internal communications, and direct mail. Id. at 40-41; Rossiter Aff., ¶¶ 1-4, Exhibit 2.

1.3    At the time Rossiter was hired by IBM, James Monahan conducted a courtesy interview with Rossiter in New York, where Monahan was located. During the interview, Monahan asked Rossiter, "Do you still have the fire in your belly to do the job?" Rossiter Dep. (Vol. 1), at 49-50, Exhibit 1. Mr. Mohanan was 39 years old at the time. Monahan Dep., at 8, Exhibit 3.

1.4    During one of Rossiter's early meetings with Ron Black, who was in his mid-20s, Mr. Black asked Rossiter if he had any trouble reporting to him. Rossiter Dep. (Vol. 1), at 50, Exhibit 1.

1.5    IBM formed a Marketing Communications unit in the Microelectronics Division, and in April 1995, James Monahan became Plaintiff's manager. Rossiter Dep. (Vol. 1), at

2

13-14, Exhibit 1.  Rossiter was the oldest employee in Monahan's work group. Id. at 62.
Monahan told Rossiter early on that Plaintiff was "overqualified," and he stated that he
did not know what to do with Rossiter. Id. at 28.  Plaintiff performed Marcom work for
the server business line, a line within the microprocessor division that marketed
microprocessor technology to the server market; that is, to server manufacturers. Id. at
15-16.  In addition, Monahan assigned Rossiter to product naming, which involves
naming products as they come onto the market. Id. at 29.  Rossiter developed
relationships with corporate personnel to expand his naming functions into branding
responsibilities; that is; assuring that as new products came along, they were folded into
the IBM brand, a key corporate asset, in a well-planned and cohesive manner. Id. at 19-
20, 29.  As a Manager in the Microelectronics Division, Rossiter had five to seven
employees reporting to him. Rossiter Dep. Vol. 1, at 46, Exhibit 1.

### The Dumbing-Down and Demotion of Rossiter

1.6     Monahan made it clear by his rebuffs to Plaintiff's requests for additional
responsibilities that he did not want to advance an older guy. Rossiter Dep. (Vol. 1), at
56, Exhibit 1.  In the absence of Monahan providing Plaintiff with sufficient work,
Rossiter picked up internal communications to sales people in the field.  He developed a
newsletter to sales personnel with product information and updates, which he entered into
IBM's web-based application for distribution. Id. at17.  This self-generated project was
one of IBM's first web-based applications. Id. at 165.

1.7     In 1997, when Rossiter was 55 years old, Monahan demoted Rossiter, removing
his managerial title and reports and reducing his job-level band to 9.  Monahan told
Rossiter, and he testified in his deposition, that Rossiter's demotion was part of a leveling

3

of the organization and that now the Division could have only one manager, Monahan. <u>Rossiter Dep.Vol. 2</u>, at 52, <u>Exhibit 5</u>; <u>Monahan Dep.</u>, at 32, <u>Exhibit 3</u>. Subsequent to the demotion, Monahan assigned Rossiter to a cramped cubicle outside of his work group and assigned Plaintiff to low-level work assignments. <u>Rossiter Dep.Vol. 1</u>, at 58, <u>Exhibit 1</u>.

1.8     It was the policy and practice for an IBM employee and the employee's manager to sit down and develop the employee's goals for the year. At the end of the year, the employee summed up achievements against goals and gave the summary to the manager, who agreed or disagreed and assigned a rating for the year's job performance. While goals might occasionally be readjusted mid-year, Monahan *rewrote Rossiter's goals, indeed the entire document, at the end of the year*, and then evaluated Rossiter on the revised goals. <u>Rossiter Dep. (Vol. 1)</u>, at 58-59, <u>Exhibit 1</u>. Monahan never explained why he took this heretofore unheard of and hostile action against Rossiter. Plaintiff believed that Monahan rewrote the document to reflect his preconceived, age-stereotyped notions of Plaintiff's capabilities and his age-inappropriateness for advancement and to try and get Rossiter to leave. <u>Id.</u> at 59; <u>Rossiter Dep. (Vol. 2)</u>, at 51, <u>Exhibit 5</u>.

1.9     Rossiter did not complain to Monahan because he believed it was futile to complain to the manager who was already victimizing him. <u>Rossiter Dep. (Vol. 1)</u>, at 67, <u>Exhibit 1</u>. He did not complain to any of Monahan's superiors because he did not want to be identified as a person who complains and possibly trigger retaliation. <u>Id.</u> at 68. In addition, Rossiter liked being affiliated with IBM, which he regarded as one of the finest corporations in American history, notwithstanding the dismissive treatment that he experienced. <u>Rossiter Dep. (Vol. 2)</u>, at 78, <u>Exhibit 5</u>.

4

**Promotions and Job Creations for Younger Employees**

1.10.    In late 1997 or early 1998, Patricia McGloin assumed Monahan's responsibilities and became Rossiter's immediate supervisor. Def.'s SOF, Tab D, ¶ 2.  She was 45 years of age.  Under McGloin, Rossiter's branding responsibilities developed and became more time-consuming. Rossiter Dep. (Vol. 1), at 24-25, Exhibit 1.  McGloin rebuffed many of his work proposals, and Rossiter had to work harder than McGloin's other reports to receive the same performance rating. Rossiter Dep. (Vol. 2), at 73-74, Exhibit 5.

1.11    Ed Abrams became the Integrative Marketing Communications Director, and McGloin's boss, in June 1999. Def.'s SOF, Tab J, ¶ 5.  Mr. Abrams was 28 years of age. Rossiter's Aff., ¶ 10 & Exh. A, Exhibit 2.

1.12    Notwithstanding the alleged leveling of manager positions in the Microelectronics Division, under Ed Abrams' direction, Marge Oppold, age 42, and Kathleen Spilke, age 48, were promoted into manager positions in 1999 and 2000, respectively. Rossiter Aff., ¶¶ 10, 14 & Exhs. B, E, Exhibit 2.  In 2000, Ms. Oppold, who had joined IBM as a secretary and was at band 6 in 1996 when Rossiter was a manager at band 10, was promoted to Marketing Manager, in charge of events, at band 8.  McGloin again promoted Oppold in 2001 to band 9. Rossiter Aff., ¶ 14 & Exh. E.  These promotions were made notwithstanding feedback from a couple of business lines that Oppold was not performing well. Rossiter Dep. (Vol. 1), at 113, Exhibit 1.  Rossiter, who had been Director of Marketing Communications at Exxon Corporation and Wang Laboratories and had produced some of the largest events in IBM's history, had significantly more experience and skills to bring to the manager position than Ms. Oppold. Rossitier Aff., ¶¶ 1-4, Exhibit 2; Rossiter Dep. (Vol. 2), at 20, Exhibit 5.  Ms. Spilke was made Manager

for Collateral (brochures), a marketing discipline in which Rossiter also had extensive experience. Id. at ¶ 2; Rossiter Dep. (Vol. 1), at 160-161, Exhibit 1.

1.13    It was Rossiter's understanding from the posting policy on IBM's website, during his employment, that all positions had to be posted. Rossiter Dep. (Vol. 2), at 26, Exhibit 5.  Neither Oppold's nor Spilke's new position was posted for applications from IBM personnel, and Rossiter did not have the opportunity to compete for a manager's position. Rossiter Dep. (Vol. 1), at 112, Exhibit 1; Rossiter Dep. (Vol. 2), at 25, Exhibit 5.

