UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENNIS ROSSITER,                    )
        Plaintiff,                  )
                                    )        CIVIL ACTION NO.
            v.                      )        04-10069-DPW
                                    )
INTERNATIONAL BUSINESS              )
MACHINES CORPORATION,               )
        Defendant.                  )

MEMORANDUM AND ORDER
October 19, 2005

Plaintiff Dennis Rossiter ("Rossiter") brings this action against Defendant International Business Machines Corporation ("IBM") alleging age discrimination in IBM's decision to lay him off effective January 3, 2002[1] contrary to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), and the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B § 4(1B).  IBM has moved for summary judgment on both claims. I will grant that motion.

## I. BACKGROUND

---

[1]  In his Complaint, Rossiter alleges that his exclusion from a number of promotional opportunities within IBM and his 1997 demotion were also discriminatory.  The lack of timeliness to these allegations as independent claims is irrelevant because Rossiter clarified in his opposition to defendant's motion for summary judgment ("Rossiter Opposition") that he referenced these earlier incidents only to provide context and as evidence of IBM's state of mind in terminating him.

-1-

The following recitation of the facts, which are largely not in dispute, is drawn from Defendant International Business Machines Corporation's Statement of Undisputed Facts Pursuant to Local Rule 56.1, Plaintiff Dennis Rossiter's Rule 56.1 Statement of Facts In Dispute, and the supporting affidavits and exhibits submitted.  Given the wide ranging character of plaintiff's allegations, an extended recitation is necessary.

## A. Rossiter's Work History at IBM

Rossiter was born on January 16, 1942.  He was 53 years old when IBM hired him in January 1995 as a Band-10[2] manager of Marketing Communications ("MARCOM") for IBM's PowerPC product line, which is part of the Microelectronics Division.  Rossiter had previously gained marketing and communications experience at other companies.  As the manager of Marketing Communications for IBM's PowerPC product line, Rossiter was responsible for developing a comprehensive plan for the marketing campaign for IBM's PowerPC product.  In this position, Rossiter had 5-7 people reporting to him.

Initially, Rossiter reported to Ron Black ("Black"), Director of Marketing for PowerPC, although it was James Monahan ("Monahan") who interviewed and hired him.  Rossiter alleges that in this initial interview Monahan asked him "Do you still have the fire in your belly to do the job?"  Rossiter also alleges

---

[2] IBM has a system under which employees are grouped into "Bands" 1-10.  Each of these bands has a salary range associated with it.  The next level up from Band 10 is a director level position.

that in one of his early meetings with Black, who was in his mid-
30s, Black asked him if had any trouble reporting to a younger
boss.

In April 1995, Monahan became his manager.  Rossiter
continued carrying out the same MARCOM duties under Monahan, but
Monahan allegedly told Rossiter that he was "overqualified" and
that Monahan did not know what to do with Rossiter.  At some
point Rossiter changed focus from the PowerPC business line to
the server line.  Monahan also assigned Rossiter the tasks of
"branding" and "product naming".

In April 1997, when Rossiter was 55, Monahan demoted him to
a Band 9 level and removed his managerial responsibilities.
Rossiter testified that Monahan told him he was being demoted due
to a general re-leveling in the organization.  Specifically,
Monahan stated that Monahan's own manager at the time, Jesse
Parker ("Parker"), determined that there only needed to be one
manager in the marketing communications organization and that
Monahan would be it.  Rossiter alleges that both before and after
the demotion, Monahan only assigned him low-level work and
rebuffed his requests for additional responsibilities.  He also
alleges that he asked Monahan if Monahan was trying to get rid of
him and Monahan did not have a "cohesive response."

In Monahan's 1995, 1996 and 1997 annual performance reviews
of Rossiter, he rated Rossiter at level "3" on a scale of 1-3 (3
being the lowest rating).  In 1995, a "3" signified that "more
was expected of the employee"; in 1996 and 1997, a "3" signified

that the employee "achieved some commitments."  In one of these
years, Monahan evaluated Rossiter on his goals for that year as
usual, but Rossiter alleges that Monahan had deviated from normal
practice by re-writing Rossiter's goals at the end of the year.

In late 1997 or early 1998, Monahan left the company and
Parker re-organized the marketing department of the
Microelectronics Division, assigning Monahan's responsibilities
to Patricia McGloin Waitt (nee McGloin) ("McGloin") in addition
to her existing job functions.  This made her Rossiter's new
manager.  McGloin's title was Manager of Field and Marketing
Programs until August 2000 when her title became Manager of
Integrated Marketing Communications.  McGloin remained in that
position but her managers changed.  She reported to Parker until
mid-1999; then to Ed Abrams ("Abrams") from mid-1999 through
early 2001; and finally to Mark Lefebvre ("Lefebvre")[3] from
February 2001 on.

Under Abram's management, the alleged leveling of manager
positions in the Division, which Monahan referred to, ended and
the Technology Group Events Manager and Technology Group
Collateral Manager positions were created.  These jobs were not
posted.  Abrams promoted Marge Oppold to the Events position as a
hierarchical movement that was an expansion of her
responsibilities in event planning/management at the time.

_____

[3] At an annual Worldwide Communications meeting, Lefebvre
allegedly stated, for all present to hear, that the music
Rossiter likes (Sam and Dave) "is so far off my time frame that I
don't even want to talk about it."

Similarly, Abrams promoted Kathleen Spilke to the Collateral position as a hierarchical movement that was an expansion of her collateral (<u>i.e.</u> brochures) responsibilities at the time. Rossiter claims that he was better qualified for both positions.

In McGloin's initial annual performance review of Rossiter, she rated him at level "3" on a scale of 1-4 (4 being the lowest). A level "3" signified that the employee had achieved some, but not all, of his commitments. McGloin's assessment of Rossiter "improved over time." She rated him a "2" on a scale of 1-4 in the 1999 and 2000 performance reviews, signifying that he had achieved or exceeded commitments. The written assessments in McGloin's 1999 and 2000 performance evaluations of Rossiter were quite positive overall. In both 1999 and 2000, Rossiter was awarded a 10% bonus and cash awards for special achievements.

In the late fall of 2001, McGloin selected Rossiter as one of her "surplus" employees to be laid-off even though she felt his overall performance was better in the 2001 calendar year than in the year 2000. Rossiter was notified in November 2001 and given until January 2002 to try to obtain another job within IBM. Rossiter unsuccessfully applied for other internal positions, and his termination became effective January 3, 2002.