1.14    Karen Smith, age 47, transferred into McGloin's work group in 2000, at band 10. Rossiter Aff., ¶ 11 & Exh. B, Exhibit 2.  Ms. Smith was responsible for the Power PC business line, for which Rossiter had been responsible at the time of his hire in 1995. There was a huge gap between Rossiter's experience and Smith's experience. Rossiter Dep. Vol. 1, at 115, Exhibit 1.  Smith had a problem developing the core plans for her business lines, and personnel in the business lines began to take over her job because they were not satisfied with her performance. Id.  McGloin told Rossiter, "Karen can't get a plan done, and Ed Abrams has been talking to the business line to try and get it to work." Id. at 116.  Smith's problems went on for many weeks, and Abrams involved several senior managers, Chris King, Scottie Ginn, and Wendy Arnette, in trying to resolve the problem. Rossiter Aff., ¶ 17 & Exh. G, Exhibit 2. .

1.15    In January 2001, Smith's responsibility for the Power PC business line was transferred to Cynthia Roy (nee Putlitz). Rossiter's Aff., ¶ 13 & Exh. D, Exhibit 2.

1.16    McGloin then created a web-based project on architectural messaging for Smith because she had lost a major component of her job, Power PC. Rossiter Aff., ¶ 13,

6

Exhibit 2; <u>Rossiter Dep. (Vol. 1)</u>, at 118, 123, <u>Exhibit 1</u>.  Rossiter had told McGloin on

numerous occasions that he was eager for new opportunities and projects, particularly

web-related projects, and McGloin rebuffed his requests. <u>Id.</u> at 124.

1.17    McGloin's efforts to create a project for Smith to keep her in her work group,

after Smith had major problems performing a critically important responsibility of her

job, and McGloin's rejection of Rossiter's requests to expand his job responsibilities

evidenced McGloin's disparate, negative treatment of Rossiter, who was eleven (11)

years older than Smith, in favor of McGloin's age peer, Karen Smith. <u>Rossiter Dep.(Vol.</u>

<u>1)</u>, at 123-124, <u>Exhibit 1</u>.

1.18    After Rossiter was terminated, McGloin assigned Rossiter's job responsibilities

for the Information Technology Server business line to Karen Smith. <u>McGloin Dep.</u>, at

127, <u>Exhibit 4</u>.

1.19    During her deposition, McGloin attempted to mask her discriminatory, age-based

*animus* towards Rossiter and falsely testified that Ed Abrams never interceded on behalf

of Smith due to Smith's performance-related problems with the Power PC product line.

<u>McGloin Dep.</u>, at 125, <u>Exhibit 4</u>.

### Rossiter's Unassisted Ownership of His Job Responsibilities

1.20    Notwithstanding McGloin's disparately negative treatment of Rossiter in favor of

his younger co-workers, McGloin wrote a very positive performance evaluation for

Rossiter's work performed in 2000.  McGloin stated:

> Dennis has certainly achieved his commitments.  During the initial quarter,
> He continued with responsibility for MD naming coordination and as key contact
> for the Pervasive Business Line.  This <u>included difficult, time-pressured work</u> for
> naming Networking offerings.  Dennis <u>persevered with little cohesive input</u>,
> obtaining approval in adequate time for unveiling a key announcement and
> event... . Dennis remained <u>actively involved</u> in key projects.  This was <u>critical to</u>

7

the successful completion of works in progress, …pressing hard for the key elements such as customer-centric views he saw as vital.  For months, he stepped in to handle sales alerts until staffing could be obtained.  He adopted his responsibility as key strategist for the Information Technology Business Line, quickly establishing good relationships and delivering to IBM commitments regarding Infiniband, for which the Business Line shared its appreciation.  In addition, Dennis *accepted the trying work* as focal point for marketing workbench for Technology Group/IMC.

Dennis responsibly drove the naming architecture for the networking technology Business Line, again under tight time constraints and difficult politics.  His close working with corporate ensured buy-in.  He might improve simply by continuing to be sensitive to the time pressures of our business.  Dennis has received unsolicited good words from the Business Lines, marketing intelligence, and corporate naming areas as someone who has good insights and is responsive.

Rossiter Dep. Vol. 1, at 144 & Exh. 8, at 1000107, Exhibit 1 (emphasis added).  In each of the two years preceding Rossiter's lay-off, his performance was rated as "Achieved/Exceeded Commitments" – one of the highest classifications of performance.  Rossiter was also awarded 10% bonuses, as well as supplemental "cash awards" for special achievements. Rossiter Aff., ¶ 4, Exhibit 2.

### The Hiring of Rossiter's Replacements

1.21    In January 2001, Mark Lefebvre became the Director of the Microelectronics Division, replacing Ed Abrams.  Mr. Lefebvre was 43 years of age. LeFebvre Dep., at 4, Exhibit.

1.22    That same month, January 2001, Lefebvre hired Carol McNerney into his Division, at band 9.  Ms. McNerney, who was 32 years old, had joined IBM three years previously, in 1998. Rossiter Aff., ¶ 12 & Exh. C, Exhibit 2.

1.23    At the annual Worldwide Communications meeting in New York, which draws IBM personnel from around the world, Lefebvre stated, for all to hear, that the Sam and Dave music that Rossiter likes and which dates from the 1950s-1960s, "is so far off my time frame that I don't want to talk about it." Rossiter Dep. Vol. 1, at 70, Exhibit 1.

1.24    In July 2001, Carol McNerney began to perform some of Rossiter's naming

responsibilities, involving all of the business lines within the Microelectronics Division.

McNerney Dep., at 32, Exhibit 7.  Based on Rossiter's extensive background in branding,

Rossiter made a branding presentation at the Worldwide Communications meeting,

where McNerney was in attendance. Rossiter Dep. (Vol. 2), at 96, Exhibit 5.

1.25    Pursuant to IBM's lay-off guidelines, reduction targets were established by

October 19, 2001, and employees were selected for lay-off between October 22 and

October 24, 2001. Def.'s SOF, Tab D1, at 1001304.  McGloin selected Rossiter for lay-

off on October 26, 2001. Def.'s SOF, Tab D3, at 1000110.

1.26    On November 16, 2001, *after* Rossiter was selected for lay-off and *before* he was

notified, Lefebvre hired Ray Chang into his Division.  Chang was hired by IBM right out

of college and was in his 20s. Rossiter's Aff., ¶¶ 15-16 & Exh. F, Exhibit 2; Rossiter

Dep. (Vol. 1), at 81, Exhibit 1.  Thus, at the same time that the Division was reducing its

head count, Mark Lefebvre added a new, and very young, employee into his Division to

replace Rossiter in the performance of naming responsibilities. Rossiter's Aff., ¶ 16,

Exhibit 2.  Mr. Chang had no background or experience in any of the work that the

Division performed. Rossiter Dep. (Vol. 1), at 153, Exhibit 1.

1.27.   In December 2001, before Rossiter was laid off on January 3, 2002, the

organization chart for the Microelectronics Division under the directorship of Mark

Lefebvre, identified Carol McNerney as the head of "Brand Marketing and Corporate

Programs" for the Division. Rossiter Dep. Vol. 1, at 43-45 & Exh. 3, Exhibit 1.

McNerney, a new, less qualified, and substantially younger employee in the Division,

took over Rossiter's job. Id. at 151.

9

1.28    Ray Chang worked with Carol McNerney. <u>Rossiter Dep. Vol. 1</u>, at 153, <u>Exhibit 1</u>. The last day before Rossiter lost his job, he had to sit down with Chang and instruct him about Rossiter's naming responsibilities; that is, Rossiter had to tell this new twenty-something employee how he could best replace Rossiter. <u>Id.</u>

1.29    McGloin and Lefebvre assigned Rossiter's marketing responsibilities for the Information Technology Business Line to Karen Smith, who had had problems performing the same responsibilities for the Power PC Business Line and who had been replaced on that line by Cynthia Roy (nee Putlitz). <u>Rossiter Aff.</u>, ¶¶ 13, 17-18 & Exhs. D, G, <u>Exhibit 2</u>.