### B. The Structure of the Microelectronics Division at the time of the lay-off

In the fall of 2001, Rossiter reported to McGloin, who reported to Lefebvre. Lefebvre's supervisor was Christine King ("King"), the Vice President of the Microelectronics Division and

King's Operations Manager was Maria Lipner ("Lipner").

McGloin's Integrated Marketing Communications Group consisted of 14 people, including two subordinate managers, Robert Rohrer (Technology Group Interactive Marking Manager - a posted position that Rohrer, but not Rossiter, applied for) and Marge Oppold (Technology Group Events Manager); one Band 10 IMC specialist, Karen Smith[4]; five Band 9 IMC specialists (Rossiter, Ronald Milos, Kathryn Weaver, Kathleen Spilke and Deborah Guynn); and three Band 8 IMC specialists.

Lefebvre had a number of other groups reporting to him for a total of 46 subordinates, including Ray Chang ("Chang") and Carol McNerney ("McNerney").  IBM hired Chang into Lefebvre's Microelectronics Division right out of college on July 30, 2001. Chang initially reported to two managers who reported to Lefebvre, but after both managers successively left his group (the second one leaving in November 2001), Chang began reporting to Lefebvre directly.  McNerney was initially hired by Lefebvre into the Technology Group in November 2000, but when the Technology group disbanded in January 2001, Lefebvre brought McNerney into his Microelectronics Division.

In November, 2000 Wendy McGee, the Program Director of PowerPC Marketing, posted the position PowerPC Marketing

---

[4] McGloin had transferred Smith into her work group in 2000. Rossiter alleges that Smith was performing her job so poorly that the PowerPC line was transferred to Cynthia Roy (nee Putlitz). Rossiter claims that McGloin had to create a web-based project for Smith to keep her in her group.  McGloin's 2001 performance review of Smith fails to support these conclusory assertions.

Communications Manger.  Cynthia Roy was the only person from
within the PowerPC group who applied (Rossiter did not apply) and
she was given the job.

### C. The Lay-Off

In 2001, there was a significant downturn in the
microprocessor/semiconductor industry.  As a result, IBM's
Microelectronics Division laid-off more than 1,200 employees.  In
October 2001, Lipner instructed Lefebvre that the target number
of lay-offs from the groups reporting to him was 20 or 21 out of
the 46 employees under his management.  Based on this
instruction, Lefebvre told McGloin that her group was expected to
contribute to the lay-off, but he did not give her a specific
target.

In order to effectuate the lay-offs, IBM issued training
guidelines for its managers called the TG U.S. Surplus Selection
Guidelines ("Selection Guidelines"), which set forth the
methodologies managers were to follow.  IBM also conducted a
telephone conference training session for managers regarding the
methodology of selecting employees to be laid-off.

The Selection Guidelines describe two selection
methodologies: work elimination (where the person's or group's
work would be going away altogether) and staff reduction (where
the work remained the same but needed to be done by fewer
people).  McGloin followed the staff reduction methodology for
her group.

In Rossiter's reply submissions he repeatedly criticizes

IBM's interpretation of the Selection Guidelines claiming that IBM distorted the comparator groups to shield certain employees, such as Karen Smith.[5] Rossiter further argues that "[a]ll employees with interchangeable skills should have been evaluated and compared with one another enabling a rational lay-off based on the comparative skills of all employees performing the same work instead of an assessment of some, but not all, employees depending upon what bands were targeted for assessments." Rossiter's reading of the Selection Guidelines is unpersuasive. There is no genuine issue of factual dispute that IBM's Selection Guidelines instruct managers to define Skill Groups according to their secondary job categories, skills, salary band, exempt/nonexempt/manager status, part-time/full-time status and geography.  Thus, McGloin reasonably followed the Selection Guidelines when she grouped her employees into Skill Groups, including the IMC/Band 9 Skill Group, which consisted of the five, non-manager Band 9 IMC Specialists.

The common sense interpretation of the Selection Guidelines requires managers to next define the "critical skills" and the required corresponding proficiency levels for each skill group

---

[5] Rossiter argues in his Statements of Defendant in Dispute that "IBM transposes 'band' for the broader 'skills' grouping, thereby artificially inventing and narrowing the criteria and comparator group and obviating the procedures/instructions in the *TG U.S. Surplus Selection Guidelines/Manager Training* handbook. The total assessment was supposed to be based on skills... The 'skill group' must include *all* regular full time employees" with the skill set of Integrated Marketing Communications. Interestingly, Rossiter does not argue that he should have been considered against the Band 7 and 8 employees.

that is being considered.  For the IMC/Bank 9 Skill Group,
McGloin chose six skills from a pre-existing IBM document
entitled "IBM Marketing Professional Career Skills By Job Level
Integrated Marketing Communications" ("Skills List"):  in-depth
knowledge[6] of business plans, in-depth knowledge of program
development, in-depth knowledge of measurement techniques, in-
depth knowledge of use of cross-functional teams, in-depth
knowledge of agency operations, and in-depth knowledge of basic
financial concepts.  McGloin testified that she "believed [these
skills] reflect the set of skills that would be required for the
individuals who would be in the organization going forward,
recognizing that the group might be reduced."

The final steps of the Selection Guidelines require the
decision-making manager to fill out the selection worksheet for
each employee in the Skill Group being considered.  This requires
assessing the employee's proficiency with respect to each of the
"critical skills".  The manager is also directed to provide a
business example and comments for each skill, and to use personal
attributes to provide additional detail.  After completing the
assessment, the manager must select whether any employee should
be considered "surplus".  Each selection worksheet must be signed
by two levels of management before being submitted.

Following this protocol, McGloin assessed the skills of the

---

[6] "In-depth knowledge" means that the employee can perform
the skill without assistance and can lead or direct others,
whereas "applied knowledge" means can perform with assistance.

IMC/Band 9 Group members who reported to her directly (Rossiter and Deborah Guynn) and Robert Rohrer assessed the skills of the IMC/Band 9 Group members who reported to him directly (Ronald Milos, Kathryn Weaver, and Kathleen Spilke.)  McGloin testified that in making her skill assessments, she relied on her knowledge of the employee's recent work and their previous work, including reviewing their past performance reviews.