### The Age-Biased Lay-Off

1.30    McGloin's application of the lay-off guidelines was procedurally flawed and her worksheet on Rossiter was rife with falsehoods about Rossiter's job performance. First, McGloin selected six criteria for her evaluation, three of which were not even critical to job performance in the Integrated Marketing Communications discipline. The "IBM Marketing Professional Career Skills List By Job Level Integrated Marketing Communications Discipline" provides a list of skills, fourteen of which are notated with an asterisk, indicating that those skills are "Critical Marketing Skills." <u>Def.'s SOF</u>, Tab D2, at 1000783. McGloin selected only three of these fourteen critical skills: Business plans, measurement techniques, and agency operations. <u>Def.'s SOF</u>, ¶ 23, at 8. The other three skills chosen by McGloin; that is, develop programs, use of cross-functional teams, and basic financial concepts, are not deemed by IBM to be of crucial importance to job performance. <u>Def.'s SOF</u>, Tab D2, at 1000783. Thus, McGloin's choices substantially

ignored the very performance criteria emphasized by IBM and toward which IBM directed employees for their career development. Id.

1.31    McGloin did not bother to consult the document that sets forth the job skills in integrated communications marketing in selecting employees for elimination. McGloin Dep., at 50, Exhibit 4. McGloin could not testify to the fact that Deborah Guynn performed at a higher skill level in her job than Rossiter – she could only state that her assessments showed that Guynn's skill levels in the specific skills McGloin selected, 3 of which were not critical skills, were higher than Rossiter's. Id. at 118.

1.32    McGloin and Lefebvre distorted the term, "different job categories," by substituting "band" for "skills," which are much more inclusive. The "job category," Integrated Marketing Communications, transcends "bands." Def.'s SOF, Tab D1, at 1001283. The guidelines provided that the assessments were to be done by skill set, which for Rossiter's group was "Integrated Marketing Communications. Def.'s SOF, Tab D2. The "skill group" was supposed to include *all* regular full time employees. Def.'s SOF, Tab D1, at 1001284. McGloin's and Lefebvre's distortion of the comparator group allowed them to shield certain employees, such as Karen Smith, who was performing the exact same work as Rossiter, from comparison along the same skill sets. Id. All employees with interchangeable skills should have been evaluated and compared with one another enabling a rational lay-off based on the comparative skills of all employees performing the same work instead of an assessment of some, but not all, employees depending upon what bands were targeted for assessments. Def.'s SOF, Tab D1, at 1001284. Id.; Rossiter Aff., ¶¶ 4, 11 & Exh. B, Exhibit 2.

1.33    Contrary to the lay-off guidelines, McGloin did not subject all employees in her department to an evaluation for lay-off. <u>McGloin Dep.</u>, at 81, <u>Exhibit 4</u>. The guidelines required that a manager *first* complete worksheets on employees and *then* identify "surplus." <u>Def.'s SOF</u>, Tab D1, at 1001285. In her rush to eliminate the oldest employees in her group, McGloin reversed and subverted the directions. She *first* identified what she considered to be "surplus;" that is, band 9, with three 50 plus-year-olds, and *then* she completed worksheets for those employees. Given that McGloin did not have a set number of employees that she had to lay off, her failure to subject all of her employees to an assessment raises the questions of why and how old were the non-assessed employees. <u>Id.</u> at 61. For example, both Karen Bates and Deborah Long were in band 7, reported directly to McGloin, and were not assessed for lay-off. <u>Id.</u> at 66; <u>Rossiter Dep. Vol. 1</u>, at 44 & Exh. 3, <u>Exhibit 1</u>. Ms. Bates and Ms. Long were, in fact, thirteen (13) and nineteen (19) years younger than Rossiter, respectively. <u>McGloin Dep.</u>, at 114 & Exh. 9, at 100144, <u>Exhibit 4</u>. McGloin was not required to eliminate two employees from one band and none from another band. Therefore, in the absence of a skills assessment for Bates and Long, McGloin had absolutely no way of knowing whether either (or both) of them was deficient in the skills needed to go forward and constituted "surplus" in her work group.

1.34    Step 3 of the lay-off guidelines instructed managers to integrate personal attributes, such as creativity, influence, judgment, planning, teamwork, and leadership, within the assessments, which McGloin utterly failed to do. <u>Def.'s SOF</u>, Tab D1, at 1001290, Tabs D3, D4. Four days prior to McGloin's selection of Rossiter for lay-off,

she singled out Rossiter in an e-mail to her team for his ability to make a persuasive and influential presentation to Lefebvre. Id., Tab 16 A & A1, at 000081.

1.35    The content of McGloin's lay-off assessment of Rossiter evidences that she falsely testified during her deposition that when she assessed Rossiter for lay-off, she was evaluating his abilities as of the time of the lay-off. McGloin Dep., at 97, Exhibit 4. McGloin's annual evaluation of Rossiter for his work in 2000 was excellent (Achieved/Exceeded Commitments), and McGloin admitted that Rossiter's performance in 2001 was at an even higher level. Rossiter Dep. (Vol. 1), at 144 & Exh. 8, at 1000107, Exhibit 1; McGloin Dep., at 106, Exhibit 4.  Nonetheless, McGloin made false, negative statements about Rossiter in her assessment, one of which dated back to *1998*. Specifically, McGloin wrote that Rossiter "needs coaching to stay within budgetary guidelines." Def.'s SOF, Tab D3, at 1000110.  This statement was patently false.  With the exception of an instance in 1998 when Rossiter's proposed budget for a series of promotional seminars was deemed excessive, Rossiter never received any criticism about his ability to limit costs and stay within the budget. Rossiter Dep. (Vol. 2), at 139-140 & Exh. 19, Exhibit 5; Rossiter Dep. (Vol. 1), at 144-145 & Exhs. 6, 8, Exhibit 1; Rossiter Aff., ¶ 9, Exhibit 2.

1.36    McGloin also falsely wrote in her lay-off assessment of Rossiter that he had "designed surveys and managed research agencies, but research did not meet validity criteria." Def.'s SOF, Tab D3, at 1000110.  Rossiter worked in collaboration with a well-regarded external research company and IBM's own internal research professionals.  The surveys that Rossiter managed were very expensive, and if a survey had not been done correctly in terms of the sample size, the measurement techniques used, or the validity

13

and/or the reliability of the survey, Rossiter's IBM research colleagues – in advance of launching the research in the field – would have called it to his attention. <u>Rossiter Dep. (Vol. 1)</u>, at 124, <u>Exhibit 1</u>; <u>Rossiter Aff.</u>, ¶ 8, <u>Exhibit 2</u>. Rossiter oversaw numerous surveys, and he at no time received any feedback or indication that there was a validity problem with any of the surveys prior to, or after, launch. <u>Rossiter Dep. (Vol. 1)</u>, at 124, 144-145 & Exhs. 6, 8, <u>Exhibit 1</u>; <u>Rossiter Aff.</u>, ¶ 8, <u>Exhibit 2</u>.

1.37.    McGloin's assessment of Rossiter's proficiency level as having "applied knowledge," along five of the six criteria, was false and contrary to McGloin's prior recognition of Rossiter's leadership abilities. <u>Def.'s SOF</u>, Tab D3, at 100110; <u>Rossiter Dep. (Vol. 1)</u>, at 144-145 & Exh. 8, at 100107, <u>Exhibit 1</u>; <u>Rossiter Aff.</u>, ¶¶ 5-7, <u>Exhibit 2</u>. In IBM parlance, "applied knowledge" means "can perform with assistance," while "in-depth knowledge" means "can perform without assistance; can lead or direct others." <u>Def.'s SOF</u>, Tab D1, at 1001288. Rossiter, who performed without assistance and led and/or directed others, should have been assigned a proficiency level of "in-depth knowledge," on all lay-off assessment criteria. <u>Rossiter Aff.</u>, ¶¶ 6-7, <u>Exhibit 2</u>; <u>Rossiter Dep. (Vol. 1)</u>, at 144-145 & Exh. 8, <u>Exhibit 1</u>.