The result of the assessments by Rohrer and McGloin is as follows, with the numbers 1-6 reflecting the proficiency/knowledge level (1 = comprehensive knowledge, 2 = in-depth, 3 = applied, 4 = conceptual, 5 = limited, and 6 = no skills):

| Name (Age*) | Knowledge of Business Plans | Knowledge of Program Development | Knowledge of Measurement Techniques | Knowledge of Use of Cross-Functional Teams | Knowledge of Agency Operations | Knowledge of Basic Financial Concepts | Average of Ratings |
|---|---|---|---|---|---|---|---|
| Guynn (38) | 2 | 1 | 2 | 1 | 1 | 2 | 1.5 |
| Milos (54) | 2 | 2 | 2 | 1 | 3 | 2 | 2 |
| Spilke (49) | 2 | 2 | 2 | 2 | 3 | 2 | 2.16 |
| Weaver (54) | 2 | 2 | 3 | 2 | 2 | 3 | 2.33 |
| Rossiter (59) | 3 | 3 | 3 | 2 | 3 | 3 | 2.83 |

* Age as of November 2001. [Shine Aff., ¶ 1(b)-(e), (i).]

McGloin repeated the selection process for the IMC/Band 8 Skill Group, but did not assess Karen Smith, a Band 10 employee, or Karen Bates and Deborah Long, Band 7 employees.  Based on these relative assessments, McGloin recommended the layoff of the two employees with the lowest overall assessments in the IMC/Band 9 Skill Group -- Rossiter and Kathy Weaver -- and two other employees from the IMC/Band 8 Skill Group to Lefebvre.  Lefebvre approved the four

-10-

selections.  In total, Lefebvre laid-off 16 of the 46 individuals in his group.  Some of these lay-offs followed the work elimination methodology and some were based on the staff reduction methodology.

### D. Lay-Off Statistics

Although IBM laid-off more than 1,200 employees, Rossiter has focused his discrimination allegation on the lay-offs from Lefebvre's 46-person group and McGloin's 14-person group.  As statistical evidence, Rossiter draws from the data in the MERA Notice to point out that:

- two of the three oldest employees in McGloin's group were laid-off
- the oldest four of Lefebvre's employees were laid-off
- prior to the lay-off, Lefebvre's employees ranged from 22 to 59; after the lay-off, Lefebvre's remaining 30 employees ranged from 24 to 54
- nobody 55 or above was retained in Lefebvre's group
- prior to the lay-off there were 8 employees in Lefebvre's group over 50 (17.39%); 6 of these (75%) were laid-off[7]
- the average age in Lefebvre's group went from 42 to 41.6

### E. Reorganization after the Lay-Off

Prior to the lay-off, Rossiter had two primary job functions: (1) creating and managing the Integrated Marketing Communications strategy and plan for the Server product line; and (2) coordinating the naming of new Microelectronics Division products.  Since Rossiter was laid-off as part of a staff reduction and not work elimination, his responsibilities had to be re-distributed.

Lefebvre testified that even before the lay-off, he had decided to move the naming function from McGloin's group to McNerney, the

---

[7] IBM points out that there were actually 10 employees 50 and over (21.7%) in Lefebvre's group; thus the 6 who were laid-off constituted 60%.

person in charge of Brand Marketing and Corporate Programs, because
the product naming function was being aligned with brand
management/marketing at a corporate level.  As a result, when
Rossiter was selected for the lay-off, his naming functions were
taken over by McNerney, who was assisted by Chang, in addition to
the existing brand marketing and corporate programs responsibilities
they performed.  Lefebvre transferred Rossiter's IMC
responsibilities within McGloin's department to Karen Smith, a Band
10 IMC Specialist who was 48 years old and a 27 year IBM veteran at
the time.

## II. DISCUSSION

### A. Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is entitled
to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

A fact is "material" if it has the "potential to affect the
outcome of the suit under the applicable law."  Santiago-Ramos v.
Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000), and
a "genuine" issue is one supported by evidence such that "a
'reasonable jury, drawing favorable inferences,' could resolve it in
favor of the nonmoving party."  Triangle Trading Co., Inc. v. Robroy
Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v. F.W.
Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996)).

To oppose a motion for summary judgment successfully, the non-

moving party must present evidence with "substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." LeBlanc v. Great American Insurance Co., 6 F.3d 836, 841-42 (1st Cir. 1993)(internal citations omitted). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

In an employment discrimination case where the employer proffers, as here, non-discriminatory reasons for the dismissal, the question at the summary judgment stage is not which of the competing explanations for Rossiter's termination is most convincing -- IBM's non-discriminatory explanation or Rossiter's allegation that it was motivated by age discrimination. Rather, the determinative issue is whether the plaintiff has produced enough evidence to raise a genuine issue of fact regarding his allegation of age discrimination. Thomas v. Eastman Kodak Co., 183 F.3d 38, 61 (1st Cir. 1999).

In evaluating the record before me, I have construed the facts in the light most favorable to Rossiter, the non-moving party, drawing all reasonable inferences in his favor. United States Steel v. M. DeMatteo Construction Co., 315 F.3d 43, 48 (1st Cir. 2002).

### B.  Anti-Discrimination Law Elements

Both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1)[8], and the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B § 4(1B)[9], prohibit employers from discriminating against employees on the basis of their age.  The conventional three-step McDonnell Douglas framework (commonly called the "pretext analysis") applies to disparate treatment cases brought pursuant to both statutes where there is no direct evidence of discrimination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-205 (1973); Sullivan v. Liberty Mutual Insurance Co., 444 Mass. 34, 39-40 (2005).

The first step of the McDonnell Douglas framework requires the plaintiff to establish a four-element prima facie case.  Under both

---

[8] "It shall be unlawful for an employer -- (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1).  "The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."  29 U.S.C. § 631(a).

[9] "It shall be an unlawful practice: (1B) For an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." Mass. Gen. Laws. ch. 151B § 4(1B). "The term 'age' unless a different meaning clearly appears from the context, includes any duration of time since an individual's birth of greater than forty years."  Mass. Gen. Laws ch. 151B § 1(8).

Massachusetts and federal law, the plaintiff must establish (1) that
he was at least forty years old when he was terminated; (2) that his
job performance met the employer's legitimate expectations; and (3)
that his employment was nonetheless terminated. Cruz-Ramos v.
Puerto Rico Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000);
Sullivan, 444 Mass. at 41. The fourth element of the prima facie
case under both state and federal law varies depending on whether
the termination was part of a reduction in force ("RIF"), as alleged
in the instant action, or not. A RIF occurs when "business
considerations cause an employer to eliminate one or more positions
within the company," while continuing to carry out the same net
work. LeBlanc, 6 F.3d at 845 citing Barnes v. GenCorp Inc., 896
F.2d 1457, 1465 (6th Cir. 1990). Here, IBM argues and Rossiter does
not meaningfully dispute that Rossiter's termination was part of a
lay-off, called a "Resource Action", caused by a "significant
downturn in the microprocessor/ semiconductor industry."