1.38    There was a fundamental requirement at IBM that employees work as a team, in a collaborative and integrated fashion, and this requirement was written in employees' Personal Business Commitments. <u>Rossiter Aff.</u>, ¶ 5, <u>Exhibit 2</u>. While working together was important, personal initiative, self-reliance, problem-solving, and good interpersonal skills were also high-priority evaluation criteria. <u>Id.</u> at ¶ 6. Performing without assistance involved taking ownership of responsibilities and not relying on the manager to solve problems and/or to determine how goals should be achieved. <u>Id.</u>

14

1.39    Beyond general guidance and goal-setting, Rossiter did not require remedial

assistance from McGloin to complete his assigned responsibilities. <u>Rossiter Aff.</u>, ¶ 7,

<u>Exhibit 2</u>.  McGloin acknowledged this fact in her evaluation of Rossiter's 2000 job

performance, which makes no reference to Rossiter requiring assistance and which uses

forceful, "take-charge" descriptors of Rossiter's performance.  <u>Rossiter Dep. (Vol. 1)</u>, at

144-145 & Exh. 8, at 100107, <u>Exhibit 1</u>.  McGloin's annual evaluation of Rossiter, unlike

her lay-off assessment, accurately reflected the initiative, drive, self-reliance, problem-

solving, and strong interpersonal skills that Rossiter demonstrated in his work.  In the

annual evaluation McGloin wrote:  Rossiter's work was "difficult, time-pressured;"

Rossiter "persevered with little cohesive input;" "remained actively involved in key

projects," which was "critical to the successful completion of works in progress,

…pressing hard for key elements;" "stepped in to handle sales alerts;" "adopted his

responsibility as key strategist,"…"quickly establishing good relationships and delivering

to IBM commitments;" "responsibly drove the naming architecture…again under tight

time constraints and difficult politics;" Rossiter's "close working with corporate ensured

buy-in;" and Rossiter "received unsolicited good words from the Business Lines,

marketing, intelligence, and corporate naming areas as someone who has good insights

and is responsive." <u>Id.</u>

1.40    McGloin's false depiction of Rossiter's proficiency level in her lay-off

assessment, as well as her false statements about Rossiter's budgetary and survey skills,

were intended to, and did, set up Rossiter for termination.  Rossiter testified that McGloin

"could make up anything that she wanted to and put it in there to justify getting rid of me,

and that's what happened."  He went on to testify that he believed McGloin wanted to

justify getting rid of him because she had unexpressed, preconceived stereotypes about

him as an older man. Rossiter Dep. (Vol. 1), at 88, Exhibit 1. The lay-off statistics were

in accord with Rossiter's belief.

### The Oldest Workers Were Disproportionately Selected for Lay-Off

1.41    During the 2001 lay-off, McGloin and Lefebvre successfully *eliminated the four*

*oldest employees and reduced the upper age limit in the Microlectronics Marketing*

*Division by five (5) years. No one 55 and older survived the cut.*

1.42    Prior to the lay-off, there were 46 employees in Lefebvre's Microelectronic

Marketing Division, and their ages ranged from 22 to 59; that is, there was *no employee*

*60 years of age or older.* Def.'s SOF, Tab 4, at 1001140, 1001165. The modal age (the

age that occurred most frequently) was 40, and the median age (the age at the mid-point

of the array of ages) was 42.5. Id.

1.43    There were 38 employees within the 20 through 50 age group, and 8 employees

over 50 years of age, prior to the lay-off. Def.'s SOF, Tab 4, at 1001140, 1001165. The

20 through 50 year-old employees represented 82.6 % of all employees eligible for lay-

off selection in the Division (38/46). Id. The over 50 age group represented 17.39% of

all employees eligible for lay-off selection (8/46). Id.

1.44    After the lay-off, there were 30 employees in the Division, and their ages ranged

from 24 to 54; that is, there were *no employees 55 years of age or older*, and *5 years had*

*been lopped off the upper age limit.* Def.'s SOF, Tab 4, at 1001165. The modal age was

still 40, and the median age remained at 42.5. Id.

1.45    Sixteen (16) employees were selected for lay-off. Def.'s SOF, Tab 4, at 1001140.

Of the 38 employees in the 20 through 50 age group, 10 employees (26.3%) were laid

off. Id. at 1001140, 1001165. Among the 8 employees in the over 50 age group, 6 (*75%*)

were laid off. Id. While those aged 20 through 50 comprised 82.6% of the Division, only

62.5% of those laid off were age 20 through 50 (10/16). In contrast, even though

employees over 50 constituted only 17.39% of the Division, 37.5% of those employees

laid off were over 50 (6/16). Thus, employees over 50 were selected for lay-off at a rate

more than double their statistical likelihood, whereas younger employees were

substantially underrepresented among those laid off, given their 82.5% representation

within the Division, prior to the lay-off. Id.

1.46    Among the factors that allegedly informed the lay-off decisions in the

Microelectronics Marketing Division, an employee's age clearly played an important

role. While the Defendant evidenced some ambivalence about employees who were 54

years of age, the ambivalence vanished for employees who were older than 54. Among

the four 54-year-old employees, two were retained and two were laid off. Def.'s SOF,

Tab 4, at 10001140, 1001165. *Everyone 55 and older, as Rossiter was, was terminated.*

Id. Four years earlier, in the absence of a lay-off, Rossiter had been demoted when he

reached the age of 55. Rossiter Aff., ¶ 1, Exhibit 2; Rossiter Dep. (Vol. 2), at 51-52,

Exhibit 5.

1.47    In an effort to mask IBM's age discrimination against Rossiter, McGloin

falsely attested in IBM's position statement to the MCAD, which McGloin helped

prepare, reviewed for accuracy, and signed, that Rossiter was demoted in 1997 because of

"concerns with [Rossiter's] work performance." McGloin Dep., at 34-35 & Exh. 2, at 5,

Exhibit 4. McGloin advanced this false reason for Plaintiff's demotion, notwithstanding

her knowledge that Rossiter had been demoted because of a reorganization. Id. at 31, 35.

17

McGloin's motive at the MCAD was to try and reinforce the falsehoods about Rossiter's

job performance, which McGloin had set forth in his lay-off worksheet, and thereby

divert attention away from the age discrimination, which infused the lay-offs.

## 2.0    STATEMENTS OF DEFENDANT IN DISPUTE

Def.'s SOF 5    Rossiter does not dispute that IBM had a legitimate reason to engage in a significant lay-off in the Microelectronics Division. Rossiter I at p. 89 (Exhibit A hereto)

2.1    **Denied in part:**        See Pl.'s SOF 1.25-1.28.  Rossiter does not dispute that the

computer market experienced a downturn in 2001 or that IBM engaged in a lay-off.

However, the lay-off affected a very small portion of the Microelectronics Division's

workforce and an infinitesimal percentage of the overall IBM workforce.  Further,

Rossiter takes issue with the fact that just at the time that IBM was reducing its head

count, the Microelectronics Marketing Division hired a much younger, inexperienced

employee, Ray Chang, *two weeks before Rossiter received notice of his lay-off*, and

required that Rossiter instruct Chang about how to perform Rossiter's job responsibilities.