     Under federal law, the fourth element of the prima facie case
in a RIF context requires the plaintiff to show that "younger
persons were retained in the same position or that the employer
otherwise did not treat age neutrally." Currier v. United
Tecnologies Corp., 393 F.3d 246, 254 (1st Cir. 2004). The
Massachusetts Supreme Judicial Court recently adopted a more
flexible standard requiring the plaintiff to produce "some evidence
that [his or] her layoff occurred in circumstances that would raise

a reasonable inference of unlawful discrimination." <u>Sullivan</u>, 444 Mass. at 45.  The Supreme Judicial Court did note, however, that the fact an employer retained an employee outside the plaintiff's protected class in the plaintiff's same position may indeed be "sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff." <u>Id.</u> at 44 (citing <u>Barnes</u>, 896 F.2d at 1466).

Once the plaintiff succeeds in making out the prima facie case, there is a presumption that the employer engaged in impermissible age discrimination, <u>LeBlanc</u>, 6 F.3d at 842, and the burden of production shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the adverse employment." <u>Cruz-Ramos</u>, 202 F.3d at 384; <u>Sullivan</u>, 444 Mass. at 50-51.  Upon presentation of such a reason, the presumption generated by the employee's prima facie case disappears, <u>LeBlanc</u>, 6 F.3d at 842, and the ultimate burden falls back upon the employee to prove that the employer intentionally discriminated against the employee.[10]

At the third step, the plaintiff must provide sufficient proof,

---

[10] Intentional discrimination does not require conscious discrimination.  Employment decisions based on unconscious, stereotypical thinking are no less "injurious or worthy of eradication than blatant or calculated discrimination." <u>Thomas v. Eastman Kodak Co.</u>, 183 F.3d 38, 60 (citing <u>Price Waterhouse v. Hopkins</u>, 825 F.2d 458, 469 (D.C. Cir. 1987), <i>aff'd in part</i>, 490 U.S. 228, 250-52 (plurality opinion)).  In fact, "the very essence of age discrimination" is for an employer to fire an older employee "because the employer believes that productivity and competence decline with old age." <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993).

"as a matter of law, to show that when [the employee] was terminated, [the employer] had a discriminatory intent, motive, or state of mind based on [the employee's] age ... and that any such animus was a material and important ingredient in the discharge." Sullivan, 444 Mass. at 57 (internal quotation omitted). See also Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) (holding that "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision."). This may be done by proving that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000); Sullivan, 444 Mass. at 55.[11]

The standard the plaintiff must meet to avoid summary judgment under 151B seems to be "friendler to plaintiffs" than under the ADEA. Joyal v. Hasbro, 380 F.3d 14, 17 (1st Cir. 2004). See John F. Adkins & Nancy S. Shilepsky, Massachusetts Employment Law §5.1.2(b) (MCLE, Inc. rev. ed. 2003). Federal case law provides that "a plaintiff *may* rely on her prima facie case, together with a

---

[11] The rationale for the pretext analysis is that "discrimination, rarely explicit and thus rarely the subject of direct evidence, may be proven through the elimination of other plausible non-discriminatory reasons until the most plausible reason remaining is discrimination." Thomas, 183 F.3d at 61. See also Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 118 (2000) (finding that "when all legitimate reasons have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration"(internal citations and quotations omitted)).

showing that the defendant's proffered reasons for the adverse employment action were false, without further demonstrating that the defendant's state reasons were motivated by a discriminatory animus." <u>Rodriguez v. Smithkline Beecham</u>, 224 F.3d 1, 8, n. 12 (1st Cir. 2000) (emphasis added).  <u>See also</u> <u>Ronda-Perez v. Banco Bilbao Vizcaya Argentaria – Puerto Rico</u>, 404 F.3d 42, 44 (1st Cir. 2005). "The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case," <u>Thomas</u>, 183 F.3d at 57 (citing <u>Fisher v. Vassar College</u>, 114 F.3d 1332, 1338 (2d Cir. 1997)), especially "the strength of the plaintiff's prima facie case" and "the probative value of the proof that the employer's explanation is false." <u>Ronda-Perez</u>, 404 F.3d at 44 (citing <u>Reeves</u>, 530 U.S. at 148-49).  By contrast, Massachusetts case law may be read only to require evidence of pretext to survive summary judgment.  "A showing that the employer's reasons are untrue gives rise ... to an inference that the plaintiff was a victim of unlawful discrimination.  That inference, together with the elements described in stage one, establishes a prima facie case sufficient to withstand a motion for directed verdict" or a motion for summary judgment. <u>Abramian v. President & Fellows of Harvard College</u>, 432 Mass. 107, 118 (2000); <u>Donald v. Farrakhan</u>, 436 Mass. 94, 96 (2002) (finding that the "standard applied to a motion for a directed verdict is identical to that applied to a motion for summary judgment for most purposes.").  In <u>Lipchitz v. Raytheon Co.</u>, 434

Mass. 493, 498 (2001), for example, the Supreme Judicial Court suggested that a plaintiff need only show that "at least one of the reasons given by the defendant was pretextual."  But see Joyal, 380 F.3d at 17 (noting that this seems like an "oddly mechanical rule" because "one can imagine easily a case where an unimpeached and powerful nondiscriminatory reason is proved but the jury finds 'pretextual' a further reason also given by the employer as a make-weight.")[12]

Considering these nuances, I now apply the facts to each element of the Mcdonnell Douglas framework.

## 1. Prima-Facie Case

Under either the state or federal formulation, the plaintiff's burden to establish a prima facie case is "not onerous".  Cruz-Ramos, 202 F.3d at 384; Sullivan, 444 Mass. at 40, 45.  In this case, there is no question that Rossiter meets the first and third elements: he was over the minimum age of 40 -- he was 59 when he was fired -- and he suffered an adverse employment action -- IBM terminated his employment.  With respect to the second element, IBM does not contest that Rossiter's job performance met the employer's legitimate expectations.  Furthermore, "in a reduction of force case the discharge is not the result of the employer concluding that an individual is not performing well: presumably before layoffs,

---

[12] The Supreme Judicial Court did not address the Lipchitz formulation in its most recent case in this area, Sullivan v. Liberty Mutual Insurance Co., 444 Mass. 34, 54-57 (2005).

every plaintiff in such a case is performing 'at an acceptable level' or she would have been discharged before a downsizing occurs. Rather, the dispute will almost always concern the fourth element[.]" <u>Sullivan</u>, 444 Mass. at 41. IBM does argue, however, that Rossiter cannot meet his burden of proof with respect to the fourth element of the prima facie test.  Given the relatively modest burden on a plaintiff, I disagree.