Rossiter Aff., ¶¶ 15-16 & Exh. F, Exhibit 2; Rossiter Dep. Vol. 1, at 81, 153, Exhibit 1.

Def.'s SOF 9    IBM issued training guidelines for the lay-off, called the TG U.S. Surplus Selection Guidelines ("Selection Guidelines"), which set forth the methodology managers were to follow in selecting which employees to lay-off. McGloin Affidavit at ¶ 10, and see Selection Guidelines which are Attachment 1 to Ms. McGloin's Affidavit; Lefebvre Affidavit at ¶ 7. As discussed below, managers were directed to define skill groups by grouping employees together by salary "band." IBM has a system where employees are grouped into bands 1-10. Rossiter I at pp. 46-47 (Exhibit A hereto); McGloin Affidavit at ſƒ 8 (Exhibit D hereto). Each of these bands has a salary range associated with it. Id. The next level up from Band 10 is a director level position. McGloin Affidavit at ¶ 8. At the time of

2.2    **Disputed:**        See Pl.'s SOF 1.32.  IBM transposes "band" for the broader

"skills" grouping, thereby artificially inventing and narrowing the criteria and comparator

group and obviating the procedures/instructions in the *"TG U.S. Surplus Selection Guidelines/Manager Training* handbook. Def.s' SOF, Tab D1, at 1001283. The total assessment was supposed to be based on skills. Id. at 1001285. The guidelines provided that the assessments were to be done by skill set, which for Rossiter's organization was *"Integrated Marketing Communications"* (IMC). Def.'s SOF, Tab D2. The "skill group" must include *all* regular full time employees. Def.'s SOF, Tab D1, at 1001284.

> **Def.'s SOF 10**   On or about October 18, 2001, IBM conducted training for managers in the methodology of selecting employees to be laid-off. Lefebvre Affidavit at ¶ 8; McGloin Affidavit at ¶ 11. Lefebvre and McGloin participated in the training. Id.

**2.3    Denied in part:**        See Pl.'s SOF 1.30-1.31. The "training" consisted of Lefebvre and McGloin, along with many others, participating in a telephone conference with Human Resources for 1 to 1 ½ hours. Lefebvre Dep., at 20, Exhibit 6; McGloin Dep., at 59, Exhibit 4. McGloin failed to even consult the skill sets for the Integrated Marketing Communications job category prior to or during her assessments, notwithstanding the fact that the guidelines required that the assessments be based on skills within the job category. McGloin Dep., at 50, Exhibit 4; Def.'s SOF, Tab D1, at 1001285.

> **Def.'s SOF 11**   The written guidelines and training described two selection methodologies: work elimination (where the person's or group's work would be going away altogether) and staff reduction (where the work remained the same but needed to be done by fewer people). IBM instructed managers to follow the following multi-step process in conducting a staff reduction:
>
> •    Managers were instructed to define so-called skill groups consisting of people in the same job category, in the same salary band level and with the same managerial status (managers and non-managers could not be in the same skill group). In other words, managers were instructed that they could not compare employees in different job categories, different salary bands or different managerial status.
> Managers were instructed to define the critical skills required for that skill

group.

- Managers were instructed to define the proficiency/knowledge level the members of the skill group were to possess in each of the critical skills. These proficiency levels were determined according to a pre-existing IBM scale (which accorded higher proficiency levels to higher band levels) and were also specifically defined in the Selection Guidelines. The six proficiency/knowledge levels, in descending order, are as follows:

  "Comprehensive Knowledge" meaning the employee can give expert advice and lead others; is sought by others for consultation and leadership; has comprehensive ability to make sound judgments;"In-depth Knowledge" meaning the employee can perform without assistance; can lead or direct others.

  "Applied Knowledge" meaning the employee can perform with assistance.

  "Conceptual Knowledge" meaning the employee has limited ability to perform.
  "Limited Knowledge."

  "No Skill."

- Managers were instructed to fill out selection worksheets on an established template where the critical skills were listed in left hand column and the manager's assessment of the employee's proficiency/knowledge level in each skill was listed in the right hand column. In assessing the proficiency level for each skill, managers were instructed to consider the employee's performance reviews (so-called "Personal Business Commitment" or "PBC"), and other job-related information. Managers were instructed to provide supporting examples of their assessments.
- Where managers determined that there was a surplus in a skill group (i.e., that the work could be carried on by fewer employees), they were instructed to identify employees in that skill group for lay-off based on the relative skill assessments (i.e., to lay-off the employees whose skills were assessed to be weaker). If employees' skills were assessed as being identical, seniority was a tie-breaker (i.e., the person with less seniority was to be selected for lay-off).
- The Selection Guidelines and training emphasized that managers were not to target skill groups of one-i.e., where there were was only one employee in that job category of the same band and managerial level.

2.4    **Disputed:**    See Pl.'s SOF 1.32. The Defendant distorts the term, "different job categories," by substituting "band" for "skills," which are much more inclusive. The "job category," Integrated Marketing Communications, transcends and subsumes "bands."

Def.'s SOF, Tab D1, at 1001283. McGloin's and Lefebvre's distortion of the comparator

20

groups allowed them to shield certain employees, such as Karen Smith, who was performing the exact same work as Rossiter, from comparison along the same skill sets. Tellingly, IBM has omitted a key element in the instructions to managers; that is, "Skills must be interchangeable within the group." Id. at 1001284. All employees with interchangeable skills should have been evaluated and compared with one another enabling a rational lay-off based on the comparative skills of all employees performing the same work instead of an assessment of some, but not all, employees depending upon what bands were targeted for assessments.

> Def.'s SOF 16    In following the lay-off methodology, Ms. McGloin first grouped her employees into skill groups. McGloin Affidavit at ¶ 16. In grouping her employees into skill groups, she readily determined that the skill group with the largest number of incumbents was the Band 9, non-managers, who were in the job category of "IMC Specialist Advanced." Id. IMC stands for Integrated Marketing Communications. McGloin Affidavit at ¶ 3. This skill group she called "Integrated Marketing Communications Band 9" (hereinafter, the IMC/Band 9 Skill Group"). McGloin Affidavit at ¶ 16. This skill group consisted of 5 people: Dennis Rossiter, Ronald Milos, Kathy Weaver, Karen Spilke, and Deborah Guynn. McGloin Affidavit at ¶ 16. Based on the relatively large number of people in the IMC/Band 9 Skill Group, Ms. McGloin included this group in the lay-off analysis. McGloin Affidavit at ¶ 16.

2.5    **Disputed:**    See Pl.'s SOF 1.33. The *Guidelines* required that a manager *first* complete worksheets on employees and *then* identify "surplus." Def.'s SOF. Tab D1, at 1001285. In her rush to be rid of the oldest employees in her group, McGloin reversed and subverted the directions. She *first* identified what she considered to be "surplus;" that is band 9, with three 50 plus-year-olds, and *then* she completed worksheets for those employees. McGloin failed to complete worksheets for all employees in her department. McGloin was not required to lay off a specified number of employees nor eliminate two employees from one band and none from another band. McGloin Dep., at 61, Exhibit 4. McGloin did not complete worksheets for Karen Bates (age 46) and Deborah Long (age

40), who reported directly to her and were both in band 7. McGloin Dep., at 66, Exhibit 4. Therefore, in the absence of a skills assessment for Bates and for Long, McGloin had absolutely no way of knowing whether either (or both) of them was deficient in the skills needed to go forward and constituted "surplus" in her work group.