Rossiter points to the following evidence to establish that age was not treated neutrally and that his lay-off occurred in circumstances that would raise a reasonable inference of unlawful discrimination: (1) substantially younger hires (McNerney - 32; Chang - 20s; and Karen Smith - 38) took over Rossiter's responsibilities; and (2) statistically age was not treated neutrally.  Weighing against him are the uncontested facts that McGloin retained two IMC Specialists over 40 within the same band classification as Rossiter, including one 54 year old, and that Lefebvre's group retained twenty-one employees over 40, including two 54 year olds.  While I find that Rossiter has established a prima facie case of age discrimination, I make that determination with the following reservations.

Although the First Circuit has repeatedly said that a plaintiff can satisfy the fourth element by simply showing that the employer retained unprotected or younger workers in the same position as the plaintiff, <u>see</u> <u>e.g.</u> <u>Currier</u>, 393 F.3d at 254, this narrower, more specific requirement must be considered in the context of the

alternative proof requirement -- "that the employer otherwise did not treat age neutrally." Id.  The First Circuit's two-part formulation developed to allow a "plaintiff to show either that he was purposefully or intentionally discriminated against as an individual (in keeping with the Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir. 1979) formulation) or that his employer's facially neutral actions had a significant discriminatory impact on members of the protected class." Herbert v. Mohawk Rubber Co., 872 F.2d 1104, 1111 (1st Cir. 1989).  In several RIF cases, the First Circuit has simply assumed that the plaintiff met the burden to establish a prima facie case, see e.g. Hidalgo v. Overseas Condado Insurance Agencies, Inc., 120 F.3d 328, 334 n. 5 (1st Cir. 1997) and LeBlanc, 6 F.3d at 844, but given the Supreme Judicial Court's analysis in Sullivan, I will take a closer look rather than making that assumption.

a.  Substantially younger replacements - First, McNerney, Chang and Smith did not "replace" Rossiter as he asserts. They took over his responsibilities in addition to their existing responsibilities.[13] Second, three of the four cases upon which Rossiter relies are non-RIF cases and as such do not support his contentions.  See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311-12 (1996); Knight v. Avon Products, Inc., 438 Mass. 413, 423 (2003); Hidalgo,

---

[13] "[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 (6th Cir. 1990).

120 F.3d at 334, n. 5.  While a non-RIF plaintiff can satisfy the prima facie case by showing that he or she was replaced by someone who is substantially younger, that is not the relevant test for a RIF case.

Koster v. Trans World Airlines, Inc., 181 F.3d 24, 31 (1st Cir. 1999) does offer some support for Rossiter's prima facie case.  In Koster, the station manager had to reduce the six supervisor positions to four.  He elected to keep four managers aged 25, 44, 49, and 56 and selected two managers for furlough aged 48 and 49 (the plaintiff).  Id. at 29.  The First Circuit held that "[a]lthough no one took over [the plaintiff's] exact job, his duties were subsumed by other employees, some of whom were younger, one substantially younger, than [the plaintiff].  In a reduction in force, a prima facie case requires only that [the plaintiff] show that [the employer] did not treat age neutrally in deciding who to furlough.  Thus, sufficient evidence existed to allow a reasonable jury to find that the plaintiff met his burden of proving a prima facie case of discrimination."  However, the First Circuit clarified the test in Lewis, 321 F.3d at 216 (1st Cir. 2003), finding that:

> [The Plaintiff] attempts to avoid our inevitable conclusion by asserting that the [employer]'s delegation of his duties to other individuals not in his protected class amounted to retaining individuals in the same position. We disagree. The purpose of the prima facie case is to identify those circumstances where the employer's actions, if left unexplained, are more likely than not based on unlawful discrimination. ... Merely demonstrating that, as a result of the reduction in force, the employer consolidated positions or allocated duties of discharged employees to other existing employees does not itself raise a reasonable inference that

the employer harbored discriminatory animus toward any one employee. Accepting Lewis's argument "would render meaningless the fourth requirement of the prima facie case" under *LeBlanc*. ... [Thus, the] employee must come forward with something more than evidence of the inevitable transfer of his or her responsibilities to existing employees.

Here, Rossiter's responsibilities were re-assigned to three substantially younger employees, but this is not enough to prove that IBM retained younger workers in the "same position" as the plaintiff. <u>Currier</u>, 393 F.3d at 254.[14] McNerney and Chang clearly had different responsibilities than Rossiter at the time of the lay-off. Yet, reading the facts in the light most favorable to Rossiter, I find that at least the other Band 9 IMC Specialists can be considered to have held the "same position" as Rossiter prior to the lay-off. McGloin grouped the IMC/Band 9 Skill Group together for the selection process because they shared the same secondary job

---

[14] <u>See</u> e.g. <u>Holt v. Gamewell Corp.</u>, 797 F.2d 36, (1st Cir. 1986): "Holt compares himself to the three buyers who worked under him, all of whom were younger than he was, and whose salaries were below $30,000. He suggests that they were not subject to possible discharge because of their lower salary, and implies that they were doing the same work that he did, and that he occupied, more or less, the same position. The record reveals otherwise. Appellant was the purchasing manager. He was the only person who occupied this position. He trained and supervised the buyers and evaluated their performances. He and Hayes jointly determined their salaries. While it is true that Holt was capable of performing all the duties in his section, and that he in fact substituted for them when one of the buyers was absent, he nevertheless had a wide range of responsibilities not delegatable to his subordinates."

<u>See</u> also <u>Lewis v. City of Boston</u>, 321 F.3d 207, 215 (1st Cir. 2003): "Lewis points to no convincing evidence that shows how the positions held by the other directors may reasonably be considered the same as the position that Lewis held."

category, skills, salary band, exempt/nonexempt/manager status,

part-time/full-time status and geography.  Given that McGloin chose,

and Lefebvre approved, the retention of Guynn (38), Milos (54) and

Spilke (49), I find that IBM did retain younger persons in

Rossiter's same position, but I note that only one was under 40 and

outside the protected class.  <u>Currier</u>, 393 F.3d at 254.

b. <u>Statistical Evidence</u> - The First Circuit and the Supreme Judicial

Court have both acknowledged that "statistical evidence" may be

admissible in a disparate treatment case to support a prima facie

case and the inference that the particular employment decision was

discriminatory at the pretext stage.  <u>See</u> <u>e.g.</u> <u>Currier</u> and <u>Sullivan</u>.