> Defs.' SOF 17  In accordance with the Selection Guidelines, Ms. McGloin defined the skills necessary for the IMC/Band 9 Skill Group. McGloin Affidavit at ¶ 17. She selected the skills from a pre-existing IBM document entitled "IBM Marketing Professional Career Skills By Job Level Integrated Marketing Communications Discipline" (hereinafter, "Skills List"). Id. The Skills List defines a wide variety of skills that are used by various employees throughout IBM in the IMC discipline. Id.

2.6    **Denied in part:**        See Pl.'s SOF 1.30-1.31.  Three of the six skills that McGloin selected were "non-critical" skills for employees in the Integrated Marketing Communications skills/job category, which were not crucially important to the performance of Integrated Marketing Communications employees.  When asked if her assessments indicated that Deborah Guynn was performing at a higher skill level in her job than Rossiter, McGloin ducked the question and said that her assessments showed that Guynn's skill levels in the specific skills that McGloin selected, including 3 out of 6 skills that were not critical skills, were higher than Rossiter's. McGloin Dep., at 50, Exhibit 4.

> Def.'s SOF 18  The skills Ms. McGloin selected from the Skills List for the IMCBand 9 Skill Group were those she believed reflected the set of skills that would be required for the individuals who would be in the organization going forward, recognizing that the group might be reduced. In particular, she chose the following skills (and associated proficiency/knowledge levels):
>
> a.    In-depth knowledge of business plans.
> b.    In-depth knowledge of program development.
> c.    In-depth knowledge of measurement techniques.
> d.    In-depth knowledge of use of cross-functional teams.
> e.    In-depth knowledge of agency operations.
> f.    In-depth knowledge of basic financial concepts.
> McGloin Affidavit at (g 18.

2.7    **Disputed:**    See Pl.'s SOF 1.30-1.31, and 2.6.  McGloin's contention that she selected skills required for "going forward" is not credible in light of her selection of 3 non-critical and 3 critical skills instead of 6 critical skills.

21)    Def.'s SOF 21    Ms. McGloin conducted the skill assessments in late October 2001. McGloin Affidavit at ¶ 21. In making the skill assessments of the people who reported directly to her, Ms McGloin relied on her knowledge of the employees' recent work and of their previous work (including reviewing their performance reviews). Id.

2.8    **Disputed:**    See Pl.'s SOF 1.35, 1.39.  Given Rossiter's very high annual performance rating for 2000 and his even better performance in 2001, McGloin was compelled to dredge up a criticism that she made in *1998* to support her effort to eliminate the 59-year-old Rossiter from the Division. Rossiter Dep. (Vol. 1), at 144 & Exh. 8, Exhibit 1; McGloin Dep., at 106, Exhibit 4; Def.'s SOF, Tab D3, at 1000110; Rossiter Dep. (Vol. 2), at 139 & Exh. 19, Exhibit 5.

Def.'s SOF 22    Ms. McGloin's skill assessment of Rossiter, which she documented on the required Selection Worksheet, was that he had "Applied Knowledge" in 5 of the 6 skill categories, which signified that he could perform with assistance in those skill categories. McGloin Affidavit at ¶ 22. In accordance with the Guidelines, Ms. McGloin provided supporting examples of her assessment of Rossiter. McGloin Affidavit at ¶ 22 and see Rossiter's Selection Worksheet attached thereto as Attachment 3. At her deposition, Ms. McGloin provided additional examples in support of her assessment of Rossiter's skills. See excerpts from deposition of Patricia McGloin Deposition at pp. 98-101, 103-106, copies of which are attached hereto as Exhibit E.

2.9    **Disputed:**    See Pl.'s SOF 1.30-1.33, 1.40, and 2.8.  McGloin failed to provide "associated business examples" or "personal attributes for additional detail" in her assessments on each skill, and her vague criticisms about "needing coaching to stay with budgetary guidelines" and "research did not meet validity criteria" were false. Def.'s SOF, D1, at 1001290; D3, at 1000110; Rossiter Dep. (Vol. 1), at 124, 144-145 & Exhs. 6,

8, Exhibit 1; Rossiter Dep. (Vol. 2), at 139-140, Exhibit 5; Rossiter Aff., ¶¶ 5-9, Exhibit

2. Further, any *ad hoc* rationales that McGloin concocted by the time of her deposition,

three years later, merely underscore the deficiencies of her assessment process and

replicate the untimely and false criticisms set forth in Rossiter's assessment.

> Def.'s SOF 24   Based on these relative assessments, McGloin recommended the
> layoff of the two employees with the lowest overall assessments in the IMC/Band
> 9 Skill Group: Rossiter and Kathy Weaver. McGloin Affidavit at ¶ 24. McGloin
> made this recommendation to Mark Lefebvre, who, relying on McGloin's greater
> knowledge of the employees involved, approved the recommendation. McGloin
> Affidavit at ¶ 24; Lefebvre Affidavit at ¶ 12. Rossiter was age 59 at the time, and
> Weaver was 54. Affidavit of Margaret Shine ("Shine Affidavit") at ¶ 1, attached
> hereto as Exhibit F. The employees retained in the IMC/Band 9 Skill Group-Ron
> Milos, Kathy Spilke and Deborah Guynn-were ages 54, 49, and 38 respectively.
> Id.

2.10   **Disputed:**    See Pl.s' SOF 1.30-1.46. Lefebvre's and McGloin's procedures in

implementing the lay-off in the Microelectronics Marketing Division were biased and

flawed, and the content of McGloin's assessment of Rossiter was false. McGloin's claim

that Rossiter could perform "with assistance" but not "without assistance" is not credible

– Rossiter, and not McGloin, had worked as Director of Communications for Fortune 500

companies. Rossiter Dep. (Vol. 2), at 13-14, Exhibit 5; McGloin Dep., at 16-17, Exhibit

4. Beyond general guidance and goal-setting, Rossiter did not require assistance from

McGloin or any other manager to perform his job responsibilities. In fact, McGloin

provided little assistance and actually impeded the department's contribution to the

Division in not lobbying for the budgets and resources that the department required.

Rossiter Aff., ¶ 7, Exhibit 2; Rossiter Dep. (Vol. 1), at 144-145 & Exhs. 6, 8.

> Def.'s SOF 25   After going through the selection process for other skill groups
> in her department, Ms. McGloin also recommended the layoff of two other
> employees from a Band 8 skill group. McGloin Affidavit at ¶ 25. Mr. Lefebvre
> approved these selections as well. McGloin Affidavit at ¶ 25. Therefore, in total,

McGloin recommended the lay-off of 4 of the 14 employees in her department. McGloin Affidavit at ¶ 25.

2.11     **Denied in part:**     To the extent that the Defendant seeks to imply that the lay-off selection process was not biased against older workers, Rossiter denies that the process was unbiased. Three (3) of those four (4) employees laid off were 54 years of age or older: Kathryn Weaver was 54; Doris Gentes was 55; and Dennis Rossiter was 59. McGloin Dep., at 114 & Exh. 9, Exhibit 4.

> Def.'s SOF     As far as the group naming coordinator responsibilities, even before the lay-off, Mr. Lefebvre had decided to move the naming function from McGloin's group to the person in charge of Brand Marketing and Corporate Programs (Carol McNerney), because on a corporate level, the product naming function was being aligned with brand management/marketing. Lefebvre Affidavit at ¶ 15; and see Affidavit of Carol McNerney ("McNerney Affidavit") at ¶ 5, which is attached hereto as Exhibit G. Therefore, Mr. Lefebvre wanted the naming of Microelectronics products to be aligned with the MD Brand Marketing function, which was under Ms. McNerney. Lefebvre Affidavit at ¶ 15; McNerney Affidavit at ¶ 5. As a result, when Rossiter was selected for lay-off, his naming responsibilities were taken over by Carol McNerney. Lefebvre Affidavit at ¶ 15. Ms. McNerney maintained her existing responsibilities in brand marketing and corporate programs, and she estimates that the naming responsibilities comprised approximately 10-15% of her job after Rossiter's departure. McNerney Affidavit at ¶ 6. McNerney was a "team lead" in Brand Marketing and Corporate Programs (a team lead heads a team on particular projects but is not a supervisor per se) and was assisted by Ray Chang, a recent hire out of college. Lefebvre Affidavit at ¶ 16. After Rossiter's departure, Mr. Chang assisted Ms. McNerney with the naming function. Lefebvre Affidavit at ¶ 16; McNerney Affidavit at ¶ 7. Mr. Chang maintained his existing responsibilities (in brand marketing and marketing management), and the naming responsibilities he took on comprised 10-15% of his job. McNerney Affidavit at ¶ 7.