Since the focus of a disparate treatment claim is on how an

"individual was treated compared to her similarly situated

coworkers[, only] ... statistical analyses that compare coworkers

who competed directly against each other to receive a benefit, here

selection for retention, are appropriate." <u>Sullivan</u>, 444 Mass. at

56, n. 36 (citing <u>Smith v. Xerox Corp.</u>, 196 F.3d 358, 370 (2d Cir.

1999)).[15]  Given that Rossiter's allegation of age discrimination is

_____

[15] The Supreme Judicial Court recently noted that: "The
first stage of the <u>McDonnell Douglas</u> paradigm, the prima facie
case, however, should not be the occasion for battling
statisticians. Especially when, as here, the sample sizes are
small, the inquiry at this threshold stage is whether a jury,
guided by their collective day-to-day experiences with
probability, could reasonably conclude from statistical and other
indirect evidence that discrimination was more likely than not
the reason for the plaintiff's layoff. The third stage is the
more appropriate stage for the employer to establish that the
plaintiff's statistical evidence is unreliable or not probative
of discrimination because the statistics do not account for
factors pertinent to the employer's selection process."

directed at both McGloin and Lefebvre, I find that the relevant lay-off statistics are for McGloin and Lefebvre's group.

Rossiter argues that the fact that the oldest four employees in the Microelectronics Division were laid-off is sufficient in and of itself to establish a prima facie case. As support for this unequivocal statement, he cites to Sullivan, 444 Mass. at 45 n. 14, which suggests consideration of

> . . . a hypothetical case where a hospital employed five nursing supervisors, four of whom are women. In implementing a reduction in force, the hospital retained the four female nurse supervisors, but discharged the only male supervisor. The fact that the hospital retained all women nursing supervisors and discharged the only man is sufficient, by itself, to raise a reasonable inference that the hospital selected the man for discharge because of his sex.

But this hypothetical situation is plainly distinguishable from the facts in this case. Lefebvre did not approve the lay-off of all employees over 40. In fact, only 9 out 21 employees over 40 were selected for the lay-off. Thus, the citation does not support Rossiter's expansive assertion.

Turning to the other statistics, Rossiter states that prior to the lay-off, the 46 employees in the Microelectronics Division ranged in age from 22 to 59. After the lay-off, the 30 remaining employees ranged in age from 24 to 54. Thus, this lay-off reduced the upper age limit of the employees in the Microelectronics Division by 5 years. Furthermore, prior to the lay-off, there were 38 employees aged 20 through 50 (82.6% of the 46 employees) and 8 employees over 50 (17.4% of the 46 employees). 10 employees aged 20

---

Sullivan, 444 Mass. at 46, n. 16.

through 50 were laid off (62.5% of the 14 employees laid-off) and 6 employees over 50 were laid off (37.5% of the 14 employees laid-off). This left 28 employees 50 or under and 2 employees over 50 (93.3% and 6.7% of the remaining 30 employees, respectively).[16]

While IBM is correct to point out the limitations of these selective statistics, I find that it is significant, at the prima facie stage, that 6 of the 14 people Lefebvre chose to lay-off were his oldest employees. This statistic, combined with the fact that McGloin chose to retain younger persons in Rossiter's same position, is enough to permit a reasonable jury to conclude that IBM's termination of Rossiter, if otherwise unexplained, is more likely than not to be based on the impermissible consideration of age. Sullivan, 444 Mass. at 50.

## 2. **Non-Discriminatory Reason**

Rossiter does not contest IBM's non-discriminatory reason for laying off Rossiter, along with over 1,2000 employees in the Microelectronics Division. His criticisms of the lay-off selection process are properly considered under the third step of the Mcdonnell Douglas framework.

## 3. **Pretext**

IBM's uncontested non-discriminatory reason for firing 14

---

[16] IBM reformulates the same underlying data to show that prior to the lay-off, there were 10 employees 50 and over (21.7% of the 46 employees) and 30 employees 40 and over (65.2%). These ratios changed to 4 employees 50 and over and 21 employees 40 and over after the lay-offs (13.3% and 70% of the remaining 30 employees, respectively). IBM also points out that the average age of the employees in Lefebvre's group only went from 42 to 41.6.

people in the Microelectronics Division means the presumption of age
discrimination disappears and the burden returns to Rossiter to
provide enough evidence such that a reasonable jury could find that
IBM's legitimate reasons were not its true reasons, but were a
pretext for age discrimination.  The burden on the plaintiff at this
stage in the Mcdonnell Douglas analysis is "heavy" because it
"merges with the ultimate burden of persuading the court that [he]
was the victim of intentional discrimination." Dow v. Donovan, 150
F.Supp.2d 249, 264 (D. Mass. 2001) (citing Santiago-Ramos, 217 F.3d
46, 53 (1st Cir. 2000)).

Rossiter argues the following to establish that IBM's proffered
reason is pretextual: (1) the lay-off procedures were flawed and
Rossiter's worksheet was rife with falsehoods; (2) the division's
state of mind evidences pretext; and (3) less-qualified employees
were retained. At this stage, I may also "consider the evidence
establishing the plaintiff's prima facie case and inferences
properly drawn therefrom on the issue of whether the defendant's
explanation is pretextual[.]" Reeves, 530 U.S. at 143 (internal
citations and quotations omitted).

a. The Lay-off Procedures - Rossiter makes the following three
criticisms of the lay-off procedures in an effort to show pretext:
(1) McGloin selected 3 non-critical skills; (2) McGloin and Lefebvre
distorted the comparator groups allowing them to shield certain
employees, such as Karen Smith; and (3) McGloin reversed and
subverted the directions by selecting groups with "surplus" without

completing worksheets for all the employees in her department first.
With respect to the content of McGloin's assessment, Rossiter
criticizes both the proficiency levels McGloin assigned to him and
some of the accompanying comments.

Before addressing each of these arguments, I must point out
that my "role is not to second-guess the business decisions of an
employer, nor to impose [my] subjective judgments of" a person's
skill set.  Petitti v. New England Tel & Tel Co., 909 F.2d 28, 31
(1st Cir. 1990).  "Courts may not sit as super personnel
departments, assessing the merits--or even the rationality--of
employers' nondiscriminatory business decisions." LeBlanc, 6 F.3d at
847 (citing Mesnick v. General Electric Co., 950 F.2d 616, 825 (1st
Cir. 1991)).