2.12     **Disputed:**     See Pl.'s SOF 1.5, 1.21-1.28. Rossiter had been responsible for brand work and functioning as the Division's liaison to IBM's corporate brand office. Rossiter had far more experience in brand work than McNerney. Rossiter Aff., ¶¶ 3, 12 & Exh. C, Exhibit 1. Instead of expanding Rossiter's job, as Ed Abrams and McGloin had done with Marge Oppold and Kathleen Spilke, who were substantially younger than

Rossiter, Mark Lefebvre turned over Rossiter's branding functions to the much younger, much less experienced McNerney and Chang.  Even before Rossiter was out the door, McNerney was officially designated as the head of "Brand Marketing and Corporate Programs" in the Division. Rossiter Dep. (Vol. 1), at 43-45 & Exh. 3, Exhibit 1.

LeFebvre *hired* Ray Chang, who was in his 20s and had come to IBM out of college, into the Division *two weeks* before Rossiter was notified about his layoff.  Chang had no background or experience in any of the work that the Division performed, and Rossiter had to sit down with him and tell Chang how to perform Rossiter's naming responsibilities. Rossiter Dep. (Vol. 1), at 81, 153, Exhibit 1.

> **Def.'s SOF 29**   Rossiter's IMC responsibilities were distributed to Karen Smith, who was a Band 10 IMC Strategist in Ms. McGloin's department. McGloin Affidavit at ¶ 29. Ms. Smith had product lines that she was already supporting and she simply added the business line that Rossiter had been supporting (the Server line). McGloin Affidavit at ¶ 29. Ms. Smith estimates that the responsibility for the Server line comprised less than 5% of her total job after Rossiter's departure. See Affidavit of Karen Smith at ¶ 3, attached hereto as Exhibit H. At the time of the lay-off, Ms. Smith was 48 years old and was a 27 year IBM veteran. Shine Affidavit at ¶ 1.

2.13   **Disputed:**    See Pl.'s SOF 1.14-1.19.  Karen Smith was 11 years younger than Rossiter and substantially less experienced. Rossiter Dep. (Vol. 1), at 115, Exhibit 1. Smith had failed in an earlier assignment with the Power PC business line, even with the intercession of Ed Abrams, then Director of the Division, and several senior officers. Rossiter Aff., ¶¶ 13, 17-18 & Exhs. D, G, Exhibit 2.  Despite Smith's major problems with the Power PC line, McGloin and LeFebvre terminated Rossiter, who had "exceeded" his commitments, and entrusted Smith with Rossiter's Information Technology business line.

> **Def.'s SOF 31**   Rossiter does not, however, have a problem with McGloin's selection of the six (6) skills that she used for purposes of the selection assessment

26

process, although the proficiency levels he finds to be "esoteric." Rossiter I at pp. 105-107.

2.14    **Denied in part:**        See Pl.'s 1.30-1.31. The skills were not so much "esoteric" as non-critical to the performance of the Integrated Marketing Communications skills/job.

> Def.'s SOF 32   Rossiter believes McGloin produced an inaccurate assessment of his skills, at least in part, because she lacked an understanding of, and was relatively inexperienced in, marketing communications and so was unable to assess him accurately. Rossiter I at pp. 108-111, 125-127.

2.15    **Denied in part:**        See Pl.'s SOF 1.35-1.40. While McGloin lacked Rossiter's depth and breadth of experience in marketing communications, Rossiter contends that McGloin's false assessment of his skills reflected her underlying prejudice against older employees, which was manifested in other ways prior to Rossiter's termination, and an attempt to negatively affect his chances of surviving lay-off. Rossiter Dep. (Vol. 2), at 73-74, Exhibit 5. Rossiter testified that McGloin "could make up anything that she wanted to and put it in there to justify getting rid of me, and that's what happened." He went on to testify that he believed McGloin wanted to justify getting rid of him because she had unexpressed, preconceived stereotypes about him as an older man. Rossiter Dep. (Vol. 1), at 88, Exhibit 1.

> Def.'s SOF 41   Rossiter also believes that Karen Smith, who received some of his job responsibilities after his lay-off, was a less experienced and an inferior performer to him. Rossiter I at pp. 115-120. Ms. Smith was not in Mr. Rossiter's skill group (she was a Band 10) and thus, he was not compared to Ms. Smith in the lay-off selection process. McGloin Affidavit at ¶ 30 (Exhibit D hereto).

2.16    **Disputed:**        See Pl.'s SOF 1.14-1.15, 1.32-1.33, 2.4, and 2.5. IBM again attempts to isolate Karen Smith by her job band. Assessments for lay-off were supposed to be done by identical skill sets, and "skills" transcend and subsume "bands." Smith was

doing the same work as Rossiter and should have been included among the comparators for lay-off. Rossiter Aff., ¶ 11 & Exh. B, at 1, Exhibit 2. Smith *was* an inferior performer, as evidenced by her inability to perform her core functions for the Power PC business line, in contrast to Rossiter, who successfully performed the same functions for the Information Technology business line. Rossiter Dep. (Vol. 1), at 115-116, Exhibit 1; Rossiter Aff., ¶¶ 13, 17 & Exhs. D, G, Exhibit 2.

> Def.'s SOF 42    Rossiter believes that the age statistics of the lay-off in Lefebvre's group evidences age discrimination.  In reaching this conclusion, he relies on the information provided to him by IBM at the time of his lay-off, which contained information about the ages of the people let go and retained in Mr. Lefebvre's group. Rossiter I at pp. 72-75, and see Age and Title Information which is Exhibit 4 thereto.  In particular, he relies on the fact that this information shows a) that employees 50 or older comprised 22% of the population in Lefebvre's group before the lay-off; and b) 60% of the employees 50 or older were selected for lay-off.  Rossiter did not know what percentage of people 49 and under got laid off. Rossiter I at p. 74.

2.17    **Denied in part:**    Rossiter testified that he had calculated percentages laid off for other age group(s), but he did not have that information with him at his deposition.

Rossiter Dep. (Vol. 1), at 78, Exhibit 1.

> Def.'s SOF 43    The age statistics of the lay-off in Lefebvre's group are as follows:
> - Mr. Lefebvre's group consisted of 46 employees before the lay-off.
> - 45% of the employees 35 years old or younger (or 5 of 11) were laid-off. Before the lay-off, the percentage of employees in Lefebvre's group age 40 or older was 65%; after the lay-off that percentage increased to 70%.
> - 22% of the employees (or 10 employees) before the lay-off were 50 or older;
> - 37% of the employees (or 6 employees) laid-off were 50 or older;
> - 35% of the employees (or 16 employees) before the lay-off were under the age of 40;
> - 44% of the employees (or 7 employees) laid-off were under 40.
> - The average age of the employees in Mr. Lefebvre's group before the lay-off was 42; after the lay-off the average age was 41.6.
> Rossiter I at pp. 73-75, and see Age and Title Information which is Exhibit 4 thereto.