Rossiter's three criticisms of the lay-off procedures fail to
show any pretext.  IBM's Selection Guidelines did not mandate what
skills must be considered.  Rather, IBM chose to delegate the
responsibility of selecting critical skills to the appropriate
decision-maker.  In this case, Lefebvre asked McGloin to assess her
group and she chose six skills from an older document unrelated to
the MERA lay-off. McGloin testified that she "believed [these
skills] reflect the set of skills that would be required for the
individuals who would be in the organization going forward,
recognizing that the group might be reduced."  While Rossiter urges
that this statement lacks credibility, there is nothing in the
record to suggest that her selection of skills evinces pretext.  The

fact that program development, use of cross-functional teams and basic financial concepts were not flagged as "critical marketing skills" in the May 2001 Skills List does not demonstrate otherwise because this document was not created for the layoffs. While the nomenclature of "applied knowledge" and "indepth knowledge" might be "esoteric and vague" and "leaves lots of room for interpretation", Rossiter himself testified that there is nothing about the skills selected that he thought was "improper or evidence of age bias."

In Section I.C _supra_, I rejected Rossiter's criticism of McGloin's interpretation of the appropriate comparator groups. McGloin's explanation that she avoided considering skill groups where there was only one employee is a satisfactory reason for why she did not assess Karen Smith, the lone Band 10 employee in her group, for potential lay-off. Likewise, I find the argument that McGloin reversed and subverted the directions by selecting groups with "surplus" without first completing worksheets for all the employees in her department unpersuasive.[17] The Selection Guidelines themselves are ambiguous as to the proper order to be followed. However, common sense suggests that McGloin's identification of her largest skill groups (Band 9 had 5 employees and Band 8 had 3 employees) as groups with potential surplus, far from being indicative of pretext, was a rational, non-discriminatory approach

_____

[17] Rossiter provides no support for his speculation that "[i]n her rush to be rid of the oldest employees in her group, McGloin reversed and subverted the directions. She first identified what she considered to be 'surplus;' that is band 9, with three 50 plus-year-olds, and then she completed worksheets for those employees."

to the difficult task of laying-off employees.

McGloin's evaluation of Rossiter contained the following assessments:

- Knowledge of business plans: Applied knowledge as demonstrated by developing NT naming architecture based on business need, with assistance from team.
- Knowledge of program development: Applied knowledge. Needs development in creating simple, effective approaches.
- Knowledge of IMC measurement techniques: Applied knowledge.  Has designed surveys and managed research agencies, but research did not meet validity criteria.
- Knowledge of use of cross-functional teams: In-depth knowledge.  Works cross-organization and cross-geography.
- Knowledge of agency operations: Applied knowledge.  Has experience working with agencies; requires guidance in limiting costs.
- Knowledge of basic financial concepts: Applied knowledge. Manages budgets and can explain ROI concepts, needs coaching to stay within budgetary guidelines.

Before evaluating this assessment, I must make two observations. First, the employee's own "personal opinion regarding his own job qualifications is not sufficiently probative on the issue of pretext." Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 15 (1st Cir. 1998)(citing Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) for the proposition that "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance.") On the other hand, "[a]n employer's asserted strong reliance on subjective feelings about candidates may mask discrimination." Koster, 181 F.3d at 32.[18]

---

[18] In Currier, the Court found that the five Matrix categories used to evaluate the employees ("achieves results," "criticality of skills," "qualifications," "business orientation," and "interpersonal skills") were "entirely

Rossiter initially takes issue with McGloin's assessment that he only had "applied knowledge" with respect to five out of the six skills. Rossiter argues that he should have been assessed as "in-depth knowledge" for all of the criteria. <u>See</u> note 6 <u>supra</u>. The email chain submitted as evidence, Rossiter's 1999 and 2000 annual performance reviews, and McGloin's expressed belief that Rossiter's overall performance was better in the 2001 calendar year than in the year 2000, are overall very positive and all compel careful attention. However, the annual performance evaluations used a different scale (1-4) than the lay-off selection worksheet (1-6; no skill to comprehensive knowledge). Rossiter has not provided any evidence regarding the appropriate correlation between the two scales to show that his lay-off score were inaccurately low.[19]

---

subjective." <u>Currier</u>, 393 F.3d at 255. The same could be said here.

[19] <u>Cf.</u> <u>Thomas</u>, 183 F.3d at 46, where the Court found that "[the Plaintiff's] most significant and concrete allegation is that [the manager] gave her inaccurately low scores on her annual performance appraisals. For example, after receiving only 5s and 6s in 1988 and 1989, [the plaintiff] received a 2, four 3s, and a 4 from [the manager] in 1990, for an overall score of 3. This was a below-average rating, appropriate for employees who had "a need for further improvement to achieve a middle rating [of 4]" or for employees "whose overall performance has slipped from a higher level." [The Plaintiff's] performance appraisal scores in 1991 and 1992, while higher than her 1990 scores, were also inappropriately low, in [the Plaintiff]'s estimation--especially when compared to the higher scores that [the manager] gave to other [employees]."

<u>See also</u> <u>Currier</u>, 393 F.3d at 255, where the Court found that, "[o]n the evidence offered, the jury reasonably could have concluded that Mayes gave an inadequate explanation for Currier's decline from the excellent evaluations he was given just a few

-31-

In addition to this problem, IBM focuses on Rossiter's inability to provide evidence that his performance was superior to that of Guynn, Milos, Spilke and Weaver.  In fact, Rossiter acknowledged that the performance of Guynn, Spilke and Weaver was comparable to his own.[20] When asked who should have been laid-off out of the Band 9 non-managers, assuming that McGloin had to eliminate someone from that group, Rossiter did not answer the question asserting he did not think it was relevant.

IBM argues that Rossiter was not let go because of poor performance, but because he scored the lowest in an assessment of his skills relative to the other four employees in his Skill Group. While the Selection Guidelines do not instruct managers to assign a relative proficiency score, common sense dictates that a person in Rohrer or McGloin's position would in fact be rating each employee against the other when assigning proficiency scores within a Skill Group.  Thus, Rossiter's failure to provide any evidence that he deserved a better assessment than "applied knowledge" for five of the six skills in the context of a relative evaluation is a significant weakness in his case.[21]

---

years earlier."

[20] Rossiter could not compare his performance to that of Milos.

[21] I also question Rossiter's argument that the lay-off assessment is contrary to McGloin's prior recognition of his leadership abilities.  Leadership is a skill in and of itself. In fact, IBM characterizes leadership as a "soft" skill. Assigning Rossiter the proficiency level "applied knowledge" does

Rossiter also takes issue with two of McGloin's comments on his Selection Worksheet: (1) "needs coaching to stay within guidelines" and (2) "designed surveys and managed research agencies but research did not meet validity criteria".  McGloin testified that when she did the selection evaluations she was evaluating the abilities of each employee at the time of the lay-off, but that the assessment was based on the experience she had with the individual, including her knowledge of the employee's recent and previous work, and a review of the employee's past performance evaluations.