2.18    **Denied in part:**        See Pl.'s SOF 1.42-1.47.  The Defendant's figures tell only

part of the lay-off story.  While only 26.3% of employees 20 through 50 years of age

were laid off, 75% of those employees over 50 were laid off, *including the four oldest*

*workers*.  Def.'s SOF, Tab 4, at 1001140, 1001165.  As the result of the lay-off, the age-

range of Division employees went from 22-59 to 24-54, thereby *lopping off five (5) full*

*years at the top of the range*.  In 2001, the Division had no 60 plus-year-olds.  In 2002,

the Division had *no 55 plus-year olds*. Id.  As the work-life for Americans grows longer,

the work life for employees of IBM's Microelectronics Division grows shorter.

> Def.'s SOF 44    Rossiter concedes that Ms. McGloin never made any comments
> that exhibited age bias.  Rossiter I at p. 71.  Rossiter also initially testified that
> McGloin treated him with respect and that they "had a professional relationship."
> Rossiter I at 79.

2.19    **Denied in part:**        See Pl.'s SOF 1.40 and 2.15.  Rossiter testified that

McGloin's underlying prejudice against older workers resulted in McGloin dismissing

Rossiter's work proposals and his efforts to take on projects that would advance his

career at IBM. Rossiter Dep. (Vol. 2), at 74-75, Exhibit 5.  Rossiter further testified that

he believed that McGloin had unexpressed, preconceived stereotypes about him as an

older man. Rossiter Dep. (Vol. 1), at 88, Exhibit 1.

> Def.'s SOF 45    Rossiter has no knowledge of McGloin discriminating against
> any other employee on the basis of age.  He does not know how she treated other
> older workers.  Rossiter I at p. 80; see excerpts from volume II of deposition of
> Dennis Rossiter ("Rossiter II") at p. 102, copies of which are attached hereto as
> Exhibit A-1.

2.20    **Denied in part:**        See Pl.'s SOF 1.30-1.47, and 2.18.  Rossiter has knowledge

that the lay-offs in the Marketing Department, in which McGloin was a key player,

resulted in a "preponderance of older people getting laid off." Rossiter Dep. (Vol. 1), at

72, Exhibit 1.  He also knows that employees 20 through 50 constituted 82.6% of all

employees eligible for lay-off, and yet only 26.3% of that group was laid off. Def.'s SOF,

Tab 4, at 1001140, 1001165.  Conversely, employees over 50 comprised only 17.9% of

all eligible employees, and 75% of them were eliminated. Id.  Further, after McGloin and

Lefebvre discriminated against Rossiter and other older workers in the lay-off, McGloin

falsely attested at the MCAD that Rossiter had been demoted because of performance

issues, in an attempt to buttress her false lay-off assessment of Rossiter's job performance

and divert attention from her age-based discrimination against him. McGloin Dep., at 31,

34-35 & Exh. 2, at 5, Exhibit 4.

>    Def.'s SOF 65    At all relevant times, the IBM job posting policy for internal job
>    opportunities provided that regular Band 10 and below, non-executive positions
>    and temporary assignments were to be posted. The policy provided the following
>    exceptions to the posting requirement for Band 10 and below, non-executive
>    positions: a) physician and lawyer positions were not posted; b) lateral or
>    hierarchical movement within a department and shift practice moves were
>    excluded from the posting requirement; and c) senior management could exclude
>    a specific job from being posted. See Affidavit of Edward Abrams at ¶ 2
>    ("Abrams Affidavit"), attached hereto as Exhibit J. Under this posting policy,
>    executive level positions, including Director positions (which are above a Band
>    10) generally do not get posted. Abrams Affidavit at ¶ 3. In addition, where there
>    is simply an expansion of the mission of a current position-holder (a "hierarchical
>    movement"), it is not considered a job opening and it does not get posted. Abrams
>    Affidavit at ¶ 3.

2.21    **Disputed:**     See Pl.'s SOF 1.12-1.14, 1.20.  It was Rossiter's understanding

from the posting policy on the IBM web, at the time of his employment, that all positions

had to be posted. Rossiter Dep. (Vol. 2), at 26, Exhibit 5.  If, as IBM avers, the above-

recited policy was in effect at any time during Rossiter's employment, the policy was not

applied neutrally.  Rather, the policy was used by managers to "cherry pick" individuals

for professional development and/or promotion by describing a position as an

"expansion" of current job responsibilities and not posting the position.  Rossiter testified

that there was an age *animus* within the Division, an "overall atmosphere in the group" that was "against older people." Rossiter Dep. (Vol. 2), at 18, Exhibit 5. The alleged reduction in management positions, which James Monahan had used to explain Rossiter's demotion, did not last, and younger employees were appointed as managers. Rossiter Dep. (Vol. 2), at 52, Exhibit 5. Ed Abrams, Monahan's successor, appointed younger people to jobs for which Rossiter was better qualified, and an age factor played a part in Abrams' decision to put Marge Oppold in an un-posted Manager of Events position, notwithstanding the fact that Rossiter had handled some of the largest events in the history of the Division. Id. at 18-20. In addition, there was feedback at the time from a couple of business lines that Oppold was not performing well. Rossiter Dep. (Vol. 1), at 113, Exhibit 1. McGloin was part of these opportune appointments of younger employees with less experience than Rossiter into positions for which he was more qualified. Id. at 111. The appointment of Kathleen Spilke to a position as Collateral Manager was another instance when Rossiter was more qualified and was overlooked in favor of a younger employee. Id. at 160-162; Rossiter Dep. (Vol. 2), at 26, Exhibit 5. When Rossiter told McGloin that he thought that he was well-qualified for some of the positions to which she was making appointments, she was not interested in listening to him. Rossiter Dep. (Vol. 1), at 166, Exhibit 1. In contrast to McGloin's *rebuffs* of Rossiter's requests for more professional opportunities and projects, McGloin *created* a project for Karen Smith, who had lost a major component of her job due to poor performance. Id. at 119; Rossiter Aff., ¶¶ 17-18 & Exh. G, Exhibit 2.

> Def.'s SOF 74   Rossiter does not know if Ed Abrams or Pat McGloin promoted Oppold into this position. Rossiter I at p. 158; Rossiter II at pp. 17-18. Rossiter cannot say whether Ed Abrams had an animus against older workers because he did not deal with him enough. Rossiter II at pp. 18-19. Rossiter does not know

of any instances of Abrams exhibiting age animus. Rossiter II at p. 21. But he believes that Abrams may have had a mind set that he wanted younger people in certain jobs like the Oppold job. Rossiter II at pp. 18-19.

2.22    **Disputed:**    See Pl.'s SOF 1.11-1.19, and 2.21. Rossiter testified that the

overall atmosphere under Ed Abrams' direction was against older employees, and even

though Rossiter had handled some of the biggest events in the Division's history, he was

never approached nor informed about the Events Manager position, because he was

considered to be too old. Rossiter Dep. (Vol. 2), at 18, 20, Exhibit 5.

> Def.'s SOF 79    Rossiter was equivocal about whether he would have even taken
> he position if it had been offered to him. Rossiter I at p. 161.

2.23    **Denied in part:**    Rossiter testified that he had enjoyed doing collateral work,

and being the Collateral Manager would have enabled him to work with graphic

designers, a relationship in which he had a lot of prior experience and had enjoyed.

Rossiter Dep. (Vol. 1), at 161, Exhibit 1.

Respectfully submitted,

Dennis Rossiter
By his Attorneys,

Kevin G. Powers, BBO #405020
Linda Evans, BBO #635078
Robert S. Mantell, BBO #559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 5/18/05

Linda Evans

RossiterSOF

32