With respect to the first statement, "needs coaching to stay within guidelines", Rossiter argues that it is "patently false."  He contends that "[w]ith the exception of an instance in 1998 when Rossiter's proposed budget for a series of promotional seminars was deemed excessive, Rossiter never received any criticism about his ability to limit costs and stay within the budget." Although Rossiter himself admits that he did receive criticism about his ability to stay within guidelines, it may be strained for McGloin to bring up a 1998 incident in November 2001.  However, there is nothing in the Selection Guidelines precluding her from considering that incident.  Discrimination statutes do "not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate

---

not mean that he lacks leadership skills generally, rather it means that he can only perform the particular skill with assistance.

that discriminatory animus was the reason for the decision." <u>Smith
v. Stratus Computer, Inc.</u>, 40 F.3d 11, 16 (1st Cir. 1994).

With respect to the second statement, "designed surveys and
managed research agencies but research did not meet validity
criteria", Rossiter argues that he oversaw numerous surveys and that
he never received any feedback or indication that there was a
validity problem.  In response to a request to explain her comment
"did not meet validity criteria", McGloin testified that "Dennis
managed research for the division, and when it was finalized and
presented to IBM's market intelligence organization, they identified
that the samples were small and therefore not statistically valid."
While neither Rossiter nor McGloin provide additional support for
their positions, McGloin's view appears well within the range of
judgment calls a manager can make without judicial second guessing.

<u>b. State of Mind</u> - Rossiter offered evidence of allegedly ageist
comments by Monahan and Black, unfair treatment by Monahan, the fact
of his demotion and the hiring of younger, less-qualified employees
as evidence of a discriminatory atmosphere within the
Microelectronics Division at IBM.  Rossiter cites these facts
because "circumstantial evidence of a discriminatory atmosphere at a
plaintiff's place of employment is relevant to the question of
motive in considering a discrimination claim. While evidence of a
discriminatory atmosphere may not be conclusive proof of
discrimination against an individual plaintiff, such evidence does
tend to add "color" to the employer's decision making processes and

-34-

to the influences behind the actions taken with respect to the individual plaintiff."  Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987).  The concept of discriminatory atmosphere is differential, however, because evidence that is too remote from the adverse action under review is not considered relevant.  In this connection, I find that any alleged mistreatment by Monahan or Black is not relevant here.  Unlike the situation in Conway, neither Monahan nor Black was involved in Rossiter's termination in any way.

Rossiter points to no other persuasive direct or circumstantial evidence of a discriminatory animus held by any of the relevant players at IBM.  Rossiter concedes that Lefebvre did not exhibit any obvious age bias or make any ageist comments, other than Lefebvre's comment regarding Sam and Dave, which I find to be ambiguous and vagrant at worst.  Similarly, he concedes that McGloin did not exhibit any age bias.  Rather, he speculates she has an underlying prejudice against older workers.  Rossiter claims that he experienced a great deal of resistance to his ideas from McGloin and that she rebuffed his requests for new opportunities and projects, but there is nothing to substantiate this characterization. Rossiter also puts much emphasis upon McGloin's alleged preferential treatment of Karen Smith, but the evidence indicates at most a difference of perception about the quality of her performance with the evidence heavily weighted against Rossiter's speculative perception.

As for the hiring of younger, less-qualified employees, I find

that IBM has sufficiently explained its decisions in each case.  In fact, three of the positions (PowerPC Marketing Communications Manager, Technology Group Interactive Marketing Manager Position, and Microelectronics Server Group Marketing Services Manager Position) were posted internally and Rossiter did not apply for them.

Finally, I find that while the statistics showing the disproportionate impact the RIF had on older employees in Lefebvre's group helped Rossiter establish his prima facie case, "it has limited probative value at this stage.  The evidence fails to rebut [IBM]'s proffered reason[] for laying off [Rossiter] and does not, by itself, create [a] reasonable inference[] of discriminatory animus and causation. [Rossiter]'s evidence similarly fails to eliminate other explanations for the disproportionate statistics, such as random chance (given the small discrepancies and small sample size involved here) or the actual distribution of aptitudes or expertise among [employees] of differing ages ... both before and after the reduction in force." Sullivan, 444 Mass. at 55-56 citing to the following cases for the following propositions: Rummery v. Illinois Bell Tel. Co., 250 F.3d 553, 559 (7th Cir.2001) (statistics that do not account for employer's legitimate nondiscriminatory explanations do not establish pretext); Coleman v. Quaker Oats Co., 232 F.3d 1271, 1283 (9th Cir.2000), cert. denied sub nom. Gentile v. Quaker Oats Co., 533 U.S. 950, 121 S.Ct. 2592, 150 L.Ed.2d 751 (2001) (statistics that do not account for factors pertinent to

selection of plaintiff for discharge do not alone establish pretext); Smith v. Xerox Corp., 196 F.3d 358, 371 (2d Cir.1999) (statistics that do not account for other possible causes of disparity do not establish pretext); Fallis v. Kerr-McGee Corp., 944 F.2d 743, 747 (10th Cir.1991) (statistics must eliminate nondiscriminatory reasons for disparity).

## c. Retention of Less-Qualified Employees

Rossiter's argument that the retention of McNerney and Chang, two younger, allegedly less-qualified employees, evidences pretext fails because under the Selection Guidelines McGloin was not supposed to evaluate Rossiter relative to Chang or McNerney, who, in any event, did not, as I have observed, supra at 22, replace him but rather took over his responsibilities in addition to their own.

## 4. Summary

In sum, there is no evidence that Rossiter was given an inaccurately low score either compared to his previous performance evaluations or compared to the other Band 9 IMC specialists.  In fact, Rossiter himself suggests that at least three of those others were comparable in their performance to him.  The only evidence that arguably might permit a reasonable jury to infer that IBM's reason for laying-off Rossiter was pretext is McGloin's vaguely explained comment that Rossiter "designed surveys and managed research agencies but research did not meet validity criteria."  However, I find that even this comment, considered with the statistics discussed in the prima facie analysis, Section II.B.1.b supra, is

insufficient to raise a genuine issue of fact regarding Rossiter's allegation of age discrimination under either the state or federal standard for the third part of the <u>McDonnell Douglas</u> framework.

### III. CONCLUSION

For the reasons set forth more fully above, IBM's motion for summary judgment is hereby GRANTED.


/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE